NONCONFIDENTIAL

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

MEDYTOX INC.,
*Appellant*,

*v.*

INTERNATIONAL TRADE COMMISSION,
*Appellee*

CROMA PHARMA GMBH, HUGEL, INC., HUGEL AMERICA, INC.,
*Intervenors*

Appeal from the United States International Trade Commission
in Investigation No. 337-TA-1313

## PRINCIPAL BRIEF OF MEDYTOX INC.

Keith R. Hummel
Sharonmoyee Goswami
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

June 23, 2025

*Attorneys for Complainant-Appellant Medytox Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number**          2025-1262

**Short Case Caption**   Medytox Inc. v. International Trade Commission et al.

**Filing Party/Entity**  Medytox Inc.

I certify the following information is accurate and complete to the best of my knowledge.

Date: 06/23/2025              Signature:  */s/ Keith R. Hummel*

                             Name:    Keith R. Hummel

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
| Medytox Inc. | N/A | Medytox Inc. has no parent corporation. No publicly held entity owns more than 10% of Medytox Inc.'s stock. |

i

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

| Quinn Emanuel Urquhart & Sullivan, LLP | S. Alex Lasher | James E. Baker |
|---|---|---|
| Nina Tallon | David Bilsker | John Rhie |
| Margaret Shyr | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see    ☑ No    ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

✓    None/Not Applicable

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF CONTENTS...................................................................... iii

TABLE OF AUTHORITIES .................................................................v

STATEMENT OF RELATED CASES ................................................ vii

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUES............................................................2

STATEMENT OF THE CASE................................................................4

I. Procedural History ..................................................................4

II. Parties.......................................................................................5

III. Factual Background .................................................................6

    A. *C. botulinum* ..................................................................6

    B. Hugel's *C. botulinum* Strain........................................7

        1. Hugel's can of beans story is not credible .................7

            a. Moon had never worked with *C. botulinum*....................7

            b. No evidence corroborates Moon's claim that he searched food items for *C. botulinum*................................................8

            c. Hugel has shifted the date it isolated its strain ................9

            d. Moon never published his discovery or reported it to the authorities ................................................................10

        2. DNA evidence shows that Hugel's strain could not have arisen spontaneously in a can of beans.................................11

            a. Phylogenetic analysis of *C. botulinum* ............................11

            b. Medytox's and Hugel's strains have the same recent common ancestor ................................................................16

            c. Hugel's strain could not have occurred naturally..........21

        3. Hugel's strain did not come from a laboratory leak .................22

            a. No laboratory leaks of a ▓clade name▓ strain ...............23

            b. ▓clade name▓ strains are unlikely to survive in nature ..24

            c. ▓clade name▓ strains are unlikely to survive canning....24

d.    Moon was unlikely to have found three contaminated food items in 2,000 samples ...........................................25

4.    Hugel disclaimed all possible sources of its strain other than a can of beans................................................................25

C.    Medytox's *C. botulinum* Strains..........................................27

SUMMARY OF THE ARGUMENT .......................................................30

ARGUMENT ......................................................................................33

I.    Legal Standards ........................................................................33

II.   The Commission Erred by Refusing to Address the Veracity of Hugel's Can of Beans Story...............................................................................35

A.    The Commission Should Have Considered the Substantial Evidence That Hugel's Can of Beans Story Was False ......................................35

B.    Consideration of the Evidence of the Falsity of Hugel's Can of Beans Story Would Not Shift the Burden of Proof to Hugel.........................41

C.    The Commission's Crediting of Possible Sources for Hugel's Strain, Other Than a Can of Beans, Was Error................................................45

D.    Medytox Did Not Waive the Ability To Advance Legal Theories Based on Hugel's False Exculpatory Story.........................................46

III.  The Commission Erred in Finding that Medytox Did Not Possess a Mixed Lineage Culture ...........................................................................50

A.    The ALJ Erred in Ignoring Evidence That Hugel Did Not Obtain Its Strain from Any Source Other Than Medytox....................................50

B.    The Commission's Factual Findings Underlying Its Conclusion That Medytox Did Not Possess a Mixed Lineage Culture Are Not Supported by Substantial Evidence.....................................................53

1.    The ALJ improperly credited Respondents' speculation that Yang did not possess a mixed colony culture...........................54

2.    The ALJ erred by assuming, without evidence, that the sample Medytox claims Hugel converted would have been subjected to cell bank prep. method .............................................................58

IV.   The Commission Erred by Forcing Medytox To Rely on a Single Theory of Conversion ....................................................................................61

CONCLUSION ....................................................................................64

CONFIDENTIAL MATERIAL OMITTED

The material omitted on pages iv, 28, 54, 55, 56, 57, 58 and 59 describes the method through which certain Medytox cell banks were created. The material omitted on page 30 describes the method through which certain other Medytox cell banks were created. The material omitted on pages 11, 18, 19, 21, 23, 37, 53 and 54 describes the number of SNPs shared by certain *C. botulinum* strains. The material omitted on pages 22, 23, 26, 53, 54 and 60 describes the number of additional SNPs shared by certain *C. botulinum* strains. The material omitted on pages iii, 11, 18, 19, 20, 21, 22, 23, 24, 25, 26, 37, 38, 53 and 54 identifies the clade to which Hugel's strain belongs. The material omitted in footnote 4 on page 16 describes the reason why two of the six Hugel samples were unsuitable to be used for the phylogenetic analysis. The figures redacted on pages 17, 18 and 20 show the phylogenetic tree showing the relationships between certain *C. botulinum* strains.

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Adams v. Wells Fargo Bank, N.A.*
   No. 5:17CV73-RWS-CMC, 2018 WL 3301676
   (E.D. Tex. Feb. 5, 2018) ................................................... 42, 43

*Al-Adahi v. Obama,*
   613 F.3d 1102 (D.C. Cir. 2010) ........................................... 38, 39, 44, 52

*Albers v. Mellegard, Inc.,*
   No. CR 06-4242-KES, 2008 WL 7122683 (D.S.D. Oct. 27, 2008) ........ 61

*Amarin Pharma, Inc. v. Int'l Trade Comm'n,*
   923 F.3d 959 (Fed. Cir. 2019) ................................................... 1

*Astellas Pharma, Inc. v. Sandoz Inc.,*
   117 F.4th 1371 (Fed. Cir. 2024) ....................................... 45, 46

*Blackboard, Inc. v. Desire2Learn, Inc.,*
   574 F.3d 1371 (Fed. Cir. 2009) ............................................... 49

*Chamberlain Grp., Inc. v. Int'l Trade Comm'n,*
   No. 2020-1965, 2023 WL 3115579 (Fed. Cir. Apr. 27, 2023).... 34, 48, 49

*DBN Holding, Inc. v. Int'l Trade Comm'n,*
   755 F. App'x 993 (Fed. Cir. 2018) ................................... 34, 57

*Gerritsen v. Shirai,*
   979 F.2d 1524 (Fed. Cir. 1992) ....................................... 34, 45

*Harris Corp. v. Ericsson Inc.,*
   417 F.3d 1241 (Fed. Cir. 2005) ............................................... 50

*HIF Bio, Inc. v. Yung Shin Pharms. Indus. Co.,*
   600 F.3d 1347 (Fed. Cir. 2010) ............................................... 34

*In re BP Am. Inc.,*
   2016 WL 3745868 (FERC 2016) ................................... 38, 39, 44

*Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.,*
   285 F.3d 1353 (Fed. Cir. 2002) ....................................... 62, 64

*Masimo Corp. v. True Wearables, Inc.*,
   No. 18-02001, 2022 WL 17083396 (C.D. Cal. Nov. 7, 2022) ............... 62

*Medtronic, Inc. v. Teleflex Innovations S.À.R.L.*,
   68 F.4th 1298 (Fed. Cir. 2023) ................................................................ 49

*Optional Capital, Inc. v. Kim*,
   414 F. App'x 12 (9th Cir. 2011) ....................................................... 61, 62

*Overdrive, Inc. v. Baker & Taylor, Inc.*,
   No. CIV.A. 5835-CC, 2011 WL 2448209 (Del. Ch. June 17, 2011) ...... 62

*Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*,
   35 F.3d 1226 (8th Cir. 1994) ................................................................... 47

*PPC Broadband, Inc. v. Iancu*,
   739 F. App'x 615 (Fed. Cir. 2018) ....................................... 34, 35, 41, 53

*TechnoMarine SA v. Jacob Time, Inc.*
   905 F. Supp. 2d 482 (S.D.N.Y. 2012) ..................................................... 42

*Techtronic Indus. Co. v. Int'l Trade Comm'n*,
   944 F.3d 901 (Fed. Cir. 2019) ........................................................... 33, 34

*Teva Pharms. USA, Inc. v. Sandhu*,
   291 F. Supp. 3d 659 (E.D. Pa. 2018) ...................................................... 62

*United States v. Philatelic Leasing, Ltd.*,
   601 F. Supp. 1554 (S.D.N.Y. 1985),
   *aff'd*, 794 F.2d 781 (2d Cir. 1986) ................................................... passim

## Statutes & Rules

19 U.S.C. § 1337 ............................................................................................ 4

28 U.S.C. § 1295(a)(6) ................................................................................... 1

## <u>STATEMENT OF RELATED CASES</u>

No other appeal in or from the same proceeding in the International

Trade Commission was previously before this Court or any other appellate court.

Counsel is unaware of any case before this Court or any other court that will

directly affect or be directly affected by this Court's decision in the current appeal.

## JURISDICTIONAL STATEMENT

This is an appeal from a Commission Opinion ("CO") of the United States International Trade Commission ("ITC") issued on October 10, 2024, in Investigation No. 337-TA-1313. The CO is a final determination that this Court has jurisdiction to review under 28 U.S.C. § 1295(a)(6). *E.g.*, *Amarin Pharma, Inc. v. Int'l Trade Comm'n*, 923 F.3d 959, 962-64 (Fed. Cir. 2019).

## STATEMENT OF THE ISSUES

Issue 1.  In evaluating whether Medytox proved by a preponderance of the evidence that Hugel converted a strain of *Clostridium botulinum* bacteria from Medytox, the Commission refused to consider overwhelming evidence demonstrating the falsity of Hugel's story that it obtained its strain from a can of beans.  The Commission refused to consider this evidence because it concluded that (i) the falsity of Hugel's can of beans story was irrelevant to Medytox's conversion claim, because it viewed the story as an exculpatory defense rather than part of Medytox's proof; (ii) Medytox improperly attempted to shift the burden of proof to Hugel to show that it had not converted Medytox's strain even though Medytox never suggested that the burden be shifted to Hugel; and (iii) Medytox waived any argument that the falsity of Hugel's story was affirmative evidence of conversion even though Medytox had raised the issue throughout the investigation. Did the Commission abuse its discretion by ignoring evidence concerning the veracity of Hugel's can of beans story when deciding whether Medytox proved conversion?  (Argument II.A, II.B and II.D.)

Issue 2.  Despite ignoring the facts demonstrating the falsity of Hugel's can of beans story, the Commission determined that there were other possible sources from which Hugel could have obtained its *C. botulinum* strain even though Hugel had denied obtaining the strain from any source other than a

2

can of beans.  Did the Commission abuse its discretion by basing its decision that Hugel had not converted a *C. botulinum* strain from Medytox on speculation about possible alternative sources that Hugel disclaimed?  (Argument II.C.)

Issue 3.  The evidence showed that it is more likely than not that Medytox possessed an ancestor to Hugel's strain of *C. botulinum* that Hugel could have converted.  Did the Commission abuse its discretion by refusing to consider that the demonstrable falsity of Hugel's can of beans story—which left only the possibility that Hugel obtained is strain from Medytox—meant that Medytox necessarily possessed an ancestor to Hugel's strain?  (Argument III.A.)  Further, did the Commission err by basing its decision that Medytox did not possess an ancestor to Hugel's strain on erroneous factual findings?  (Argument III.B.)

Issue 4.  The Commission required Medytox to prove through direct evidence that Hugel converted its strain and limited Medytox to one theory of conversion.  Did the Commission commit legal error by limiting Medytox to one theory of liability even though the circumstantial evidence proved that Hugel had obtained it strain of *C. botulinum* by conversion from Medytox?  (Argument IV.)

3

## STATEMENT OF THE CASE

### I.     Procedural History

On March 30, 2022, Medytox filed a complaint with the ITC against

Hugel, Inc. and Hugel America, Inc. (collectively "Hugel")[1] for violations of

Section 337 of the Tariff Act (19 U.S.C. § 1337).  Medytox alleged that Hugel

committed conversion and misappropriation of trade secrets by stealing a strain of

*C. botulinum* from Medytox and using that strain to produce botulinum toxin

products for import into the United States.  Appx141.

On January 18, 2024, Medytox moved to terminate the investigation

of its trade secret misappropriation claims, which ALJ Bryan F. Moore granted on

January 22, 2024.  Appx288, Appx702-03.  A four-day evidentiary hearing was

held on Medytox's conversion claim in February 2024.

On June 10, 2024, the ALJ issued a final initial determination ("ID"),

in which he found that Medytox had not met its burden to show by a

preponderance of the evidence that Hugel violated Section 337.  Appx23.  The ALJ

found that (1) it was irrelevant whether Hugel's can of beans story was false

(Appx51); (2) Medytox's framing of the issue as a choice between whether Hugel

---

[1] Croma Pharma GmbH was a Respondent below.  During the investigation, Croma represented that it will not be involved in distribution of the accused product Letybo® in the United States.  Appx974, 508:11-17; Appx2670:6-71:22; Appx10; Appx79.  Nevertheless, Croma intervened in this proceeding.

found its strain in a can of beans or converted it from Medytox improperly sought to shift the burden of proof to Hugel (Appx21-22); (3) Hugel's strain could have come from a source other than Medytox or a can of beans (Appx46-48); (4) Medytox waived its argument that Hugel's false assertions about where it obtained its strain should be considered as affirmative evidence of conversion (Appx40 n.16); (5) Medytox failed to prove by a preponderance of the evidence that it possessed a mixed lineage culture at the time of the conversion (Appx31); and (6) Medytox had limited its conversion theory to one set of events and had waived any other possibility (Appx38 n.15).

On October 10, 2024, the Commission affirmed the ID, adopting all of the ALJ's findings except for one word. Appx101. Medytox timely appealed. (Dkt. 1-1 (12/9/2024).)

## II.    Parties

Medytox is a biopharmaceutical company based in Korea. Medytox was founded in 2000 by Dr. Hyun Ho Jung. Appx2758, Q/A 2. Medytox launched its first botulinum toxin product in Korea in 2006. Appx2760, Q/A 10. Medytox's botulinum toxin products are approved to treat more than twenty indications, including facial wrinkles and migraines, in over thirty countries. Appx2761, Q/A 14. Medytox has been seeking approval from the FDA to market a botulinum toxin product in the United States. Appx2762, Q/A 18.

5

Hugel is a biopharmaceutical company that is also based in Korea. Appx2970, Q/A 3. Dr. Kyeong Yeop Moon founded Hugel in November 2001. Appx2970, Q/A 4; Appx2971, Q/A 16. Hugel manufactures and sells botulinum toxin products. Appx2970, Q/A 3. On February 29, 2024, the FDA approved Hugel's Letybo® for the treatment of frown lines in the United States. Appx3108.

## III. Factual Background

### A.  *C. botulinum*

*C. botulinum* is a bacterium that produces botulinum toxin—the world's deadliest known toxin—and causes botulism. Appx2899, Q/A 52; Appx918, 382:10-13; Appx1053, 730:10-12; Appx1057, 744:9-18. There are many *C. botulinum* strains, each of which produces a different serotype (variant) of toxin. Appx2817-18, Q/A 83; Appx2899, Q/A 56. There are seven known serotypes, *e.g.*, A-G. Appx2899, Q/A 57. Despite its potent toxicity, botulinum toxin has well-known cosmetic and pharmaceutical uses. Appx2899, Q/A 54.

The most commercially valuable *C. botulinum* bacteria are the "Hall A-Hyper" strains, because they produce the most toxin. Appx2900-02, Q/As 59, 63-68, 71. The Hall A-Hyper strain was developed by researchers in the 1940s by screening *C. botulinum* colonies for high toxin production, and later sent to the U.S. Army. Appx3066-67. Mid-century, Dr. Hiroshi Sugiyama obtained the Hall

6

A-Hyper strain from the Army and brought it to the University of Wisconsin Food Research Institute.  Appx1627:15-28:6; Appx872, 200:24-201:17.

### B.    Hugel's *C. botulinum* Strain

Hugel claims that its founder, Moon, discovered its strain of *C. botulinum* in a can of beans, and used it to create cell banks for Hugel. Appx2258-59; Appx1566-68.[2]  Hugel claims that Moon collected as many as 2,000 food items in 2001; cultivated them at 37°C (98.6°F) for one month; opened the packages and sniffed the food; performed testing on some of these items in 2001 and 2002; found three samples that contained *C. botulinum* DNA; and isolated Hugel's strain from one of those samples.  Appx2258-59; Appx1566-68.

### 1.    Hugel's can of beans story is not credible

The facts demonstrate that Hugel's story that it obtained its strain from a can of beans is false.

### a.    Moon had never worked with *C. botulinum*

Moon returned to Korea around 1999 or 2000 after completing his post-doctoral research in protein purification in the U.S.  Appx1855:12-19; Appx1858:22-59:2; Appx1865:23-66:5.  Around 2000 or 2001, Moon used Dr. Yeon Soo Seo's laboratory at the Samsung Biomedical Research Institute

---

[2] A "cell bank" is a frozen stock of bacteria preserved for use in the production of toxin products or for research purposes.  Appx2993, Q/A 24.

("SBRI") to work with botulinum toxin.  Appx1860:10-17; Appx1862:6-63:23.

Moon's expertise was in protein purification.  Appx1865:23-66:5.  He had no prior

experience with botulinum toxin.  Appx978-79, 525:21-526:3.  Hugel never

contended that Moon received any guidance or assistance in obtaining or isolating

Hugel's strain.  Appx2258-59; Appx1310-11; *see also* Appx1869:2-8.

Given *C. botulinum*'s severe toxicity, opening and sniffing 2,000 food

samples to determine if any contain *C. botulinum* would have posed a significant

safety risk.  Appx917, 380:19-25 ("[Y]ou'd have to open the cans, and the opening

process itself could cause a lot of problems.  It could cause spillages and things.

And then start sniffing open cans, no, I don't think so."); Appx2912.  It would have

been dangerous for Moon to perform such testing if he ***had*** experience with toxin

(Appx917, 380:14-25); the danger was more significant without training.

### b.    No evidence corroborates Moon's claim that he searched food items for *C. botulinum*

Even if Moon had possessed the necessary experience with *C.

botulinum* to discover and isolate Hugel's strain, there is no evidence corroborating

Hugel's story and significant evidence to the contrary.

Hugel never provided any contemporaneous documentary evidence of

any part of its can of beans story.  There are no receipts for purchase of the 2,000

food items, no lab notes or other records of any process Moon used to handle the

items and record the results, no records of DNA sequencing, and no records of the

8

alleged isolation of the *C. botulinum* strain from a can of beans.  These are

important records that Hugel would have kept, if they existed.

Hugel never identified where Moon performed the alleged

identification, analysis and isolation of the *C. botulinum* strain (*see* Appx917,

380:6-13), which—given the number of food items Hugel claims to have tested—

would have required a year to perform.  *See* Appx2258-59; Appx921, 394:11-

395:10.  Moon did not have the financial resources to establish a lab to test and

isolate *C. botulinum*.  Appx1986:23-87:7.  Nor could he have performed this work

in Seo's lab:  Seo testified that he never saw Moon bring cans of food into the

laboratory and testified that he would not have allowed it.  Appx1924:13-25:8.

Moreover, a fellow SBRI researcher, Dr. Junho Lee, testified that he

encountered Moon in Seo's laboratory in fall 2001.  Appx2716, Q/As 16-26.

When Lee asked Moon about the origin of his *C. botulinum* strain, Moon

responded that "there are ways of getting it" and never claimed that it came from a

can of beans.  Appx2717, Q/As 27-28; Appx840, 144:19-22.

### c.    Hugel has shifted the date it isolated its strain

Casting further doubt on Hugel's account, its timeline has shifted.

Hugel told the FDA that it had isolated the strain in 2001.  Appx3145 ("From its

original isolation in 2001, the *Clostridium botulinum* type A cells . . . .").  But in

this investigation, Hugel represented that Moon did not complete his testing of the

2,000 food items, which necessarily preceded isolation, until 2002. Appx2258 ("Moon cultured and tested the collected goods in batches during 2001 and 2002.").

> ### d. Moon never published his discovery or reported it to the authorities

Discovery of *C. botulinum* in food in Korea would have been notable, and given Moon's work at academic institutions, if he had really discovered a strain in a can of beans, he would have published that discovery. Appx997, 601:1-17 (Hugel's expert agreeing such a finding would be worthy of publication). But Moon never published his alleged discovery. Appx2771, Q/A 58.

Both sides' experts agreed that any responsible scientist who found *C. botulinum* in a can of food intended for human consumption would have reported it the health authorities, to ensure that no one was hurt or killed by such contamination in another batch. Appx1057, 744:9-746:4; Appx1086, 861:22-862:4; Appx922, 400:5-10; Appx2912, Q/A 146; Appx2839, Q/A 154; Appx2773, Q/A 67. Indeed, by 2002, botulism was a National Notifiable Disease under the Korean Infectious Disease Control and Prevention Act, requiring immediate notification. Appx2912, Q/A 147. But there is no record of Moon reporting his finding to authorities. Appx1057, 746:13-747:1; Appx922, 401:3-19; Appx2912-2913, Q/As 147-150. If Hugel ***had*** found the strain in a can of beans, this failure to report could have been unlawful under Korean law. Appx2912, Q/A 147.

10

## 2.    DNA evidence shows that Hugel's strain could not have arisen spontaneously in a can of beans

During this investigation, Medytox's expert, Dr. Pickett, collected samples from six Hugel cell banks.  Appx2905-06, Q/A 105; Appx1768-69, Q/A 20.  Tests of these samples revealed that Hugel's *C. botulinum* strain is a ▇ ▇clade name▇ strain that came from a laboratory:  Hugel's strain contains ▇#▇ genetic mutations that are present only in ▇clade name▇ strains, which were isolated and developed in laboratories.  Appx2818, Q/A 85; Appx2821, Q/A 95.

### a.    Phylogenetic analysis of *C. botulinum*

As with humans, *C. botulinum*'s cells have DNA that is organized into the familiar double-helix arrangement.  Nucleotides (colored below)—make up a strand of DNA.  Appx2795, Q/A 19.



Appx2796.

A gene is a set of nucleotides that provides instructions for cells to create proteins or perform other functions.  Appx2795, Q/A 19.  The entire set of nucleotides for an organism is its "genome."  Appx2795, Q/A 19.  *C. botulinum*'s genome has about 3.7 million nucleotides.  Appx2799.  A laboratory technique called genome sequencing can identify the order of the nucleotides in the DNA of a particular *C. botulinum* genome.  Appx2793, Q/A 13; Appx2795, Q/A19.

Generally speaking, DNA is susceptible to mutation.  Appx2793, Q/A 13; Appx2796, Q/A 21; Appx2824-25, Q/A 107.  Due to mutations in its genome, over time, a *C. botulinum* strain may evolve to have a different genetic sequence from another strain with a common ancestor.  Appx2797, Q/A 22; Appx2813, Q/A 71.  As shown below, one type of mutation is a "single nucleotide polymorphism" ("SNP"), which occurs when there is a mutation in a single nucleotide position, such as an A mutating into C.  Appx2796, Q/A 21.



Appx2797.

       Organisms, including bacteria, have systems that can repair mutations. Appx2824, Q/A 105.  A standard bacterial culture contains hundreds of millions to billions of individual bacterial cells.  Appx2832-33, Q/A 136; Appx886, 254:23-255:6.  While mutation rates may be very small on a per-nucleotide basis, because of the substantial length of a bacterial genome (in the millions) and the immense numbers of reproducing bacteria (hundreds of millions to billions), some mutations that inevitably occur in a culture will not be repaired.  Appx2832-33, Q/A 136; Appx886, 254:13-255:6.  Thus, in a large bacterial culture, spontaneous mutations will occur and persist as those bacteria divide, creating bacterial lineages within the culture that have SNPs that are not shared by other bacterial lineages in the same culture.  Appx2832-33, Q/A 136; Appx885-86, 253:17-254:12.  Every

13

bacterial culture, given enough time, will be a so-called "mixed lineage" culture,[3] because it will contain different lineages having unique SNPs. Appx1056-57, 743:24-744:8 ("bacterial colonies exist as mixed populations all the time"); *see also* Appx1056, 741:24-742:20; Appx2832-33, Q/A 136.

SNP analysis is a key part of "DNA fingerprinting." Appx2797, Q/A 22. DNA fingerprinting is a technology used to identify the relationship between and source of toxic organisms and infectious agents. Appx2793, Q/A 12. To perform DNA fingerprinting, a scientist analyzes variations between the genetic sequences of different strains of the same organism to find shared SNP patterns inherited from common ancestors. Appx2793, Q/A 13; Appx2796, Q/A 20. These shared patterns link organisms to their genetic relatives, much like DNA analysis can identify common ancestors of individual humans. *Id.*

By comparing shared patterns, a scientist can perform a form of DNA fingerprinting known as "phylogenetic analysis" to construct a "phylogenetic tree." Appx2797-98, Q/As 22-23. A phylogenetic tree, as shown below, is a graphic representation of the ancestral histories and relationships among various strains.

---

[3] The record occasionally refers to a mixed lineage ***strain*** rather than a mixed lineage ***culture***. *See*, *e.g.*, Appx23. For clarity, we use "strain" to refer to a single lineage with a unique genetic sequence and refer to a "culture" that may contain multiple lineages. However, certain record cites may refer to "strain" in the singular when referring to a collection of strains with different genetic sequences.

Appx2797-98, Q/A 23.  By tracing SNP mutations, a scientist can infer how strains

descended from one another.  Appx2798-99, Q/As 26-27; Appx2800, Q/A 30.



Appx2798.

       This simple phylogenetic tree shows how this analysis is performed.

Each strain in the tree was descended from the same common ancestor, shown at

left.  "Strain 1" was created when the first mutation occurred (G to T); creating one

branch of the tree.  "Strain 2" was created when a second mutation occurred (C to

A).  Strain 2 differs by 2 SNPs from the common ancestor.  "Strain 3" was created

when a third mutation occurred (C to T).  Appx2797-99, Q/As 23-27.

       Strains do not only mutate along one branch as in this simplified tree.

More commonly, the same ancestor will have progeny with mutations in different

spots, leading to diverging branches of the tree.  Appx2819-20, Q/As 90-91.  To

map the relationships between divergent strains, complex mathematical computations based on the SNPs of the strains help determine the most likely branching structures. Appx2808, Q/As 52-54; Appx2818-19, Q/As 86-88.

### b. Medytox's and Hugel's strains have the same recent common ancestor

Medytox's commercial strain (CB19) and the Hugel strain were sequenced. Appx2904-06, Q/As 93-94, 103-105. Medytox's expert, Dr. Keim, used SNP information from Medytox and Hugel sequences,[4] as well as publicly available SNP information for 784 other strains of *C. botulinum*, to conduct a phylogenetic analysis. Appx2813, Q/A 71; Appx2817, Q/A 81. Keim generated a phylogenetic tree of the Medytox and Hugel strains, and the 50 strains most closely related to them. Appx2817, Q/A 81; Appx2819-20, Q/A 90; Appx3134. Hugel's experts agreed that Keim's phylogenetic tree is correct and adopted it for their own analyses. *See* Appx2997-98, Q/As 47-48; Appx3029, Q/A 28; Appx3078, Q/A 80.

Keim's phylogenetic tree (below) shows the genetic relationships of these *C. botulinum* strains. Appx2820 (annotations in blue added). The tree is on its side, with the older, common ancestral strains appearing on the left and the newer strains on the right. The ancestral relationships between the various strains

---

[4] Two of the six Hugel samples were not used because they showed a ▇▇▇▇ ▇▇▇▇, making them unsuitable for the analysis. Appx2810, Q/A 62.

are shown by the separate "branches" or horizontal lines connecting the strains.

Appx2820. The name of each strain is shown to the right.



Appx2820 (annotations in blue added).

More closely related strains appear closer together in the tree. The branch lengths correspond to the number of SNPs that differentiate a strain from other strains, with the number of SNPs common to the ancestral group noted above each of the horizontal branches/lines. Appx2820, Q/A 91.

The relevant portion of the tree is excerpted below, with its original annotations.

17



CX-1046C, Figure 5; CX-1155C                                    CDX-0002.10C

Appx2822 (pink annotation added).  Medytox's and Hugel's strains all belong to a

small group (or "clade") of organisms descended from a recent common ancestor.

Appx2813-14, Q/A 73; Appx2821-23, Q/As 95-96, 99-101.  There are six strains

in the clade:  CP000727.1 (the original ████ clade name ████ strain)[5]; the Medytox CB19

strain, the Hugel strain, the University of Massachusetts ("UMass") strains and the

69A strain.  Appx2825-26, Q/A 111; Appx2999, Q/A 50.

     The ████ clade name ████ clade, including Medytox's strain and Hugel's

strain, has a unique DNA fingerprint.  Each member strain has █#█ SNPs that are

not present in the next closest strain, X58540 (highlighted in pink).  Appx1012-

---

    [5] CP000727.1 was obtained from the U.S. Army ("Army Strain").  *See*
Appx2813-14, Q/A 73; Appx886, 257:3-16.

1013, 661:2-662:7; *see also* Appx2999, Q/As 50-51; Appx911-12, 357:8-358:10.

In addition to the ▮ SNPs common to all ▮clade name▮ strains, Hugel's strain

shares ▮ SNPs ("UMass SNPs") with two other strains.  Appx2831, Q/A 129.

Each strain in the ▮clade name▮ clade that has a verifiable origin (that

is, other than the Hugel strain) is descended from or relates to strains studied by

Sugiyama at the University of Wisconsin:

| Strain | Relationship to Sugiyama | |
|---|---|---|
| CP000727.1 (Army Strain) | Sugiyama obtained his strain from the Army | Appx1627:15-28:6; Appx872, 200:24-201:17 |
| Medytox's CB19 Strain | Jung isolated it from Dr. Kyu Hwan Yang's culture, who obtained it from Sugiyama's laboratory | Appx2766-67, Q/As 29-30, 32; Appx1633:1-34:10 |
| UMass Strain | From a "Hall stock culture" obtained from Dr. Johnson at the University of Wisconsin, who inherited Sugiyama's Hall A-Hyper cultures and laboratory | Appx2830, Q/As 122-126; Appx1522; Appx1000, 611:9-18 |
| 69A Strain | A source at the University of Wisconsin gave rise to the FDA 69A strain | Appx1049, 714:1-8; Appx1518 |

Keim's phylogenetic analysis and the common origin of the other

strains in the ▮clade name▮ clade reveal a common ancestry between Medytox's

CB19 strain and Hugel's strain.  Both strains possess the ▮ unique SNPs of the

▮clade name▮ clade that are present in the most recent common ancestor identified

in red lettering in the tree below, but that are absent in the over 780 other strains of

*C. botulinum* Keim analyzed.  Appx2813, Q/A 71; Appx2821, Q/A 95.



Phylogenetic tree of certain C. botulinum strains

CX-1046C, Figure 5; CX-1155C

CDX-0002.10C

Appx2822.

As discussed above, particular SNPs in the bacterial genome tend to

be rare.  Appx2821, Q/A 97.  As a result, it would be extremely rare for the ***same***

SNP to develop independently in two different strains.  Appx2799, Q/A 29;

Appx2821-22, Q/A 97-98.  This rarity of shared SNPs strongly supports that the

Medytox and Hugel strains descend from a recent common ancestor that gave rise

to the ▮clade name▮ clade.  Appx2821, Q/A 97; Appx2823, Q/A 101; Appx2825,

Q/A 110.  Hugel's expert Dr. Parkhill agreed:  "some source at the University of

Wisconsin is the one that gave rise to ***Hugel's strain***, to UMass's strain, to the

FDA 69A, and to the ***KAIST/Yang/Sugiyama 1975 [i.e., a Medytox] strain***."

Appx1049, 714:1-8 (emphases added); *see also* Appx1047, 706:6-9.

### c.     Hugel's strain could not have occurred naturally

Contrary to Hugel's suggestion, it would have been impossible for a strain isolated from a can of beans to have spontaneously developed the exact ▮ SNPs found in the ▮clade name▮ clade strains. Appx2839, Q/A155 ("There is no way that Hugel's strain came from a natural source and shares ▮ SNPs with the other laboratory strains of the ▮clade name▮ clade. The odds of that happening are on the order of many billions to one.").[6] Hugel's expert testified that for even the same 2 SNPs to "appear[] randomly," the probability would be about 1 in 10 billion. Appx1072, 805:22-806:1. He agreed that for the ▮ SNPs Hugel's strain has in common with the other strains in the ▮clade name▮ clade to "appear[] randomly," *e.g.*, in a can of beans in Korea, the probability would be on the scale of 1 in about 10 to the power of 105—$10^{105}$ (*i.e.*, 10 followed by 105 zeros). Appx1072, 806:2-8. The probability of Hugel's strain occurring naturally through random chance is so low that Hugel's experts were unwilling to testify that it was likely that Moon discovered Hugel's strain in a "can of beans" or that this was

---

[6] The probability is so low because SNPs would have to occur at the specific ▮ positions within the about 3.7 million nucleotides in the *C. botulinum* genome. Appx2799, Q/A 29; Appx2994-95, Q/A 34.

more likely than Hugel's conversion from Medytox.  *See*, *e.g.*, Appx1058, 751:15-19; Appx1086, 860:22-861:3; Appx1356 (admitting "Hugel's experts agree that they cannot calculate a pre-existing statistical likelihood or probability of Dr. Moon's discovery of CBFC26 in a can of food.").

### 3.    Hugel's strain did not come from a laboratory leak

Confronted with the lack of evidence supporting Hugel's can of beans story, Hugel's expert testified that "the only way that [he] can postulate that it would have gotten into that can of beans is, it leaked from a lab somewhere." Appx1015, 672:12-19.  But this is just speculation, and is unsupported by any record evidence.  It is also extraordinarily implausible.

For a laboratory leak to have led to Hugel finding a [clade name] strain in a can of beans, a remarkable daisy-chain of events would have had to occur.  *First*, a laboratory working with a [clade name] strain with the [#] UMass SNPs must have disregarded all safety protocols and allowed its bacteria to escape into the environment.  *Second*, the leaked [clade name] bacteria had to survive in the wild.  *Third*, the bacteria had to be transported to a bean field or bean processing plant and contaminated beans that were to be canned.  *Fourth*, the bacteria had to survive the canning process.  And, *finally*, Moon had to buy that can of beans for screening and subsequent isolation of the *C. botulinum* strain.  At

some point along this chain of events, living bacteria had to have been transported

to Korea.  No evidence supports any of these steps, let alone all of them.

### a.    No laboratory leaks of a [clade name] strain

For the events postulated above to have even started, the putative

"leaked" strain would have had to include the [#] SNPs unique to the [clade name]

clade, as well as the [#] UMass SNPs.  No credible evidence was presented during

the investigation of any laboratory leak of a [clade name] strain in the relevant

time.  Indeed, all but one of the experts from both sides testified that they were

unaware of *any* laboratory leak of *any C. botulinum* strain anywhere in the world.

Appx999, 606:5-12; Appx1081, 842:14-18; Appx894-95, 289:24-290:4;

Appx2880, Q/A 93.  And given that *C. botulinum* is known to be very dangerous

and that the [clade name] strain produces more highly lethal toxin than other

strains, researchers take precautions to ensure that *C. botulinum*, especially a [ ]

[clade name] strain, does *not* leak from the laboratory.  Appx999, 607:14-19.

The only expert testimony that there may have been a laboratory leak

of any kind came from Hugel's expert Parkhill.  He speculated that a laboratory

strain might have leaked at some point because a strain collected in Argentina in

1976 is six SNPs away from a laboratory strain created in the early 20th century.

Appx3101-02, Q/A 160; Appx1016, 676:3-677:7.  But it is undisputed that this

strain, even if it leaked, was *not* a Hall A-Hyper strain.  Appx3101-02, Q/A 160.

Parkhill admitted that his analysis was missing so many facts that it could not be relied upon to support a laboratory leak theory.  Appx1016-17, 676:3-679:9.

### b.    [clade name] **strains are unlikely to survive in nature**

The [clade name] strains are not likely to survive outside of a laboratory.  It is undisputed that "the [clade name] strain [] sporulates poorly relative to many other strains of *C. botulinum*."  Appx2880, Q/A 93; *see also* Appx2846, Q/A 178; Appx919, 387:6-14.[7]  Medytox's expert, Dr. Lenski, explained that this "makes it much less likely that the [clade name] strain would survive in nature and then find its way into a can of food."  Appx2880, Q/A 93. He also testified:  "the [clade name] strain has evolved in and become adapted to lab conditions over many years.  As a consequence, it has become domesticated to some degree, making it an unlikely candidate to escape and survive in nature."  *Id*.

### c.    [clade name] **strains are unlikely to survive canning**

Canning is a method to preserve food that is known to kill bacteria within the can.  Hugel's expert, Dr. Goodnough, testified that "[f]inding a strain [of *C. botulinum*] in a food source, yeah, it's novel.  They are typically—you can find C. bot. in food, but typically it's been inactivated [killed]."  Appx997, 601:1-6.

---

[7] *C. botulinum* bacteria "sporulate[]" to generate spores that can survive harsh environmental conditions.  Appx2868, Q/A 33.  A strain that sporulates poorly has difficulty surviving conditions found in nature.

Thus, even if a [clade name] strain had leaked and survived in the wild, the canning process would have killed it.

### d.     Moon was unlikely to have found three contaminated food items in 2,000 samples

Hugel provided no indication that Moon used any criteria for collecting his 2,000 food items other than that they were "old, rusty, expired, and damaged canned goods and sealed goods from stores around Seoul, Gyeonggi-do (Gapyeong and Yangpyeong) and Daejeon." Appx02258; Appx1566, 3.1. It is implausible that many Korean stores in the early 2000s had canned beans contaminated by a leaked *C. botulinum* strain related to the strains held by the University of Massachusetts or the FDA, which are based in the United States. It is even less likely that three of the cans contained *C. botulinum* that had survived in nature, somehow traveled to Korea, survived the canning process, and were found by Moon. Appx02258-59; Appx1568, 4.1.

### 4.     Hugel disclaimed all possible sources of its strain other than a can of beans

Hugel's corporate representative —Chief Technology Officer and Head of R&D, Dr. Chanjin Lee—testified that the ***only*** source of its strain was ***the can of beans***. He denied that Hugel obtained its strain from the FDA or the University of Massachusetts, owners of the ***only*** two Hall A-Hyper strains (69A and the UMass strain) that are more closely related to the Hugel strain than the

Medytox strain. Appx977, 520:15-21. He also denied getting the strain from the

University of Wisconsin, *i.e.* from Sugiyama. Appx977, 520:22-24.

To the extent that there existed some other unreported [clade name]

strain that shares the [#] UMass SNPs—a hypothetical situation for which Hugel

advanced no supporting evidence—Hugel denied that its strain had been received

or purchased from anyone. Appx978, 524:11-19. Hugel specifically denied

receiving and/or purchasing its strain from more than 25 other possible sources:

Allergan, Daewoong, Revance, Ipsen, Merz, Wako Laboratories, Metabiologics,

Johnson & Johnson, List Biologic Laboratories, any university (such as University

of Chicago, California Polytechnic State University, University of Oregon,

University of Pennsylvania, Harvard, Indiana University, KAIST and Osaka

Prefecture University), any government institution (such as the U.S. Army, U.S.

Army Medical Research Institute of Infectious Disease and Michigan State

Department of Health), any individual person (such as Bal Ram Singh), the

Botulinum Research Center, anywhere outside of Korea, and two other

confidential sources. Appx977-78, 520:25-524:19.

Hugel claimed that the ***only possible*** origin for Hugel's strain was ***the

can of beans***.

### C.    Medytox's *C. botulinum* Strains

There are two primary methods of using bacteria from a culture to prepare a cell bank:  "single colony isolation" and "direct culture."  In single colony isolation, bacteria cells are spread onto a plate to separate them.  After each cell grows into a colony, one colony is selected for further propagation, creating a new culture with largely uniform characteristics—until the new culture itself undergoes mutation over time.  Direct culture involves taking a larger sample from a cell culture, in which the sample can be a mixture of cells with different genetic material (*i.e.*, multiple lineages).  Whereas single colony isolation initially eliminates the genetic diversity of the original culture, direct culture is capable of retaining that diversity.  *See* Appx2833, Q/A 137.

Neither single colony isolation nor direct culture requires the destruction of cells that were not used to prepare a cell bank or culture; the original cells continue to be stored in their original vials.[8]  *See, e.g.*, Appx1631:17-24 (describing going back to the original stock from time to time to make more cultures); Appx1775, Q/A 41 (describing freezing the remainder of cell vials for storage); Appx888, 262:8-13 (explaining that researchers preserve the source from which single colony isolation was conducted and return to that source for future

---

[8] Bacterial cultures are typically stored in cell vials in a refrigerator or freezer. *See*, *e.g.*, Appx1630:3-16.

cultures), Appx887, 258:8-13 (explaining that there is no reason for Yang's lab to eliminate the diversity of a mixed lineage culture).

In 2000, when Medytox was founded, it possessed *C. botulinum* strains with significant genetic diversity, including a Hall A-Hyper culture and strains from serotypes B and F.  Appx1633:1-7, Appx1680:24-81:4; Appx2767, Q/A 33.  Medytox's strains descended from those in Sugiyama's laboratory, which had been passed to Yang and then to Jung.  Appx1633:1-34:10, Appx1680:8-83:5; Appx2766-77, Q/A 32.  Medytox obtained all its strains of *C. botulinum*, including Hall A-Hyper strains, through Jung.  Appx2765, Q/A 26; Appx831, 105:6-13.

Yang had performed *C. botulinum* research at the University of Wisconsin under Sugiyama. Appx1610:25-11:19, Appx1616:10-12, Appx1617:11-20.  Sugiyama and Yang published research using multiple *C. botulinum* strains, including 69A and other Type A strains.  Appx1515, Appx1518-19.  When Yang left Wisconsin in 1979 for KAIST, Sugiyama allowed him to take vials of multiple *C. botulinum* strains with him, including a Hall A-Hyper culture.  Appx1633:1-11; Appx1633:16-34:10; Appx2766, Q/A 29.  No evidence was adduced that Yang performed cell bank prep. method on his cultures, and he described researchers returning to the original stock from time to time to make more cultures.  Appx1631:8-24.  Thus, Yang's cultures would have

contained mixed lineage strains.  Appx888, 262:18-263:4; Appx2832, Q/A 133, Appx2834-35, Q/A 140-41.

Jung worked under Yang at KAIST from 1988 to 1992. Appx2758-59, Q/A 5.  Jung worked with Yang's Hall A-Hyper strains during that time.  *Id.*  In 1995, after receiving a Ph.D. in *C. botulinum* research, Jung became a professor of microbiology at Sun Moon University in Korea.  Appx2758, Q/As 3-4.  Initially, Jung continued to work on *C. botulinum* strains at KAIST with Yang.  Appx2766-77, Q/A 32.  Once Jung got his own laboratory at Sun Moon University, he began transferring vials of *C. botulinum* strains from KAIST to his laboratory; by 2000 when Yang left KAIST, all of his cultures were transferred to Jung.  *Id.*[9]  By 2000, Jung thus possessed multiple mixed lineage *C. botulinum* strains, which were stored in his laboratory at Sun Moon University.  *Id.*; Appx1680:8-82:24.  These strains were transferred to Medytox in May 2000. Appx2766-77, Q/A 32.

Using Yang's mixed lineage Hall A-Hyper strain, Jung prepared his original cell bank.  Appx26; Appx2139:2-40:15.  In 2003, Medytox created a new cell bank, called CBAM0301, from his initial cell bank.  Appx871-72, 197:6-9.

---

[9] In March 2017, Yang and Medytox entered into a written agreement formally transferring ownership of Yang's *C. botulinum* strains to Medytox.  Appx2769-70, Q/A 48; Appx1600-01.

Medytox has other cell banks that are derived from CBAM0301, including CB19,

which is a [cell bank prep. method] of CBAM0301. Appx2812, Q/A 68.

In 2019, Pickett collected samples from Medytox's CB19 cell bank in

connection with a prior ITC investigation against Daewoong (Inv. No. 337-TA-

1145). Appx2810, Q/A 64. Pickett also collected samples from two other

Medytox cell banks (CB08 and CB13) that are not [cell bank prep. method] of CBAM0301.

Appx2810, Q/A 64. However, neither side collected samples from Medytox's

other cultures and cell banks. *See* Appx1772-75, Q/As 37-38, 40.

## SUMMARY OF THE ARGUMENT

To prove that Hugel converted Medytox's *C. botulinum* strain,

Medytox must show that it was more likely than not (1) that Medytox possessed

such a strain; and (2) that Hugel converted it. The Commission erred both legally

and factually in finding that Medytox had not met either prong of this test.

During the investigation, Medytox introduced undisputed evidence

that Hugel's *C. botulinum* strain is so closely related to Medytox's strain that the

odds are astronomical that Hugel's strain independently acquired the distinctive

genetic features that it shares with Medytox's strain. Medytox relied on this

evidence to show both that Hugel had converted Medytox's strain and that

Medytox possessed a strain that Hugel converted. In response, Hugel asserted that

its strain was fortuitously discovered by Hugel's founder in a can of beans. Hugel categorically denied that its strain could have come from any other source.

Hugel's can of beans story is patently false. And because Hugel had disclaimed all other potential sources of its strain other than a can of beans, the only remaining possible source of Hugel's strain is conversion from Medytox. Nonetheless, the ALJ and Commission found the veracity of Hugel's can of beans story to be irrelevant to Medytox's conversion claim and refused to consider it.

It is well-settled that when a party relies on a falsehood to support its litigation position, its adversary may rely on that falsity as affirmative evidence to support its case. The Commission held otherwise because it incorrectly viewed consideration of the veracity of Hugel's story as a shifting of the burden of proof from Medytox to Hugel. But improper burden-shifting would occur only if Hugel were required to prove the truthfulness of its story. Medytox never suggested that Hugel had to prove its "innocence." Instead, Medytox consistently argued that the Commission was required to consider whether *Medytox* had shown Hugel's can of beans story to be a falsehood. And here, Hugel's choice to disclaim all other sources of its strain and rely solely on its can of beans story, presented the Commission with a clear choice: If Medytox showed that the source of the strain was not a can of beans, then the Commission should have found that Hugel had

31

stolen that strain from Medytox.  At the very least, the falsity of Hugel's can of

beans story should have been part of the evidence the Commission weighed.

The Commission also erred by excluding consideration of the can of

beans story on procedural grounds—that Medytox had waived the argument by not

making it in its pre-hearing brief.  But Medytox **had** argued in its pre-hearing brief

that the falsity of Hugel's can of beans story supported Medytox's conversion case.

Medytox also made this argument throughout the hearing and in its post-hearing

briefing in the same form it appears in the pre-hearing brief.  There was no waiver.

After wrongly excluding consideration of the only source that Hugel

had cited for its strain—a can of beans—the Commission compounded its error by

endorsing the ALJ's speculation that there might be other sources of Hugel's

strain.  But Hugel's corporate representative **denied** obtaining its strain from any

such alternative source.  Crediting speculation about alternative sources after

Hugel had categorically disclaimed them was abuse of discretion.  And while the

ALJ and Commission faulted Medytox for framing the issue in this investigation as

a binary choice between conversion and the can of beans story, those were in fact

the only two explanations left after Hugel had ruled out all of the others.

The Commission abused its discretion in refusing to consider the

veracity of the can of beans story.  Under the APA, the Commission should have

weighed the totality of the evidence relating to conversion, which included the

falsity of the can of beans story. On this error alone, the Commission's decision should be vacated and this case should be remanded. But the Commission also committed errors specific to each conversion prong. *First,* the Commission legally erred in holding that Medytox was required to prove the precise way in which Hugel converted its strain, even though the law requires no such thing. Instead, it was enough to show—as Medytox did—that Hugel had the ability to convert Medytox's strain and that Hugel's strain and Medytox's strain are virtually identical. *Second*, the ALJ made a determination that Medytox did not possess a strain that Hugel could have converted, by making factual findings that were not supported by substantial evidence. To the contrary, DNA evidence shows that Medytox's strain had the same, recent common ancestor as Hugel's strain, and the other record evidence shows that Medytox likely possessed a mixed lineage strain that was an ancestor of both strains. Because the Commission's holding was based on clearly erroneous factual findings, it was an abuse of discretion.

  The Commission's decision should be vacated and the case remanded with instructions that the Commission consider all the record evidence.

## **ARGUMENT**

### I. **Legal Standards**

  The APA governs appeals from the Commission. *See Techtronic Indus. Co. v. Int'l Trade Comm'n*, 944 F.3d 901, 906 (Fed. Cir. 2019). Under the

APA, this Court "review[s] the Commission's legal determinations *de novo* and its factual findings for substantial evidence." *Id.* The Court reviews procedural and evidentiary determinations, including those of waiver, for abuse of discretion. *Chamberlain Grp., Inc. v. Int'l Trade Comm'n*, No. 2020-1965, 2023 WL 3115579, at *4 (Fed. Cir. Apr. 27, 2023). "An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors." *DBN Holding, Inc. v. Int'l Trade Comm'n*, 755 F. App'x 993, 996 (Fed. Cir. 2018) (internal quotations and citation omitted); *see also Gerritsen v. Shirai*, 979 F.2d 1524, 1529 (Fed. Cir. 1992).

An agency "must, consistent with its obligations under the . . . APA . . . consider all evidence of record, including that which opposes its conclusions." *PPC Broadband, Inc. v. Iancu*, 739 F. App'x 615, 624 (Fed. Cir. 2018).

Medytox's claim is based on conversion. The elements of conversion are "1) a possessory right (*e.g.*, ownership) in property; and 2) the exercise of wrongful dominion over that property to the exclusion of those rights." Appx18-19; *see also HIF Bio, Inc. v. Yung Shin Pharms. Indus. Co.*, 600 F.3d 1347, 1355 (Fed. Cir. 2010).

## II.    The Commission Erred by Refusing to Address the Veracity of Hugel's Can of Beans Story

Hugel claims that it could not have converted one of Medytox's strains of *C. botulinum* because its founder, Moon, discovered Hugel's strain in a can of beans.  Hugel's corporate representative then disclaimed ***all*** other possible sources for its strain of *C. botulinum.*  That left only two possibilities:  (1) Hugel obtained its strain from Medytox through conversion or (2) found it in a can of beans.  The evidence, both factual and scientific, adduced during the investigation reveals that Hugel's can of beans story is false.  That means Hugel obtained its strain from Medytox.  But the Commission refused to consider the overwhelming evidence of the falsity of the can of beans story, abusing its discretion.

### A.    The Commission Should Have Considered the Substantial Evidence That Hugel's Can of Beans Story Was False

The ALJ found that "it is irrelevant whether Hugel has proven that its strain was found in a can of beans" (Appx51), and the Commission adopted this view (Appx99 ("As to the arguments raised in Medytox's petition for review that the Commission needs to address the merits of Hugel's evidence that it allegedly obtained its bacteria from a can of beans, the Commission disagrees.")).  In reaching this conclusion, the Commission failed to appreciate that it was required, as a matter of law, to consider all evidence presented by the parties that is relevant to Medytox's claim.  *See PPC Broadband*, 739 F. App'x at 624 (holding that an

35

agency is obligated under the APA to consider all evidence before it).  The facts

demonstrating the falsity of Hugel's can of beans story was part of that body of

evidence, and should have been considered by the Commission.

To establish conversion, Medytox must prove that Hugel exercised

wrongful dominion over property that Medytox had the right to possess.  Appx94.

Medytox presented the falsity of Hugel's can of beans story as affirmative

evidence supporting **Medytox's case** that Hugel converted a *C. botulinum* strain

from Medytox.  As noted in *United States v. Philatelic Leasing, Ltd.*, "when a

litigating party resorts to 'falsehood or other fraud' in trying to establish a position,

the court may conclude the position to be without merit and that the relevant facts

are contrary to those asserted by the party."  601 F. Supp. 1554, 1565 (S.D.N.Y.

1985), *aff'd*, 794 F.2d 781 (2d Cir. 1986).  Medytox's showing that Hugel

provided a false story for the source of its strain supports a strong inference that

Hugel obtained its strain unlawfully—that is, by conversion from Medytox.

Here, the factual and scientific evidence the Commission refused to

consider overwhelmingly establishes that Hugel's can of beans story is false.  To

start, no contemporaneous documentary evidence supporting discovery in a can of

beans exists.  (*See supra* SOC Section III.B.1.b.)  Moon had no experience with

*C. botulinum* at the time he allegedly isolated it from the can of beans.  For him to

open and smell 2,000 items to identify *C. botulinum* would have been extremely

dangerous. There is no record of Moon testing any cans for *C. botulinum*, which would have taken more than a year. The only place that Moon could have performed this testing was in Seo's laboratory at SBRI, but Seo never saw Moon testing any cans of any kind and would not have allowed such testing. Appx1924:13-25:8. Even the year of Moon's putative isolation of the strain has shifted, with Hugel telling the FDA it was 2001 while asserting in this proceeding that it was in 2002. (*See supra* SOC Section III.B.1.c.) There is simply no factual basis for the Commission to conclude, if it had considered the evidence, that Hugel's story that it had gotten its strain from a can of beans is credible.

And it is not only the testimonial and documentary evidence that shows the can of beans story is false. The scientific evidence establishes that Hugel's strain could not have occurred naturally. (*See supra* SOC Section III.B.2.) DNA analysis shows that Hugel's strain has the same unique DNA fingerprint (▮#▮ SNPs) as the strains in the ▮clade name▮ clade, which includes Medytox's strain. As Hugel's expert admitted, given this unique DNA fingerprint, the probability that Hugel's strain appeared ***naturally*** is 1 in about 10 to the power of 105—$10^{105}$ (*i.e.*, 10 followed by 105 zeros). Appx1072, 806:2-8. In a word, impossible.

Nor does the evidence remotely support Hugel's suggestion that its strain came from a laboratory leak. (*See supra* SOC Section III.B.3.) There is no credible evidence that any laboratory leak of a *C. botulinum* strain has occurred, let

alone a laboratory leak of a [clade name] strain like Hugel's strain.  Even if a

laboratory leak *had* occurred, it is unlikely that the strain would have been able to

survive in the wild.  Appx2880, Q/A 93.  And even if the strain had been leaked

and had survived in the wild, this specific strain of bacteria would have had to have

been captured in a can of beans, survived the canning process (which is designed to

kill bacteria) and been found by Moon in Korea.  Appx997, 601:1-6.

Finding *C. botulinum*, which produces the world's deadliest toxin, in a

can of beans would have been noteworthy.  Appx997, 601:14-17.  But there is no

evidence of any such outbreak of *C. botulinum* in Korea.  Appx2913, Q/A 148.

Even though this would have been a significant scientific discovery, Moon never

published his alleged discovery and never reported it to the health authorities, in

contravention of the laws in effect at the time.  (*See supra* SOC Section III.B.1.d.)

This body of evidence that Hugel's can of beans story is false is—

contrary to the Commission's position—relevant to the determination of whether

Medytox can prove conversion.  This is because, as noted above, it is well-settled

that when a party advances a falsehood, that falsehood supports an inference that

the facts are the opposite of what that party has presented.  *See*, *e.g.*, *Al-Adahi v.

Obama*, 613 F.3d 1102, 1107 (D.C. Cir. 2010); *In re BP Am. Inc.*, 2016 WL

3745868, at *70 (FERC 2016); *Philatelic Leasing*, 601 F. Supp. at 1565.

In *Al-Adahi*, the Government accused Al-Adahi of being part of al-Qaida.  613 F.3d at 1103.  He attempted to explain away his personal audiences with Osama Bin Laden as being "common" for "visitors to Kandahar."  *Id.* at 1107.  The Court observed that that statement was obviously untrue because Bin Laden, "who knew he was a military target of the United States, had gone into hiding under tight security."  *Id.*  Noting the "well-settled principle that ***false exculpatory statements are evidence—often strong evidence—of guilt***," the D.C. Circuit ruled that the defendant's "close association made it far more likely that Al-Adahi was or became part of" al-Qaida.  *Id.* (emphasis added).

In *BP America*, the Federal Energy Regulatory Commission brought an enforcement action against BP's trading team for manipulating the price of natural gas.  2016 WL 3745868, at *1.  In finding that BP had engaged in such manipulation, the ALJ determined that a BP trader had made demonstrably false statements about BP's shipping ability and ability to "unwind" bad positions, all in an apparent attempt to legitimatize the team's trading positions.  *Id.* at *70.  FERC affirmed, holding that the ALJ had reasonably concluded "that these false and non-credible statements were strong evidence of [] guilt."  *Id.*

In *Philatelic Leasing*, the court found that defendants "fabricated a complicated skein of false evidence to establish the existence of [arms length] negotiations" and "sought to suppress any evidence that might shed light on the

39

issue being litigated." 601 F. Supp. at 1566. The court concluded that "[b]y this conduct, the defendants were, in effect, telling the [c]ourt that the true facts—if known—would disclose that there had been no 'Arms Length' negotiations." *Id.* The court explained that "[t]he rationale underlying these principles is that a litigating party must—of all persons—be knowledgeable of the facts supporting its own position, and if it falsifies—or seeks to suppress—relevant evidence, such conduct may be taken as an admission that the true facts would defeat the position the party is seeking to maintain." *Id.*

Here, Hugel could have advanced a legitimate explanation for the source of its strain, if one existed. But instead of providing a credible explanation, it insisted, unequivocally, that "Hugel's strain came from a can of beans," Appx1343, and from no other source.[10] Because Hugel's can of beans story is obviously untrue, according to *Al-Adahi*'s "well-settled principle," Hugel's false exculpatory statements are strong evidence of guilt. That evidence, in turn, supports Medytox's claim that Hugel obtained its strain by converting it from Medytox, particularly as Hugel disclaimed all other possible sources of its strain.

---

[10] Hugel has told the same story to regulatory agencies worldwide, including the FDA. Appx977, 519:8-520:7.

The APA requires the Commission to consider *all* evidence relevant to claims made before it. *PPC Broadband*, 739 F. App'x at 624. The Commission's refusal to do so here was an abuse of discretion.

**B. Consideration of the Evidence of the Falsity of Hugel's Can of Beans Story Would Not Shift the Burden of Proof to Hugel**

The Commission refused to consider evidence of the falsity of the can of beans story based on its erroneous legal conclusion that to do so would put the burden on Hugel to prove that it did *not* convert Medytox's strain. Appx99. This was error because Medytox never attempted to shift any burden to Hugel.

By arguing the falsity of Hugel's story about how it acquired its *C. botulinum* strain, Medytox was presenting evidence to the Commission to support its conversion claim and to meet *its* burden of proving that claim. At no point in the proceeding did Medytox contend that it was Hugel's burden to prove the truth of its can of beans story or to prove that it did not obtain its strain from Medytox. Notably, neither the Commission nor the ALJ cite any statement Medytox made that Hugel did or should bear the burden of proving its "innocence." They reached this erroneous conclusion entirely on their own.

The lack of merit in the Commission's position is reflected in its failure to cite a single authority that supports its view that that considering evidence of the falsity of Hugel's story would shift the burden to Hugel. The Commission cited two cases for that proposition (*TechnoMarine SA v. Jacob Time,*

41

*Inc.* and *Adams v. Wells Fargo Bank, N.A.* Appx94-95 n.13 (citing 905 F. Supp.

2d 482, 497 (S.D.N.Y. 2012); No. 5:17CV73-RWS-CMC, 2018 WL 3301676, at

*9 (E.D. Tex. Feb. 5, 2018)); Appx23), but neither case supports its position.

In *TechnoMarine*, the plaintiff watchmaker alleged that the defendant

watch retailer sold stolen watches bearing the plaintiff's marks.  905 F. Supp. 2d at

486.  Under New York law, when the defendant in a conversion action is in lawful

possession of the allegedly converted property, the plaintiff is required to make a

"demand" for the return of the stolen goods before the plaintiff may bring legal

action.  *Id.* at 496.  The court held that the plaintiff's demand—not its proof of

conversion—was insufficient to support the lawsuit because the demand had not

described the allegedly converted watches with enough specificity for the

defendant to identify them, which had the effect of improperly shifting the burden

to the defendant to demonstrate lawful possession of its entire inventory.  *Id.* at

497.  By contrast, there is no such requirement here that Medytox make a

"demand" for Hugel's strain, and *TechnoMarine* is therefore inapposite.

The Commission cited the holding in *Adams* that "by focusing on the

validity of the [underlying] lien, [p]laintiff's response attempt[ed] to [improperly]

shift the burden of proof as to elements of his conversion claim to [d]efendant."

Appx94-95 n.13 (quoting *Adams*, 2018 WL 3301676, at *9 (alterations in

original)); Appx23.  But the facts of *Adams* make clear that this decision fails to

support the erroneous legal rule adopted by the Commission. *Adams* involved a reverse mortgage of a house co-owned by a widow and a trust. 2018 WL 3301676, at *1. After the widow's death, the widow's executor sold the house and paid the full amount owed under the mortgage to the bank. *Id.* The trustee claimed that the mortgage collateral was only the widow's half interest in the house because the mortgage was issued only to the widow, the bank's one-half interest in the property entitled the bank to at most half of the sale proceeds, and the bank had converted the trust's half of the house by retaining the full amount of the sale proceeds. *Id.* The *Adams* court held that the plaintiffs' claim was legally deficient under Texas law governing conversion of money (not property), but the court nonetheless discussed the plaintiffs' "belated and unpled challenge to the validity of the lien itself." *Id.* at *7. Thus, *Adams* analyzed the plaintiffs' conversion claim on the merits, and did not dismiss the claim as an improper attempt to shift the burden.

The Commission erred because it appears to have misinterpreted Medytox's "framing of the issue"—a choice between the can of beans story or conversion—as an attempt to shift the burden to Hugel to prove that it had not stolen Medytox's strain. But that is not what happened. During the course of the investigation, Hugel denied that it had obtained its strain from any source ***other than a can of beans***. (*See supra* SOC Section III.B.4.) That left only two choices—the can of beans or conversion. Medytox properly told the Commission

43

that it could—indeed had to—consider which of those two choices was more likely in determining whether Medytox had proved by a preponderance of the evidence that Hugel had converted its strain from Medytox.  This was not an attempt at burden-shifting, but instead a request that the Commission engage in a run-of-the-mill weighing of evidence, including the falsity of Hugel's story.

The Commission's error is further evidenced by its statement that because the ALJ found that Medytox has not presented an affirmative case of conversion, it did not have to reach what it characterized as "Hugel's exculpatory defense."  Appx51.  The Commission failed to appreciate that the falsity of Hugel's can of beans story, regardless of whether Hugel asserted it as a "defense," was relevant to determining whether Hugel had converted Medytox's strain.  *See Al-Adahi*, 613 F.3d at 1107; *BP America*, 2016 WL 3745868, at *70; *Philatelic Leasing*, 601 F. Supp. at 1565.  The plain falsity of that defense, particularly in the unique context where Hugel disclaimed all other sources of its strain, was affirmative evidence that Hugel had committed conversion.

The Commission abused its discretion by failing to consider the falsity of Hugel's can of beans story as part of its evaluation of the evidence presented to satisfy Medytox's burden of proving conversion.

44

**C.     The Commission's Crediting of Possible Sources for Hugel's Strain, Other Than a Can of Beans, Was Error**

Hugel's corporate representative disclaimed *all* possible sources for its strain other than a can of beans.  (*See supra* SOC Section III.B.4.)  Nevertheless, over the course of three pages of the ID, the ALJ considered numerous different possible alternative sources from which Hugel could have obtained its strain.  Appx46-48.  The Commission endorsed that finding: "alternative sources for Hugel's strain remained a possibility (whether it was from a can of food tested by Dr. Moon, *or obtained from another laboratory*)." Appx101 (emphasis added).  But Hugel expressly disclaimed each source considered by the ALJ.  *Compare* Appx977-78, 520:15-524:19 *with* Appx46-48.  The Commission abused its discretion in finding that Hugel could have obtained its strain from a source other than Medytox when there was no evidence supporting that conclusion.  *Gerritsen*, 979 F.2d at 1529 (abuse of discretion when decision "follows from a record that contains no evidence on which the [agency] could rationally base its decision").

This case is similar to *Astellas Pharma, Inc. v. Sandoz Inc.*, 117 F.4th 1371 (Fed. Cir. 2024).  In that case, this Court vacated the judgment below and remanded "because the district court abused its discretion in holding the asserted claims invalid under 35 U.S.C. § 101" when the defendant "did not pursue an invalidity defense under 35 U.S.C. § 101 during the discovery phase of the

45

litigation" and "a § 101 defense [ ] was not presented at trial or in the post-trial

briefing." *Id.* at 1379, 1376. The case here is even stronger because the

Commission considered a theory that was expressly ***disclaimed*** by Hugel.

       The Commission abused its discretion by rendering its decision on a

ground not raised by Hugel and by finding that Hugel could have obtained its

strain from some source when there was no evidence supporting that finding.

### D. Medytox Did Not Waive the Ability To Advance Legal Theories Based on Hugel's False Exculpatory Story

       The Commission found that Medytox "waived its argument that

Hugel's allegedly false assertions regarding sourcing its strain from a can of beans

should be held against Hugel as proof of conversion" (Appx100 n.16) based on a

supposed violation of the "ground rules" that are set in an ITC investigation by the

presiding ALJ. The ground rules in this investigation provided that "[a]ny

contentions not set forth in detail in the pre-hearing brief shall be deemed

abandoned or withdrawn." Appx267, 11.2. The ALJ and Commission found that

Medytox violated this ground rule: "In its initial post-hearing brief, Medytox

argued for the first time that Hugel's allegedly 'false exculpatory defense' should

be held against Hugel as proof of conversion. . . . I therefore do not consider this

argument." Appx40 n.16. Contrary to the Commission's findings, Medytox

explicitly presented the false exculpatory story argument in its pre-hearing

briefing, as required by the ALJ's ground rules. *See* Appx350.

To support waiver, the Commission observed that "[i]n contesting the Final ID's waiver finding, Medytox *largely* points to material other than its prehearing brief, which are irrelevant under the Ground Rule."  Appx100 n.16 (emphasis added).  The "largely" matters, because it is a recognition that Medytox raised its contention that the falsity of Hugel's can of beans story was evidence of Hugel's conversion of Medytox's *C. botulinum* strain *in its pre-hearing brief*.  In fact, on the very first page of that brief, Medytox said it would show that the DNA evidence refuted Hugel's can of beans story, "[i]n addition to the preposterous nature of Hugel's claims."  Appx301.  Later in the brief, Medytox explicitly represented that it would satisfy its burden of proof "in light of [the] impossibility of Hugel's own 'can of beans' origin story."  Appx350; *see also* Appx359-60 (discussing the falsity of the can of beans story and asserting that "the odds of [Hugel's strain] ending up in a can of beans in Korea—and then Hugel finding that specific can and discovering the strain in its 26th culture—are so remotely unlikely that Hugel's story is preposterous.").  Medytox also cited *Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1238 (8th Cir. 1994) for the proposition that "misappropriation [is] more likely than not where the likelihood of defendant's independent development was 'one in a trillion' and 'extremely difficult to buy.'" Appx350.  There was no waiver of this point.

47

Nor was this argument a surprise to anyone. In addition to the pre-hearing brief, Medytox made it in its complaint, during the hearing, and in its post-hearing briefing. In the complaint, Medytox pleaded that "Hugel could not have discovered a novel *C. botulinum* strain from a food source in Korea in 2002." Appx179-80, ¶¶ 66-69. During the hearing, Medytox argued that "Moon . . . made an exculpatory statement that he didn't get [the *C. botulinum* strain] from anyone else, that he found it in beans. . . . if you took it from your neighbor in Korea, who you're going to be competing against, well, there is a reason to make up this kind of 'Jack and the Beanstalk' story that you found it in a can of beans." Appx815, 41:16-42:3. Medytox also solicited testimony from its experts: "you're going to hear from Drs. Keim and Lenski and Pickett why that theory that these things were all in nature, all or most of them were in nature, is just like, just not really credible from a scientific standpoint." Appx815, 43:11-14; *see* Appx2838, Q/As 151-53; Appx2879-80, Q/As 90-91; Appx920-921, 393:10-395:10. In its post-hearing briefing, Medytox repeated its argument that "Hugel's False Exculpatory Defense Is Strong Evidence of Its Guilt." Appx1210-15. Indeed, the truth or falsity of Hugel's can of beans story took up a large portion of the investigation.

This case is similar to *Chamberlain Group, Inc. v. International Trade Commission*. 2023 WL 3115579, at *5 n.1. There, the ALJ held that the appellant had forfeited its infringement argument that a "movable barrier operator" could be

48

housed within a "wall unit" in addition to or instead of a "head unit." *Id*. This Court found that the appellant not only argued the same claim scope in its claim construction brief and pre-hearing brief, but also "solicited testimony at the hearing from its expert supporting this contention," and thus maintained its position consistently throughout the investigation. *Id*. Similarly, Medytox argued in its pre-hearing brief that the "impossibility of Hugel's own 'can of beans' story" was evidence that Hugel had converted Medytox's strain (Appx350), solicited testimony from its expert supporting this contention (Appx815, 43:11-14), and thus maintained that same argument through every stage of the investigation.

Moreover, "issue preservation does not demand the incantation of particular words; rather, it requires that the lower court be fairly put on notice as to the substance of the issue." *Medtronic, Inc. v. Teleflex Innovations S.À.R.L.*, 68 F.4th 1298, 1305 (Fed. Cir. 2023) (cleaned up) (finding no forfeiture because plaintiff's statement below "still address the same, general issue"). Medytox made its position on Hugel's can of beans story sufficiently clear to the ALJ in the pre-hearing brief that there was no waiver of this argument. Indeed, there would have been no point in the ALJ receiving extensive evidence regarding the veracity of Hugel's can of beans story during the hearing if Medytox had waived reliance on the falsity of that story. *See*, *e.g.*, *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1378 (Fed. Cir. 2009) (no waiver where "Desire2Learn made its

49

position on that issue clear sufficiently in time to not mislead its adversary or the court"); *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1251 (Fed. Cir. 2005) (no waiver where the "change in [appellant's] argument is so insubstantial that it represents 'the same concept' that [appellant] raised before the district court").

Medytox's argument that the falsity of Hugel's can of beans story supports Medytox's conversion argument was adequately raised and preserved, and this evidence should have been considered by the Commission. Its decision that Medytox forfeited the argument was therefore an abuse of discretion.

## III. The Commission Erred in Finding that Medytox Did Not Possess a Mixed Lineage Culture

The Commission, without providing any additional reasoning, upheld the ALJ's "finding that Medytox failed to show that it possessed a mixed lineage culture at the time of the alleged conversion." Appx98. That was an abuse of discretion because (1) the ALJ failed to consider all the evidence regarding Medytox's possession of a mixed lineage culture, including the falsity of Hugel's can of beans story and (2) the ALJ's finding is based on erroneous factual determinations that are not supported by substantial evidence.

### A. The ALJ Erred in Ignoring Evidence That Hugel Did Not Obtain Its Strain from Any Source Other Than Medytox

Medytox argued, as part of its *prima facie* case, that Hugel's absurd claim that it obtained its strain of *C. botulinum* from a can of beans—and nowhere

50

else—supported the proposition that Medytox possessed a mixed lineage culture from which Hugel obtained its strain. Appx350. As he did when evaluating the second prong of Medytox's conversion claim (whether Hugel took a Medytox strain), the ALJ erred by failing to consider whether the evidence of the falsity of Hugel's can of beans story showed that Medytox had possession of a strain that Hugel could have converted. That evidence, taken in the context of the other factual and scientific evidence, should have led the ALJ to conclude that Medytox met its burden of proving that it was more likely than not that it possessed a mixed lineage culture from which Hugel could have obtained its strain.

Having eliminated—through the evidence and through Hugel's admissions—any other source of Hugel's strain, Medytox appropriately argued that Hugel must have obtained its strain either from a can of beans or from Medytox. Here, once again, the ALJ erred by refusing to consider the falsity of Hugel's can of beans story. If, as Medytox proved, the can of beans story is false, then Hugel must have obtained its strain from Medytox. Given that there was no other source for Hugel's strain, the evidence shows that Medytox must have been in possession of a mixed lineage culture from which Hugel's strain descended.

In the context of this case, the ALJ's refusal to consider the falsity of Hugel's can of beans story led him to conclude—erroneously—that the other factual and scientific evidence that Medytox possessed the common ancestor of the

Hugel and Medytox strains was not sufficient to satisfy Medytox's burden of proving possession by the preponderance of the evidence. *Al-Adahi* is instructive. There, the district court found that the government had not proved by a preponderance of the evidence that Al-Adahi was a member of al-Qaida because no single piece of evidence proved that fact. *Al-Adahi*, 613 F.3d at 1105. The D.C. Circuit overturned, finding that the district court had erred in deciding that if "a particular fact does not itself prove the ultimate proposition . . . the fact may be tossed aside and the next fact may be evaluated as if the first did not exist." *Id*. "This was a fundamental mistake that infected the [district] court's entire analysis." *Id*. at 1106. The D.C. Circuit then found that when all of the evidence was properly considered together, the government ***had*** met its burden. *Id*.

Here, the falsity of Hugel's story in combination with the other evidence, including the testimony of Medytox's fact witnesses on the preparation of its cultures, the DNA evidence showing the incredible similarity between the Medytox and Hugel strains, and the testimony of the experts about the preservation of genetic diversity in bacterial cultures, establishes that Medytox had possession of a strain converted by Hugel. The Commission's failure to consider the falsity of Hugel's can of beans story in determining whether Medytox possessed a mixed lineage culture that included the strain Hugel converted was an abuse of discretion.

*See PPC Broadband*, 739 F. App'x at 624 (APA requires an agency to "consider

all evidence of record, including that which opposes its conclusions").

**B.    The Commission's Factual Findings Underlying Its Conclusion
That Medytox Did Not Possess a Mixed Lineage Culture Are Not
Supported by Substantial Evidence**

The Commission also erred by adopting factual findings that were

unsupported by the evidence to conclude that Medytox did not possess a mixed

lineage culture.  In fact, those findings are contradicted by the record evidence.

We begin with an undisputed fact:  Medytox's CB19 strain and

Hugel's strain, along with the other members of the ▮clade name▮ clade sequenced

for this case—the UMass and the 69A strains—all share the same, recent common

ancestor.  Appx1049, 714:1-8 (Parkhill agreeing that "looking at that tree, the

evidence indicates to you . . . that some source at the University of Wisconsin is

the one that gave rise to Hugel's strain, to UMass's strain, to the FDA 69A, and to

the KAIST/Yang/Sugiyama 1975 [*i.e.*, the Medytox] strain"); *see also* SOC

Section III.B.2.b.  Medytox's conversion claim is based on Hugel's theft of this

common ancestor from Medytox, not Medytox's commercial strain.  Appx351.

The evidence demonstrates that it is more likely than not that

Medytox possessed that common ancestor.  While he was in Sugiyama's

laboratory, Yang worked with the 69A strain, which likely has the ▮#▮ SNPs of the

▮clade name▮ clade ***and*** the ▮#▮ UMass SNPs.  *See* Appx1515 (discussing research

using the 69A strain); Appx3134.  Yang testified, unrebutted, that he brought the

strains that he was using in his laboratory to Korea.  Appx1633:1-11 (when he left

University of Wisconsin, Yang took "strains that [he] had been using and they had

been kept in [his] refrigerator," including a Hall A culture).  By 2000, Yang had

given his strains to Jung, who gave them to Medytox.  Appx1680:8-83:5;

Appx2766-67, Q/A 32.  The preponderance of the evidence shows that at the time

Hugel acquired its strain, Medytox possessed all of Yang's strains and that those

strains included a mixed lineage culture that would have contained a [clade name]

strain with the [#] SNPs (also shared by the Hugel and Medytox strains) *and* the

[#] UMass SNPs.

In deciding otherwise, the ALJ credited Respondents' speculation,

unsupported by any evidence, that Yang performed [cell bank prep. method] on his

cultures; and assumed, again without any evidence, that Hugel would have

converted a sample from Medytox's [cell bank prep. method] cell bank, rather than from the

mixed lineage stock cultures Medytox inherited from Yang.  That was error.

## 1.  The ALJ improperly credited Respondents' speculation that Yang did not possess a mixed colony culture

The ALJ found:  "as Staff and Respondents persuasively argue, there

is no evidence that [cell bank prep. method] was not performed earlier on some

predecessor strain to the strain Dr. Jung obtained [from] Dr. Yang, either in Dr.

Yang's laboratory or at the University of Wisconsin."  Appx34.  The ALJ,

therefore, required Medytox, after the evidence-gathering phase of the

investigation had ended, to prove a negative—that Yang had ***not*** performed ███████

███████ cell bank prep. method ███.  The ALJ used the absence of that evidence to make a factual

finding that Yang had performed ███ cell bank prep. method ███ on the culture in his

possession ***and*** then discarded the original culture, so that he did not transfer a

mixed lineage culture to Jung.  Appx34-35.  This finding was based solely on

speculation and is contrary to the evidence.

*First*, there is ***no evidence*** that Yang performed ███ cell bank prep. method ███

███████ on any strain either before or after he brought them to Korea, including on

any culture he gave to Jung.  Yang never testified he did.  *See generally*

Appx1603-758.  Medytox's expert, Keim, testified he did not think Yang would

have done so, and he was not cross-examined on this point.  Appx887, 258:8-13.

*Second*, the age of the cultures that Jung inherited from Yang shows

that they necessarily were mixed lineage cultures.  Yang testified that in 1998/1999

he gave Jung ***all*** of the strains in his possession, including the Hall A-Hyper

culture he had brought back to Korea from Wisconsin.  Appx1682:12-18 ("I gave

all the strains, as well as the media, to Dr. Jung toward the end of 1998 or 1999.").

Keim testified that Jung's description of the vial he had received from Yang was

"exactly the type of vial that would have been created at the University of

Wisconsin or even earlier at the U.S. Army to represent small aliquots of [the

Army strain] Master Cell Bank," and that because of the age of the Hall A-Hyper culture, it would have possessed considerable genetic diversity. Appx886-87, 257:19-258:13. It is undisputed that, over time, spontaneous mutations in the hundreds of millions of cells in a bacterial culture will inevitably result in the creation of a mixed lineage culture. (*See supra* SOC Section III.B.2.) This creation of genetic diversity over time is exactly what Keim testified would have occurred in the culture Yang possessed and gave to Jung. Appx2832-33, Q/A 136.

*Third*, even if ▮cell bank prep. method▮ is conducted on a given sample, the original genetic diversity remains in the culture from which the sample was taken. (*See supra* SOC Section III.C (citing Appx1631:17-24; Appx1775, Q/A 41; Appx888, 262:8-13; Appx887, 258:8-13).) Keim testified that there is no reason to eliminate genetic diversity in a stock mixed lineage culture; instead, a researcher would perform ▮cell bank prep. method▮ on a sample from that culture only before performing an experiment. Appx887, 258:8-13; Appx887-88, 261:21-262:13.

The ALJ dismissed all this evidence as "conclusory" (Appx34-35),[11] but, in contrast, found that Respondents and Staff "persuasively" argued a lack of

---

[11] The ALJ also disregarded, as "attorney argument," Medytox's point that a research laboratory would not have wanted permanently to destroy the useful genetic diversity of a strain. Appx34-35 (citing Appx887, 258:8-13). This ignored Keim's testimony that a research laboratory would perform different experiments with different purposes and would frequently return to the cultures to perform new

evidence that ███████████████████ was ***not*** performed earlier on Yang's strain.

Appx34.  The ALJ did not appreciate that Hugel and Staff had made these

arguments based on practices that are used to create a new cell ***bank***, and not for

general research such as that conducted by Yang.  Appx1332; Appx3210.  And

Staff admitted that it "has seen no specific evidence concerning Dr. Yang's

culturing practices."  Appx3209-10.  Neither Staff nor Respondents ever attempted

to explain why Yang would have eliminated the genetic diversity of his stock

research culture, which he had brought from the University of Wisconsin to Korea

in the 1970s, rather than using ███████████████████ on an experiment-by-

experiment basis, as was standard in research laboratories.  Appx1633:1-34:10;

Appx1643:20-44:17; Appx887-88, 261:21-262:13.

        Yang never testified that he performed ███████████████████ on his

cultures, and Medytox presented evidence that there was no reason for him to have

performed ███████████████████ on the cultures later obtained by Medytox.  The

ALJ abused his discretion by relying on Staff's and Respondents' speculation to

the contrary.  *DBN Holding*, 755 F. App'x at 996 (decision based "on factual

findings that are not supported by substantial evidence" is an abuse of discretion).

---

experiments, and would only perform single colony isolation on an experiment-by-
experiment basis.  Appx887-88, 258:14-259:12, 261:21-262:13.

### 2. The ALJ erred by assuming, without evidence, that the sample Medytox claims Hugel converted would have been subjected to [cell bank prep. method]

The ALJ also erred by making a factual finding that any sample that Hugel would have converted from Medytox would have had to have come from Medytox cell banks that had been subject to [cell bank prep. method]. The ALJ determined that because Medytox used [cell bank prep. method] to develop certain of its cell banks, it could not have had a genetically diverse sample at the time Hugel converted its strain. Appx34. Based on this mistaken assumption, the ALJ concluded that Medytox did not possess a mixed lineage culture at the time of the conversion. Appx35 This was error because Medytox alleged that Hugel took a sample from a mixed lineage culture, not a [cell bank prep. method] cell bank.

Jung testified that in 2001, he used [cell bank prep. method] to create an initial cell bank from the culture received from Yang. Appx2139:2-40:15. Jung's use of [cell bank prep. method] would have created a cell bank with a bacterial colony that contained only Medytox's CB19 strain. Jung testified that this cell bank became the basis for Medytox's later cell banks, including CBAM0301 and CB19. Appx2156:10-2157:1. Everyone agrees that, based on the scientific evidence, Hugel could not have converted these cell banks to create its current strain. Appx2831-32, Q/A 132.

Based on this evidence, the ALJ then made an illogical leap.  He found that "[t]he evidence thus shows that Medytox's cell bank at the time of the alleged misappropriation had its genetic diversity eliminated and was not a mixed lineage culture as Dr. Keim hypothesized."  Appx34.[12]  This conclusion assumed that Hugel could only have converted cells from Jung's initial cell bank.  But this assumption has no basis in the record.  Indeed, Medytox maintained during the investigation that Hugel had converted a mixed lineage culture, ***not*** a strain from Jung's initial cell bank.  Appx1197.  Importantly, Jung never testified that after creating his [cell bank prep. method] cell bank, he destroyed the original mixed lineage vials that he had received from Yang.  And there is no evidence of such destruction.  To the contrary, after a cell bank was created, the owner would have preserved the source cell vials for future use.  *See* Appx888, 262:8-13.

The ALJ reached his erroneous conclusion by focusing on only a portion of the evidence, and misinterpreting it.  He noted that "Dr. Jung testified during his deposition that there were no genetic alterations between Medytox's original research cell bank and CBAM0301."  Appx33 (citing Appx2157:3-9;

---

[12] Dr. Jung's use of [cell bank prep. method] on a culture he received from Dr. Yang supports the fact that Dr. Yang gave Dr. Jung a mixed lineage culture (*see supra* SOC Section III.C).  If there had been no genetic diversity in the original strain, then Dr. Jung would not have needed to perform [cell bank prep. method].

Appx2157:12-58:11).  This is correct, but irrelevant to whether Hugel converted a

mixed lineage culture possessed by Medytox in 2001.  The ALJ then observed:

> Dr. Jung also testified that the strain Medytox received from Dr. Yang
> had the specific set of mutations previously identified as trade
> secrets. . . .  This testimony undermines the mixed lineage theory by
> showing that Medytox owned a culture that was genetically almost
> identical to CBAM0301.

Appx33.  But Jung did not testify that the culture he received from Yang contained

strains with ***only*** that specific set of mutations that was previously identified as a

trade secret, *i.e.*, the SNPs of the CB19 strain.[13]  Jung's testimony is ***consistent***

with his having received a mixed lineage culture from Yang.  That mixed lineage

culture would have had one bacterial lineage with the set of mutations specific to

Medytox's current cell banks in some cells (Appx2834-35, Q/A 141), and also

would have included a bacterial lineage with different sets of mutations, including

the ▮#▮ UMass SNPs present in the Hugel strain.  *Id.*

The ALJ found that Medytox did not possess a mixed lineage culture

at the time of the conversion based on this mistaken understanding of facts

concerning the cultures in Medytox's possession.  That was abuse of discretion.

---

[13] In this investigation, Medytox identified as one of its trade secrets the
mutations that are unique to its commercial strain (CB19).  Appx212-13, 2-19.
Medytox later withdrew its misappropriation of trade secret claim.  Appx286-91.

**IV.    The Commission Erred by Forcing Medytox To Rely on a Single Theory of Conversion**

The Commission held that even if Medytox possessed a mixed lineage culture, and regardless of whether the can of beans story is false, Medytox could not prove conversion because it did not show precisely when and how Hugel had obtained Medytox's strain—even though Hugel's theft occurred decades ago and Medytox only became aware of that theft years later.  Appx43-46; Appx100.  The Commission's limitation of Medytox to this single theory of conversion was error.

It is well-settled that because wrongdoers try to avoid leaving evidence of theft, direct evidence is ***not*** required to show conversion.  "It is not always possible for the person alleging conversion to provide eyewitness or other direct evidence of the act constituting conversion.  Indeed, even in a criminal case (where the standard of proof is much higher), a conviction for conversion can be sustained on the basis of circumstantial evidence."  *Albers v. Mellegard, Inc.*, No. CR 06-4242-KES, 2008 WL 7122683, at *20 (D.S.D. Oct. 27, 2008).  Thus, Medytox was not required to show exactly ***how*** Hugel converted Medytox's *C. botulinum* strain—only that Hugel had the ability to convert it.

For example, in *Optional Capital, Inc. v. Kim*, circumstantial evidence showed that money was deposited in an account that the defendants had access to and that later the money was no longer in the account.  414 F. App'x 12, 15-16 (9th Cir. 2011).  The defendants were found to have converted the money, even

61

though there was no direct evidence that defendants actually received any transfers from that account. *Id.* Similarly, in cases involving misappropriation of trade secrets—which is a type of conversion[14]—misappropriation may be established by indirect evidence that the defendant had access to the protected materials, and that defendant's product demonstrated similarity to plaintiff's product that was allegedly misappropriated. *Masimo Corp. v. True Wearables, Inc.*, No. 18-02001, 2022 WL 17083396, at *11 (C.D. Cal. Nov. 7, 2022) (finding "strong circumstantial evidence," including "fingerprint" found in the defendant's source code, "supports a finding of misappropriation"); *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1361 (Fed. Cir. 2002) ("These showings—access and similarity—may support a trade secret misappropriation claim.").

That is the exact situation presented by this case. Hugel was found to be in possession of a strain of *C. botulinum* that is so genetically close to Medytox that, in the context of the unique facts of this case, it must have come from Medytox. That is particularly so because Hugel provided a false story about the origin of its strain and disclaimed any other possible sources. Once the can of

---

[14] *See*, *e.g.*, *Overdrive, Inc. v. Baker & Taylor, Inc.*, No. CIV.A. 5835-CC, 2011 WL 2448209, at *5 (Del. Ch. June 17, 2011) ("a conversion claim could [] exist based on the misappropriation of confidential information"); *Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 680 (E.D. Pa. 2018) ("trade secrets are treated as convertible property under Pennsylvania law").

beans story is shown to be false, the circumstantial evidence leads inexorably to the conclusion that Hugel obtained its strain through conversion from Medytox.

Nevertheless, the ALJ determined that because Medytox "has waived any contention that the alleged conversion occurred in another way or at any other time," Medytox was permitted to rely only on the proposition that Seo (and no one else) converted Medytox's strain during one particular visit to Jung's laboratory at Sun Moon University. Appx38 n.15. This finding was erroneous. Medytox did not limit itself to a theory of conversion *only* by Seo. Medytox's pre-hearing brief recounted Seo's visit to Jung's laboratory without alleging that Seo converted Medytox's strain at that time. Appx331-32. In that same brief, Medytox made allegations about other potential avenues of conversion. *Id*. For example, Medytox's brief described that Seo was accompanied during his visit by another professor, Dr. Kim, who had had several disagreements with Jung. *Id*. These allegations formed the basis for Medytox's assertion of other "possible explanation[s]" rejected by the Commission. Appx1210.

In any event, the law does not require Medytox to explain precisely how Hugel converted its strain. The circumstantial evidence here showed that Hugel had ***access*** to Medytox's strains through Seo and Kim and that later Hugel possessed a strain that was extraordinarily closely related to Medytox's strains and that (according to Hugel) there were no other sources for the strain. No more is

required.  *Leggett & Platt*, 285 F.3d at 1361.  Medytox did not need to show precisely when or how Seo or Kim assisted Hugel in converting Medytox's mixed lineage culture, as the Commission appears to have required.  Appx38 n.15.  Thus, the Commission erred by limiting Medytox to a single theory of conversion and for the subsequent determination against Medytox on the second prong of the conversion claim.  Appx96.  The Commission's determination was based on an erroneous legal conclusion, and was therefore an abuse of discretion.

## CONCLUSION

This case should be remanded to the Commission for reconsideration of Medytox's conversion claim based on the complete record.

Dated:  June 23, 2025

Respectfully submitted,

*/s/ Keith R. Hummel*

Keith R. Hummel
Sharonmoyee Goswami
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001

*Counsel for Medytox Inc.*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number:** 2025-1262

**Short Case Caption:** Medytox Inc. v. International Trade Commission

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on June 23, 2025 by

☐ U.S. Mail     ☐ Hand Delivery     ☐ Email     ☐ Facsimile
☒ Other: CM/ECF

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
| --- | --- |
| | |
| | |
| | |
| | |

☐    Additional pages attached.

Date:  June 23, 2025          Signature:    /s/ Keith R. Hummel

Name:    Keith R. Hummel

66

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  2025-1262

**Short Case Caption:**  Medytox Inc. v. International Trade Commission

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☒  the filing has been prepared using a proportionally-spaced typeface and includes 13952 words.

☐  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐  the filing contains_____pages / _____words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No._____).

Date: June 23, 2025          Signature:   /s/ Keith R. Hummel

Name:      Keith R. Hummel

**FORM 31. Certificate of Confidential Material**

Form 31
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2025-1262

**Short Case Caption:** Medytox v. Int'l Trade Comm'n

> **Instructions:** When computing a confidential word count, Fed. Cir. R.
> 25.1(d)(1)(C) applies the following exclusions:
>
> - Only count each unique word or number once (repeated uses of the same
>   word do not count more than once).
>
> - For a responsive filing, do not count words marked confidential for the first
>   time in the preceding filing.
>
> The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments;
> exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains   15   number of unique words (including
numbers) marked confidential.

☑    This number does not exceed the maximum of 15 words permitted by
Fed. Cir. R. 25.1(d)(1)(A).

☐    This number does not exceed the maximum of 50 words permitted by
Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28
U.S.C. § 1491(b).

☐    This number exceeds the maximum permitted by Federal Circuit Rule
25.1(d)(1), and the filing is accompanied by a motion to waive the
confidentiality requirements.

Date: 06/23/2025

Signature: /s/ Keith R. Hummel

Name: Keith R. Hummel

# NONCONFIDENTIAL
# ADDENDUM

# UNITED STATES INTERNATIONAL TRADE COMMISSION
## Washington, D.C.

In the Matter of

**CERTAIN BOTULINUM TOXIN
PRODUCTS AND PROCESSES FOR
MANUFACTURING OR RELATING TO
SAME**

**INV. NO. 337-TA-1313**

## INITIAL DETERMINATION ON VIOLATION OF SECTION 337 AND
## RECOMMENDED DETERMINATION ON REMEDY AND BOND

Administrative Law Judge Bryan F. Moore
(June 10, 2024)

**Appearances:**

*For Complainant Medytox, Inc.*:

James E. Baker, Esq. and Laura Fairneny, Esq., of Quinn Emanuel Urquhart & Sullivan, LLP from New York, NY

S. Alex Lasher, Esq. of Quinn Emanuel Urquhart & Sullivan, LLP from Washington, D.C. David

Bilsker, Esq. of Quinn Emanuel Urquhart & Sullivan, LLP from San Francisco, CA Margaret

Shyr, Esq. of Quinn Emanuel Urquhart & Sullivan, LLP from Redwood Shores, CA *For*

*Respondent Croma Pharma GmbH*:

Goutam Patnaik, Esq., David J. Shaw, Esq., and Tuhin Ganguly, Esq. of Desmarais LLP from Washington, DC

*For Respondents Hugel Inc. and Hugel America, Inc.*:

Eric S. Namrow, Esq., Stephanie L. Roberts, Esq., Kandis C. Gibson, Esq., Min Woo Park, Esq., and Emily K. Burge, Esq. of Morgan, Lewis & Bockius LLP from Washington, D.C.

Krista Vink Venegas, Ph.D., Esq. and Zachary D. Miller, Esq. of Morgan, Lewis & Bockius LLP from Chicago, IL

Tae-Woong Koo, Ph.D., Esq. of Morgan, Lewis & Bockius LLP from Palo Alto, CA

Daniel Zaheer, Esq. of Kobre & Kim LLP from San Francisco, CA

Michael Kim, Esq., Benjamin Sirota, Esq., and Martine Forneret, Esq. of Kobre & Kim LLP from New York, NY

Zach Ruby, Esq. of Kobre & Kim LLP from Washington, D.C.

Daniel Lee, Esq. and Naomi Yang, Esq. of Kobre & Kim LLP from Seoul, South Korea

<u>*For the Office of Unfair Import Investigations*</u>:

Megan Wantland, Esq., Jeffrey Hsu, Esq., and Margaret Macdonald, Esq. of the U.S. International Trade Commission from Washington, D.C.

**Table of Contents**

I.    Introduction.................................................................................................. 1

    A.    Procedural History .............................................................................. 1

    B.    The Parties .......................................................................................... 3

        1.    Complainant Medytox Inc. .......................................................... 3

        2.    Respondents ................................................................................. 3

        3.    Relevant Third Parties.................................................................. 4

    C.    Overview of the Technology ................................................................ 6

        1.    *Clostridium botulinum* and Botulinum Toxins ............................ 6

        2.    Whole Genome Sequencing and Phylogenetic Analysis .............. 7

    D.    The Products At Issue .......................................................................... 9

II.    Jurisdiction & Importation............................................................................ 9

    A.    Personal Jurisdiction ........................................................................... 9

    B.    Importation......................................................................................... 10

    C.    *In Rem* Jurisdiction .......................................................................... 10

    D.    Standing ............................................................................................. 11

III.    Legal Principles .......................................................................................... 11

    A.    Theft and Conversion......................................................................... 11

    B.    Domestic Industry ............................................................................. 13

IV.    Theft and Conversion.................................................................................. 15

    A.    Medytox Bears the Burden of Proof to Prove its Claim ..................... 15

    B.    Medytox Has Not Proven Theft and Conversion by a Preponderance of the Evidence.................................................................................... 17

        1.    Medytox Has Failed to Prove that it Possessed a Mixed Lineage Strain........ 18

        2.    The Evidence Does Not Show it is More Likely Than Not That Hugel Exercised Wrongful Dominion over a Mixed Lineage Culture ..................... 29

V.    Respondents' Defenses to Theft and Conversion ........................................ 47

    A.    Preemption ......................................................................................... 47

    B.    Not an "Unfair Act[] in the Importation of Articles" under Section 337 ............. 47

VI.    Domestic Industry ...................................................................................... 48

    A.    Existence of a Domestic Industry ....................................................... 49

        1.    Medytox .................................................................................... 49

        2.    Evolus ....................................................................................... 53

3.   AEON ......................................................................................... 57

4.   Allergan, Ipsen, and Supernus ......................................................... 60

B.   Threat of Injury to Domestic Industry ..................................... 62

VII.   Findings of Fact and Conclusions of Law ........................................ 68

VIII.   Recommended Determination on Remedy AND Bonding ............................ 69

A.   Limited Exclusion Order ......................................................... 69

B.   Cease and Desist Order ......................................................... 71

C.   Bonding .......................................................................... 73

IX.   Initial Determination on Violation ................................................. 76

X.   Order ............................................................................ 76

**Table of Abbreviations**

| | |
|---|---|
| **CDX** | Complainant's demonstrative exhibit |
| **CIB** | Complainant's initial post-hearing brief, available at EDIS Doc. ID 816248 |
| **CPB** | Complainant's pre-hearing brief, available at EDIS Doc. ID 812219 |
| **CRB** | Complainant's responsive post-hearing brief, available at EDIS Doc. ID 817204 |
| **CSB** | Complainant's supplemental brief, available at EDIS Doc. ID 822194 |
| **CX** | Complainants' exhibit |
| **JX** | Joint Exhibit |
| **RDX** | Respondents' demonstrative exhibit |
| **RIB** | Respondents' initial post-hearing brief, available at EDIS Doc. ID 816221 |
| **RPB** | Respondents' pre-hearing brief, available at EDIS Doc. ID 812218 |
| **RRB** | Respondents' responsive post-hearing brief, available at EDIS Doc. ID 817191 |
| **RSB** | Respondents' supplemental brief, available at EDIS Doc. ID 822484 |
| **RX** | Respondents' exhibit |
| **SIB** | Staff's initial post-hearing brief, available at EDIS Doc. ID 816636 |
| **SPB** | Staff's pre-hearing brief, available at EDIS Doc. ID 814130 |
| **SRB** | Staff's responsive post-hearing brief, available at EDIS Doc. ID 818687 |
| **SSB** | Staff's supplemental brief, available at EDIS Doc. ID 822681 |
| **SX** | Staff's exhibit |
| **Tr.** | Transcript |

**PUBLIC VERSION**

# UNITED STATES INTERNATIONAL TRADE COMMISSION

## Washington, D.C.

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN BOTULINUM TOXIN PRODUCTS AND PROCESSES FOR MANUFACTURING OR RELATING TO SAME** | **INV. NO. 337-TA-1313** |

## INITIAL DETERMINATION ON VIOLATION OF SECTION 337 AND RECOMMENDED DETERMINATION ON REMEDY AND BOND

Administrative Law Judge Bryan F. Moore

(June 10, 2024)

Pursuant to the Notice of Investigation, 87 Fed. Reg. 26,782 (May 5, 2022) ("Notice of Investigation"), and 19 C.F.R. §§ 210.10(b), 210.42(a)(1)(i), this is the final initial determination in the matter of *Certain Botulinum Toxin Products and Processes for Manufacturing or Relating to Same*, Investigation No. 337-TA-1313.

For the reasons stated herein, I have determined that there has been no violation of section 337 of the Tariff Act of 1930, as amended, in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain botulinum toxin products and processes for manufacturing or relating to same.

## I.    INTRODUCTION

### A.    Procedural History

On March 30, 2022, Medytox Inc. ("Complainant" or "Medytox") filed a complaint alleging violations of section 337 based on the importation into the United States, the sale for importation, and the sale within the United States after importation of certain botulinum toxin products and processes for manufacturing or relating to the same by reason of theft and conversion and misappropriation of trade secrets. Notice of Investigation at 26,782.

On April 29, 2022, the Commission instituted Investigation No. 337-TA-1313 to determine:

> [W]hether there is a violation of subsection (a)(1)(A) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain products identified in paragraph (2) by reason of theft and conversion and misappropriation of trade secrets, the threat or effect of which is to destroy or substantially injure an industry in the United States[.]

*Id.* at 26,783.

The plain language description of the accused products or category of accused products, which defines the scope of the investigation, is "botulinum toxin drug products[.]" *Id.* at 26,783; *see also* 19 C.F.R. § 210.10(b)(1) ("The notice will define the scope of the investigation in such plain language as to make explicit what accused products or category of accused products provided in accordance with § 210.12(a)(12) will be the subject of the investigation[.]").

The Notice of Investigation named the following parties as respondents: Hugel, Inc., Hugel America, Inc. (collectively, "Hugel"), and Croma Pharma GmbH ("Croma") (all parties collectively, "Respondents"). Notice of Investigation at 26,783.

The Office of Unfair Import Investigations is a party to this investigation. *Id.*

On May 26, 2022, I set an 18-month target date of November 6, 2023, for this investigation. Order No. 5 (May 26, 2022). On October 24, 2022, I issued an initial determination extending the target date for this investigation to May 6, 2024 "'to accommodate the discovery timeline expected for [the Korean Ministry of Trade, Industry, and Energy] approval' of [the parties'] applications for export of documents and information necessary for this case." Order No. 12 (Oct. 24, 2022), *unreviewed*, Comm'n Notice, EDIS Doc. ID 784295 (Nov. 10, 2022).

On April 25, 2023, I issued an initial determination extending the target date for this investigation to October 10, 2024. Order No. 16 (Apr. 25, 2023), *unreviewed*, Comm'n Notice, EDIS Doc. ID 797109 (May 24, 2023). Pursuant to this initial determination, the final initial determination in this investigation is due on June 10, 2024. *Id.* at 2.

On January 22, 2024, I issued an initial determination granting Medytox's motion for partial termination based on withdrawal of its claims of misappropriation of trade secrets. Order No. 39 (Jan. 22, 2024), *unreviewed*, Comm'n Notice, EDIS Doc. ID 813405 (Feb. 6, 2024).

A pre-hearing conference was held on February 25, 2024.[1] The evidentiary hearing was held on February 25-29, 2024.[2] On March 1, 2024, I admitted certain exhibits into the record. Order No. 53 (Mar. 1, 2024). On March 14, 2024, I granted Respondents' unopposed motion to reopen the evidentiary record and admit RX-0005C. Order No. 54 (Mar. 14, 2024). On May 20, 2024, I granted Medytox's motion to reopen the evidentiary record to admit CX-1171 and CX-1172 and ordered the parties to submit supplemental briefing regarding these exhibits. Order No.

---

[1] EDIS Doc. ID 814997 (public transcript); EDIS Doc. ID 814998 (confidential transcript). To the extent I cite to this transcript, I refer to it by "Prehr'g Conf. Tr."

[2] The hearing transcripts were posted on EDIS as EDIS Doc. IDs 815001 (Feb. 25 public), 815000 (Feb. 25 confidential), 815081 (Feb. 26 public), 815080 (Feb. 26 confidential), 815249 (Feb. 28 confidential), 815248 (Feb. 28 confidential), 815328 (Feb. 29 confidential), 815329 (Feb. 29 confidential).

55 (May 20, 2024). The parties filed those supplemental briefs on May 23, 2024, May 29, 2024, and May 31, 2024.

The parties filed post-hearing briefing on March 15, 2024, March 22, 2024, March 29, 2024, and April 5, 2024.

### B.    The Parties

#### 1.    Complainant Medytox Inc.

Medytox is a biopharmaceutical company based in the Republic of Korea founded in 2000 by Dr. Hyun Ho Jung. CX-0001C (Jung WS) at Q/As 2, 9-11. Medytox launched its first product, Meditoxin® in 2006. *Id.* at Q/A 10. Medytox is currently seeking approval from the U.S. FDA for a product internally referred to as MT10109L, a liquid botulinum toxin product. *Id.* at Q/A 18.

Medytox's U.S. subsidiary is Luvantus, Inc. ("Luvantus"). CX-1162C (Albright WS) at Q/A 4. Luvantus's purpose is to market and commercialize MT10109L in North America. *Id.* at Q/As 23-24.

#### 2.    Respondents

##### a)    Respondents Hugel, Inc. and Hugel America, Inc.

Hugel, Inc. is a biopharmaceutical company based in the Republic of Korea founded in November 2001. RX-0009C (C. Lee WS) Q/As at 3-4. Hugel, Inc. was founded by Dr. Kyeong Yeop Moon, who served as its CEO until July 2017. *Id.* at Q/As 16-17. Hugel, Inc. manufactures a botulinum toxin product, Letybo®, for which it is seeking FDA approval. RX-0010C (Kwon WS) at Q/A 14; RX-0008C (Hartman WS) at Q/As 21-23. FDA approved Letybo® on February 29, 2024. CX-1172.

Hugel America, Inc. is a corporation incorporated in Delaware with a principal place of business in Irvine, California. EDIS Doc. ID 772556 (Hugel Resp. to Compl.) ¶ 16. Hugel America, Inc. was created as a joint venture between Hugel Inc. and Croma to bring products to

the United States and other countries. *Id.*; CX-0010C.0014 (Joint Venture Agreement). Croma no longer has any ownership interest in Hugel America, Inc. CX-1139C (Hartman Dep. Tr.) at 280:6-281:22. Hugel America, Inc. seeks to launch Letybo® in the "back half of 2024." CX-1171.1.

### b)    Respondent Croma Pharma GmbH

Croma is a limited liability company organized under the laws of the Republic of Austria, with a principal place of business in Austria. EDIS Doc. ID 772539 (Croma Resp. to Compl.) ¶ 21. Croma is a medical aesthetics company. *Id.* ¶ 22. Croma signed a joint venture agreement in 2018 to form Hugel America, Inc. *Id.* Croma and Hugel are no longer partners, and Croma no longer has any ownership interest in Hugel America, Inc. CX-1139C (Hartman Dep. Tr.) at 280:6-281:22.

### 3.    Relevant Third Parties

Medytox relies on certain third parties to prove that a domestic industry exists. Two are its licensees, Evolus, Inc. ("Evolus") and AEON Biopharma, Inc. ("AEON"). CIB at 17. Others are Allergan, Inc. ("Allergan"), Ipsen Biopharmaceuticals, Inc. ("Ipsen"), and Supernus Pharmaceuticals, Inc. ("Supernus"). *Id.*

Evolus is a Delaware corporation with a principal place of business in Newport Beach, California. JX-0086C ¶ 4. Evolus has one commercial product, Jeuveau®. *Id.* ¶ 5. Jeuveau® is a botulinum toxin product approved for aesthetic indications, treatment of glabellar lines. *Id.* ¶¶ 5, 8. Evolus developed Jeuveau® with Daewoong Pharmaceuticals Co. Ltd. *Id.* ¶ 11. Evolus entered into a license agreement with Medytox as part of a settlement of litigation between Evolus and Daewoong. *Id.*; JX-0078C. That litigation includes *Certain Botulinum Products, Processes for Manufacturing or Relating to Same and Certain Products Containing Same*, Investigation No. 337-TA-1145 (hereinafter, "the 1145 Investigation").

AEON is a Delaware corporation with a principal place of business in Irvine, California. JX-0138C ¶ 4. AEON is focused on therapeutic uses of botulinum toxins, and its product is ABP-450, a botulinum toxin product. *Id.* ¶¶ 5, 7. AEON is in clinical trials in the United States for approval of ABP-450 for therapeutic uses such as migraine, cervical dystonia, and gastroparesis. *Id.* ¶ 9. AEON is a licensee of Medytox. JX-0144C. This license agreement was entered into to settle litigation, including the 1145 Investigation. *Id.*

Allergan is a Delaware corporation with a principal place of business in Irvine, California. Allergan licensed the rights to MT10109L in September 2013, but that license was terminated in September 2021. CX-0854; CX-0846. In the 1145 Investigation, Medytox and Allergan asserted a domestic industry based on MT10109L. The Initial Determination determined that a domestic industry existed based on Allergan's investment in MT10109L, but that Allergan and Medytox had not proven a threat of injury to MT10109L. *Certain Botulinum Toxin Prods., Processes for Mfg. or Relating to Same & Certain Prods. Containing Same*, Inv. No. 337-TA-1145, Initial Determination at 189-90, 224-25 (Public Version Aug. 6, 2020). The Commission mooted the ALJ's findings regarding MT10109L because Medytox and Allergan did not file a petition for review of that portion of the Initial Determination. *Certain Botulinum Toxin Prods., Processes for Mfg. or Relating to Same & Certain Prods. Containing Same*, Inv. No. 337-TA-1145, Comm'n Op. at 55-56 (Public Version Jan. 13, 2021).

Ipsen is the U.S. subsidiary of Ipsen S.A. CX-0634C ¶ 1. Ipsen is a Delaware corporation with a principal place of business in Cambridge, Massachusetts. *Id.* ¶ 5. Ipsen's botulinum toxin product, Dysport®, was approved by FDA in April 2009. *Id.* ¶ 7.

Supernus is a Delaware corporation with a principal place of business in Rockville, Maryland. JX-0074C ¶ 5. Supernus is a biopharmaceutical company. *Id.* ¶ 3. Supernus's botulinum

toxin product is Myobloc®, which is approved for the treatment of cervical dystonia and chronic sialorrhea in adults. *Id.* ¶ 6. Supernus acquired Myobloc® from USWM Enterprises, LLC in April 2020. *Id.* ¶ 7. Supernus is seeking to expand the approved indications for Myobloc®. *Id.* ¶ 8.

### C.    Overview of the Technology

#### 1.    *Clostridium botulinum* and Botulinum Toxins

At the center of this dispute are strains of a bacteria, *Clostridium botulinum*,[3] and toxins produced by it. *C. botulinum* is a bacteria that is "ubiquitous." Tr. (Goodnough) at 621:19-622:8. It can be found in, among other things, soil. *Id. C. botulinum* can end up in food, such as canned goods, by being carried on the food into the can. Tr. (Parkhill) at 781:8-17.

There are many strains of *C. botulinum*, which produce different serotypes[4] of botulinum toxin. CX-0002C (Keim WS) at Q/A 83; CX-0004C (Pickett WS) at Q/A 56. There are seven known serotypes, labeled from A to G. CX-0004C (Pickett WS) at Q/A 57. These serotypes also contain subtypes, such as A1, A2, etc. *Id.* Certain botulinum toxins are highly potent toxins to humans but have therapeutic and aesthetic uses. *Id.* at Q/As 52, 54. Botulinum toxin is sometimes also referred to as "BoNT" or "BTX." *Id.* at Q/A 53. Type A1 botulinum toxin is generally considered the most viable for commercial purposes. *Id.* at Q/A 59.

A strain of *C. botulinum* called the "Hall A-hyper" strain is known to produce more toxin per unit than other type A strains. CX-0004 (Pickett W/S) at Q/A 68-69, 71. The Hall A-hyper strain is named after Dr. Ivan Hall, a botulinum researcher in the early 1900s who collected many

---

[3] The parties and experts refer to this species by the abbreviation "*C. botulinum.*" in accordance with scientific convention. I follow this same convention. During the evidentiary hearing, the parties and their experts also sometimes referred to this species as "*C. bot.*" *E.g.*, Tr. (Medytox Opening) at 11:10-12.

[4] A "serotype" is a variation within a species that generates a certain antigen.

*C. botulinum* strains. *Id.* at Q/A 70. In the 1940s, Dr. Elizabeth McCoy discovered that the Hall A-hyper strain produced a high concentration of toxin per culture. CX-0002C (Keim WS) at Q/A 93; CX-0129C.0003; JX-0024.0003. The Hall A-hyper strain was developed by the U.S. Army at Fort Detrick, Maryland, by screening for high toxin production. JX-0024.0003. Dr. Hiroshi Sugiyama, a researcher at the University of Wisconsin Food Research Institute, obtained the strain from the Army and brought it to the Food Research Institute. Tr. (Keim) at 200:24-201:17. As I explain in more detail below, the record in this Investigation is consistent with the 1145 Investigation, where the Commission explained that "[t]he record . . . shows that the Hall A-hyper strain held by the University of Wisconsin was freely circulated to other entities as well." *Botulinum Toxin Prods.*, Comm'n Op at 30.

### 2.    Whole Genome Sequencing and Phylogenetic Analysis

A central piece of evidence in this Investigation is the genome sequencing that was performed by the parties' experts. Whole genome sequencing involves examining the entire DNA make-up of an organism's genetic code. CX-0002C (Keim WS) at Q/A 19. *C. botulinum* has approximately 3.7 nucleotides, which are the individual units that make up DNA. *Id.* at Q/As 19, 29. Nucleotides consist of a phosphate group, a 6-carbon sugar, and a nitrogenous base. *Id.* at Q/A 19 The bases are what code for genetic information. *Id.* There are four bases, adenine ("A"), cytosine ("C"), guanine ("G"), and thymine ("T"). *Id.* Segments of long sequences of nucleotide make up a gene. *Id.* Whole genome sequencing involves sequencing not just an isolated gene, but the entire genome of a species. *Id.* Medytox's expert, Dr. Paul Keim, explained in his witness statement how whole genome sequencing is performed. *Id.* at Q/As 39-46. As discussed below, all parties adopted the sequencing and phylogenetic analysis performed by Medytox's experts for purposes of the hearing.

DNA can mutate in various ways. One way is what is called a "single nucleotide polymorphism" or "SNP." *Id.* at Q/A 21. A SNP is a mutation in a single position, such as an A mutating into C, G, or T. *Id.* Another kind of mutation is what is called an "indel" or an insertion or deletion of a nucleotide. *Id.* at Q/A 157. Genomic sequences can also be rearranged in a chromosome, changing the order of sequences of genes or other encoding. *Id.* at Q/A 169; *see also* CX-0721 (Fang et al. article describing chromosomal rearrangement in Hall *C. botulinum* strains).

Using analysis of SNPs in related species, a scientist can perform a phylogenetic analysis. CX-0002C (Keim WS) at Q/As 22-23. SNPs typically are passed along to progeny of a bacteria, meaning that unique mutations can be used to trace the origin of an organism. *Id.* at Q/A 22. Dr. Keim showed a simplified phylogenetic tree, showing how different mutations can show common ancestry. *Id.* at Q/A 23.



CDX-0002C.4. As Dr. Keim explained, by looking at mutations, a scientist can infer how strains descended from one another. CX-0002C at Q/As 26-27.

### D.    The Products At Issue

The Accused Products in this investigation are botulinum toxin products manufactured by Hugel, for which obtained FDA approval and intends to commercialize under the brand name Letybo®. CIB at 17.

The alleged domestic industry consists of several botulinum toxin products: Medytox's MT10109L, Evolus's Jeuveau®, AEON Biopharma's ABP-450, Allergan's Botox®, Ipsen's Dysport®, and Supernus's Myobloc®. CIB at 17-18.

## II.    JURISDICTION & IMPORTATION[5]

### A.    Personal Jurisdiction

By filing a complaint and participating in this Investigation, Medytox has consented to personal jurisdiction at the Commission. *See Certain Toner Cartridges, Components Thereof, & Sys. Containing the Same*, Inv. No. 337-TA-1174, Initial Determination at 35 (Public Version Aug. 10, 2020), *unreviewed in relevant part*, Comm'n Notice (Sept. 8, 2020).

Respondents have participated in this investigation by, among other things, responding to the complaint and notice of investigation and participating in discovery, thereby submitting themselves to the personal jurisdiction of the Commission. *See, e.g.*, *Certain Strontium-Rubidium Radioisotope Infusion Sys. & Components Thereof Including Generators*, Inv. No. 337-TA-1110, Initial Determination at 9 (Public Version Aug. 13, 2019), *unreviewed in relevant part*, Comm'n Notice (Sept. 30, 2019). Respondents agree that they have submitted to the personal jurisdiction of the Commission. RIB at 7.

---

[5] Medytox argues that "[t]he Commission therefore has subject matter jurisdiction over this investigation." CIB at 18. But the Commission recently stated that "the concept of 'subject matter jurisdiction' does not apply to administrative agencies." *Certain Silicon Photovoltaic Cells & Modules with Nanostructure, & Prods. Containing the Same*, Inv. No. 337-TA-1271, Comm'n Notice at 3 (Feb. 27, 2023). I therefore do not address subject matter jurisdiction.

I therefore find that the Commission has personal jurisdiction over all parties.

### B.    Importation

The statute defines a violation of section 337 as "[t]he importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles that . . . infringe a valid and enforceable United States patent." 19 U.S.C. § 1337(a)(1)(B). Accordingly, "[t]o prevail under section 337, a complainant must prove that a respondent actually imported or sold for [or after] importation the articles at issue." *Certain Carbon & Alloy Steel Products*, Inv. No. 337-TA-1002, Order No. 103 at 33 (Public Version Nov. 2, 2017), *unreviewed*, Comm'n Notice (Nov. 1, 2017).

The evidence shows that Respondents imported the Accused Products into the United States. CX-0038C.72-76 (Hugel admitting that Croma has imported Accused Products on its behalf); CX-0938C.9-17 (Croma admitting that it has imported Accused Products). Respondents do not contest that the importation requirement has been met. RPB at 9.

I therefore find that the importation requirement has been satisfied.

### C.    *In Rem* Jurisdiction

The Commission has in rem jurisdiction over the accused products by virtue of their importation into the United States. *See Sealed Air Corp. v. U.S. Int'l Trade Comm'n*, 645 F.2d 976, 985-86 (C.C.P.A. 1981) (holding that the Commission's jurisdiction over imported articles is sufficient to exclude such articles). Respondents agree that the Commission has *in rem* jurisdiction over the Accused Products. RIB at 7.

I therefore find that the Commission has *in rem* jurisdiction over the Accused Products

### D.    Standing

Medytox contends that it has standing because it owns the strain of *C. botulinum* at issue in this Investigation. CIB at 18. Respondents did not address whether Medytox has standing but did contest Medytox's ownership of any allegedly converted property. *See* RIB at 31-43. Staff argues that Medytox has standing. SIB at 16-17.

Constitutional standing is not required before the Commission. *See Certain Active Matrix Organic Light-Emitting Diode Display Panels & Modules for Mobile Devices, & Components Thereof*, Inv. No. 337-TA-1351, Comm'n Op. at 11-16 (Public Version May 15, 2024). The question of "standing" here goes to the merits, as it is about whether Medytox has an ownership interest in the allegedly converted property. *See* § III.A, *infra*. I therefore address whether Medytox has shown that it owned the allegedly converted strain in considering the merits.

## III.    LEGAL PRINCIPLES

### A.    Theft and Conversion

The Commission has not previously set forth the legal standard for a theft or conversion claim under section 337.[6] The parties all agree that civil theft claims and conversion claims should be considered under the same framework. CPB at 27; RPB at 11; SPB at 19.

Conversion is a tort claim ordinarily arising under state law. However, for purposes of section 337, "a single federal standard, rather than the law of a particular state, should determine what constitutes" an unfair method of competition under section 337. *TianRui*, 661 F.3d at 1327. One source of law that the Commission has relied upon for determining the single federal standard

---

[6] The possibility of such a claim in this context was raised in a footnote in the 1145 Investigation. *Certain Botulinum Toxin Prods., Processes for Mfg. or Relating to Same & Certain Prods. Containing Same*, Inv. No. 337-TA-1145, Comm'n Op. at 33 n.29 (Public Version Jan. 13, 2021), *vacated*, Inv. No. 337-TA-1145 (Recission), Comm'n Op. (May 3, 2021).

for claims ordinarily arising out of state law are the Restatements of Law. *Certain Processes for the Manufacture of Skinless Sausage Casings & Resulting Prod.*, Inv. Nos. 337-TA-148, 337-TA-169, Initial Determination, 1984 WL 273789, at *94 (July 31, 1984) (relying on the Restatement of Torts for trade secret misappropriation claims). All parties rely on the Restatement (Second) of Torts for their statement of the law of conversion. CIB at 21; RIB at 9; SIB at 17-20.

The Restatement (Second) of Torts explains that "[c]onversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Restatement (Second) of Torts § 222A. Under the Restatement:

> In determining the seriousness of the interference and the justice of requiring the actor to pay the full value, the following factors are important:
>
> > (a) the extent and duration of the actor's exercise of dominion or control;
> >
> > (b) the actor's intent to assert a right in fact inconsistent with the other's right of control;
> >
> > (c) the actor's good faith;
> >
> > (d) the extent and duration of the resulting interference with the other's right of control;
> >
> > (e) the harm done to the chattel;
> >
> > (f) the inconvenience and expense caused to the other.

*Id.* The Restatement states that conversion may be committed in many ways, including "dispossessing another of a chattel[.]" *Id.* § 223. A person may only be liable for conversion to: i) the possessor of the chattel, ii) a person entitled to immediately possess the channel, or iii) a person entitled to future possession of the chattel. *Id.* §§ 224A, 225, 243.

All parties also generally agree that there are two elements for conversion: 1) a possessory right (*e.g.*, ownership) in property; and 2) the exercise of wrongful dominion over that property to

the exclusion of those rights. CIB at 20-22; RIB at 9; SIB at 18-19. Although my review is not comprehensive, many states agree with the parties that at least these two elements apply to conversion claims. *See, e.g.*, *Cruickshank & Co v. Sorros*, 765 F.2d 20, 25 (2d Cir. 1985) (applying New York law); *Kremen v. Cohen*, 337 F.3d 1024, 1029 (9th Cir. 2003) (applying California law); *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 439 (7th Cir. 2005) (applying Illinois law); *NPF IV, Inc. v. Transitional Health Servs.*, 922 F. Supp. 77, 80-81 (S.D. Ohio 1996) (applying Ohio law); *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 723 S.E.2d 744, 747 (N.C. 2012) (applying North Carolina law); *Poola v. Howard Univ.*, 147 A.3d 267, 284 n.17 (D.C. 2016) (applying District of Columbia law).

## B.    Domestic Industry

An investigation raising theft or conversion claims at the Commission is governed by 19 U.S.C. § 1337(a)(1)(A), which declares unlawful—

> Unfair methods of competition and unfair acts in the importation of articles . . . , into the United States, or in the sale of such articles by the owner, importer, or consignee, the threat or effect of which is—
>
> > (i) to destroy or substantially injure an industry in the United States;
> >
> > (ii) to prevent the establishment of such an industry; or
> >
> > (iii) to restrain or monopolize trade and commerce in the United States.

19 U.S.C. § 1337(a)(1)(A). Medytox alleged injury under section 337(a)(1)(A)(i). Compl. ¶ 169.

Medytox bears the burden to demonstrate not only the existence of a domestic industry, but also that there is actual substantial injury or the threat of substantial injury to a domestic industry. 19 U.S.C. § 1337(a)(1)(A)(i); *Certain Rubber Resins & Process for Mfg. Same*, Inv. No. 337-TA-849, Comm'n Op. at 10 (Public Version Feb. 26, 2014).

"To determine whether an 'industry in the United States' exists under section 337(a)(1)(A)(i), the Commission has traditionally considered the 'nature and significance' of the

complainant's domestic activities." *Certain Bone Cements & Components Thereof*, Inv. No. 337-TA-1153, Comm'n Op. at 16 (Public Version Jan. 25, 2021). As the Commission has explained, pre-1988 precedent "continues to provide guidance" for investigations instituted under section 337(a)(1)(A). *Botulinum Toxin Prods.*, Inv. No. 337-TA-1145, Comm'n Op. at 16 (Public Version Jan. 13, 2021).[7] "Specifically, the Commission looks at what activities are performed by the complainant in the United States and determines whether they are the types of activities that Congress sought to protect from unfairly traded imports or whether they are the types of activities that a 'mere importer' would perform." *Id.* at 17. "The Commission considers 'the realities of the marketplace,' when determining the domestic industry in a . . . investigation based on unfair acts other than the infringement of statutory intellectual property rights (such as patents)." *Id.* As the Commission recently explained:

> In assessing the existence of a domestic industry, the Commission first considers the nature of the alleged activities in the United States to determine whether they are of the nature of activities that contribute to an industry in the United States under section 337(a)(1)(A)(i). Then, the Commission considers the extent of the investments in the context of the investigation to determine whether they are sufficient to establish an industry in the United States.

*Certain Raised Garden Beds & Components Thereof*, Inv. No. 337-TA-1334, Comm'n Op. at 43-43 (Public Version Apr. 1, 2024) (internal quotation marks omitted).

Medytox does not argue that it has been injured, only that there is a threat of a future substantial injury to the domestic injury. CIB at 95-118. In determining whether a threat to substantially injure exists, the Commission considers, among other things, the following indicia:

---

[7] The Commission Opinion in *Botulinum Toxin Products* was vacated, but the Commission noted that "vacatur does not mean that the Commission's final determination will have no persuasive effect in future investigations." *Certain Botulinum Toxin Prods., Processes for Mfg. or Relating to Same & Certain Prods. Containing Same*, Inv. No. 337-TA-1145 (Vacatur), Comm'n Op. at 9 (May 3, 2021).

1) substantial foreign manufacturing capacity;

2) ability of imported product to undersell the domestic product;

3) explicit intention to enter into the U.S. market;

4) the inability of the domestic industry to compete with the foreign products because of vastly lower foreign costs of production and lower prices; and

5) the significant negative impact this would have on the domestic industry.

*Rubber Resins*, Comm'n Op. at 64. "The threatened injury must also be substantive and clearly foreseen, with a causal connection between the action of the respondents and the threatened injury." *Id.* (internal quotation marks omitted). "The substantial harm or threat thereof to the U.S. industry found to exist cannot be assumed; it must be proven by a preponderance of the evidence." *Raised Garden Beds*, Comm'n Op. at 44 (internal quotation marks omitted).

## IV. THEFT AND CONVERSION

### A. Medytox Bears the Burden of Proof to Prove its Claim

As an initial matter, I address the burden of proof in this Investigation, because it is critical in assessing the evidence and arguments presented by the parties. In its post-hearing briefs, Medytox seeks to frame the investigation as presenting a "fundamental question": "[i]s it more likely that Hugel found its strain in a can of beans in Korea or stole a mixed lineage culture from Medytox?" CIB at 1. A section of Medytox's initial post-hearing brief is entitled "The Only Issue for the ALJ to Decide Is Whether Hugel Stole Its Strain from Medytox or Discovered Its Strain in a Can of Beans[.]" *Id.* at 22. Medytox made the same argument during its opening argument at the evidentiary hearing. Tr. at 50:14-19. Medytox's experts provided opinions on which of these two theories was more likely. CX-0002C (Keim WS) at Q/A 4 ("In my opinion, it is much more likely than not that Hugel obtained its strain from Medytox than from spoiled food."); CX-0003C (Lenski WS) at Q/A 94; Tr. (Keim) at 191:22-192:1; Tr. (Keim) at 290:9-14; Tr. (Lenski) at 323:10-327:12

(Dr. Lenski being impeached repeatedly on the scope of his analysis). Medytox criticized Respondents' experts for failing to address that question. Tr. (Parkhill) at 751:15-19; Tr. (Eisen) at 860:22-861:3.

I agree with Staff and Respondents that Medytox's framing is incorrect. SIB at 1 ("At the hearing, Medytox repeatedly framed this Investigation as being a choice between whether Hugel found its strain in a can of beans in Korea or stole it from Medytox. This is the wrong question."); RRB at 2 ("But that is *not* the fundamental question. The relevant question is whether Medytox has proven by a preponderance of the evidence that Hugel stole or converted Medytox's property.") (emphasis in original).[8] Medytox's framing does not take into the account the relevant burden of proof for its claim and seeks to improperly shift the burden to Hugel. Under Commission Rules and the Administrative Procedures Act, Medytox bears the burden of proof with respect to its claim to show that a violation of section 337 occurred. 19 C.F.R § 210.37(a); 5 U.S.C. § 556(d). Medytox's theft and conversion claims are governed by the ordinary preponderance of the evidence standard. Satisfying this burden "requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence." *Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993) (internal quotation marks omitted). The fundamental question under this standard is not whether Medytox's story or Hugel's story is more likely, it is whether Medytox has shown its story is more likely than not. To prove conversion Medytox therefore must establish that 1) it is more likely than not that Medytox

---

[8] I am unpersuaded by Medytox's argument that by asserting its strain came from a can of beans, Hugel has disclaimed any other potential source for its strain. *See* CIB at 25. Medytox cites no legal authority for the proposition that Hugel's assertions would bar me from considering all evidence, including other potential sources, in assessing whether Medytox has met its burden of proof.

owned a strain of *C. botulinum* and 2) it is more likely than not that Hugel converted that strain from Medytox. Under Medytox's framing, Hugel would bear a burden to present evidence showing that it is more likely that it obtained its strain lawfully, which is not proper. *See TechnoMarine SA v. Jacob Time, Inc.*, 905 F. Supp. 2d 482, 497 (S.D.N.Y. 2012) (applying New York law, explaining that the burden in a conversion case is not shifted to the defendant to prove its goods were lawfully obtained); *see also Adams v. Wells Fargo Bank, N.A.*, No. 5:17CV73-CWS-CMC, 2018 WL 3301676, at *9 (E.D. Tex. Feb. 5, 2018) (In the context of a conversion of property finding that "by focusing on the validity of the [underlying] lien, Plaintiff's response attempt[ed] to [improperly] shift the burden of proof as to elements of his conversion claim to Defendant.".).

### B. Medytox Has Not Proven Theft and Conversion by a Preponderance of the Evidence

As mentioned above, there are two elements for conversion: 1) a possessory right (*e.g.*, ownership) in property; and 2) the exercise of wrongful dominion over that property to the exclusion of those rights. For the reasons I explain below, the evidence fails to establish by a preponderance of the evidence either element: 1) that Medytox possessed a mixed-lineage strain or 2) that Hugel exercised wrongful dominion over such a strain.[9]

---

[9] As an initial matter, there is no dispute that Hugel did not convert Medytox's current strain or a strain that is genetically identical to that strain. As Medytox concedes, "Medytox's current strain as it exists in Medytox's current cell banks is not what Hugel stole." CIB at 50 (emphasis omitted). Medytox's expert, Dr. Keim, agreed. CX-0002C (Keim WS) at Q/A 132; Tr. (Keim) at 185:18-23. Instead, as discussed below, Medytox has alleged that Hugel stole a "mixed lineage culture" that contained different genetic characteristics than Medytox's current strain. *E.g.*, CIB at 50. This difference is critical because, while Medytox has established its ownership of its current strain, the parties do contest whether Medytox ever owned such a mixed lineage culture that could be the ancestor of Hugel's strain.

### 1.     Medytox Has Failed to Prove that it Possessed a Mixed Lineage Strain

To prove conversion, Medytox must identify the property that was allegedly converted and show that it had a property interest in that property. *See* § III.A, *supra*. As I will explain in more detail below, Medytox has failed to show by a preponderance of the evidence that it owned a mixed lineage of *C. botulinum* that could have been an ancestor of Hugel's strain at the time of the alleged conversion.

### a)     Undisputed Facts

Many facts about the origin of Medytox's strain that are not in dispute. Dr. Kyu Hwan Yang worked at the University of Wisconsin's Food Research Institute under Dr. Hiroshi Sugiyama, where he received his master's degree and Ph.D. RX-0029C (Yang Dep. Tr. ) at 8:25-9:11, 15:11-17. Dr. Yang left Wisconsin for the Korea Advanced Institute of Science and Technology ("KAIST") in 1979. *Id.* at 9:20-23. Dr. Yang remained at KAIST until 2009, but also took leaves of absence from KAIST to work for the Korean government. *Id.* at 10:2-24. When Dr. Yang left Wisconsin for KAIST, Dr. Sugiyama allowed Dr. Yang to take a Hall A *C. botulinum* strain. *Id.* at 31:1-4, 31:16-32:10. Medytox's founder, Dr. Hyun Ho Jung, obtained his Ph.D. at KAIST working under Dr. Yang. CX-0001C (Jung WS) at Q/A 5. Dr. Jung moved to Sun Moon University to become a professor in March 1995. *Id.* at Q/A 4. Dr. Jung transferred botulinum strains which he obtained from Dr. Yang to Sun Moon University. *Id.* at Q/A 32. All of Dr. Yang's strains were eventually transferred to Dr. Jung in around 1998 or 1999 when Dr. Yang closed his laboratory at KAIST. RX-0029C (Yang Dep. Tr.) at 78:8-79:4, 79:19-80:24, 81:19-82:10. In 2004, Dr. Yang was granted stock options in Medytox. JX-0080C.5-7. In March 2017, Dr. Yang and Medytox entered into a formal written agreement transferring ownership of Dr. Yang's rights in any strains to Medytox. JX-0081C.3-4. Medytox's master cell bank CBAM0301, ███████

███████████████████████████████████, was prepared from a predecessor cell bank

in 2003. RX-0002C (Goodnough WS) ¶ 37 (citing interrogatory responses).

### b) Disputed Facts

Other facts about the origin of Medytox's strain and its predecessors are disputed, and these

disputes are material to this investigation. How Medytox's CBAM0301 cell bank was derived from

earlier samples is one critical issue. As the experts explained, cell banks are created in one of two

ways: single colony isolation or direct cell culture. CX-0002C (Keim WS) at Q/A 137. In single

colony isolation, only one colony from a cell bank is taken, resulting in a homogenous new cell

bank that shares the characteristics of the cultured colony. *Id.* By contrast, direct cell cultures or

mass cell propagation involve taking a larger sample from a cell bank which can contain mixtures

with different genetic material. *Id.* A single colony isolation eliminates genetic diversity while a

direct culture or mass culture retains that diversity. *Id.* Medytox contends that CBAM0301 was

prepared by ████████████. CIB at 27 (citing evidence). But Respondents allege that the

evidence does not support this argument. RIB at 79 (citing evidence). Dr. Keim's witness statement

states that "CBAM0301 itself was created by ███████[.]" CX-0002C (Keim WS) at Q/A 146.

But at the evidentiary hearing, he changed his testimony and testified that CBAM0301 was created

using ████████████. Tr. (Keim) at 267:12-269:11. The evidence shows that Medytox and

Dr. Keim also changed their position on this during the 1145 Investigation. Tr. (Keim) at 293:11-

294:2 (refreshing Dr. Keim's recollection of his prior testimony, in which his expert report took

the position that CBAM0301 was created using ████████████ and then changed his

position at the hearing to testify that CBAM0301 was created by ████████).[10] As

---

[10] In the Initial Determination in the 1145 Investigation, the ALJ noted that Dr. Keim changed his
testimony on this issue and relied on the new testimony that CBAM0301 was created by ████
████. *Botulinum Toxin Prods.*, Initial Determination at 105 n.15.

Respondents argue, RIB at 79, this undermines the credibility of Dr. Keim on this issue because he has changed his opinion a second time. I agree with Respondents that credibility of Dr. Keim's hearing testimony that CBAM0301 was created by ███████████ has been undermined. I find instead that his original testimony from his witness statement, that CBAM0301 was created by ████████, is more credible. In making this finding, I note that his witness statement is consistent with the hearing testimony in the 1145 Investigation that was credited by the ALJ and Commission. I therefore find that the evidence shows CBAM0301 was created by ███████████, not ████████████████.

There is no documentary evidence showing how earlier cell banks (predating CBAM0301) were created. *See* Tr. (Keim) at 204:14-205:1. Dr. Jung testified at his deposition that he created Medytox's original research cell bank, which predates CBAM0301, using ████████████████. RX-0022C (Jung Dep. Tr.) at 98:2-99:3. There is no other testimony about how any earlier cell banks were created.

### c)    Medytox's Arguments

Medytox argues that there is "no dispute in this investigation" that it owned a strain of *C. botulinum*. CIB at 25-27. Although that is true, a critical question here is not just whether Medytox owned *C. botulinum*, but what specific strain(s) of *C. botulinum* it owned at the time of the alleged conversion. To prove its claim, Medytox must show that it owned the specific property that was allegedly converted. That means it must prove it owned the mixed lineage culture which it alleges was taken by Hugel, which is a contested issue. *See* RIB at 31-43; SIB at 23-35.

Medytox argues that the allegedly converted strain came from a mixed lineage culture that Medytox possessed. *See* CIB at 50-60. Medytox argues that mixed lineage cultures "are ubiquitous in the bacterial world" and are "the inherent result of mutations that inevitably occur as bacteria

propagate." *Id.* at 50-51. Medytox cites its experts' testimony about how mixed lineage strains can be created. *Id.* at 51-52. It argues that the mixed lineage existed, arguing it contained at least a common ancestor of "the ██████████ clade" (labeled as A) and a common ancestor of the "subclade" containing the Hugel, Umass, and 69A strains (labeled as B). *Id.* at 52-53 (including attorney-annotated version of CDX-0002C.9 reproduced below)



Medytox speculates that the lineages "could also include other SNPs unique to either Medytox's strain in the case of lineage A, or Hugel's strain in the case of lineage B. But at a minimum, lineage A does not include the ██ SNPs unique to the Hugel, Umass, and FDA 69A subclade, while lineage B does." *Id.* at 52-53. Dr. Keim also allows that other SNPs could have been included in the mixed lineage culture. CX-0002C (Keim WS) at Q/A 141. Nevertheless, Medytox argues that the Medytox A and Hugel B "lineages are not just similar to each another but they are more closely related to each other than to any of the other 784 C. botulinum Group I strains for which sequences were available in this case." CIB at 53.

Based on the branches of the phylogenetic tree, Medytox argues that bacterial lineages with the ███ unique SNPs to the subclade containing Hugel's strain would exist in a mixed culture if single colony isolation had not been performed. *Id.* at 53-54. Medytox argues that the evidence shows both lineages existed in an original culture of Hall A-hyper that existed in Dr. Sugiyama's laboratory no later than 1979. *Id.* at 54. Medytox argues that lineage of that original culture of Hall A-hyper must have existed because at least the Umass strain descended from strains at the University of Wisconsin. *Id.* at 55-56. Medytox also argues that the 69A strain is the same 69A strain about which Dr. Sugiyama published papers. *Id.* at 56-57.

Thus, Medytox asserts that the Medytox strain *must* be the origin of the Hugel strain, Medytox argues that the chances of a strain with the █ SNPs contained by Umass and 69A ending up in Korea "are astronomical" and that Medytox was the only possible source in Korea. *Id.* at 57-58. Medytox argues that the strains no longer reflect a mixed lineage because each of Medytox and Hugel's current cell banks have been created using ███████████████, which has eliminated any genetic diversity. *Id.* at 58-59. Medytox argues that it is unknown why the Umass and 69A strains have only one sequence but that their sequencing only showed one lineage. *Id.* at 59-60. Medytox argues that its experts have also explained why there are other genetic differences between these strains, including a heightened rate of new mutations due to a gene mutation. *Id.* at 60.

In its reply brief, Medytox argues that it has "presented a *prima facie* case by showing that Dr. Jung was in possession of a Hall A-Hyper strain with thousands of unique mutations and used that strain to start Medytox, that the genetic fingerprint of the Medytox and Hugel strains are almost identical, and that Hugel had motive and opportunity to steal from Medytox." CRB at 4. Medytox argues that the evidence shows "some source" at the University of Wisconsin was the

source for both Medytox and Hugel's strain. *Id.* at 5 (internal quotation marks omitted). Medytox argues that every strain (Medytox's, Hugel's, Umass, and FDA 69A) traces back to Dr. Sugiyama. *Id.* at 5-8. Medytox argues that the evidence supports that a mixed lineage culture was maintained until at least 2003. *Id* at 8-9. Medytox argues that there would have been no reason for Dr. Yang or Dr. Jung to have destroyed the mixed lineage culture and the genetic diversity of that strain. *Id.* at 9. Medytox also argues that its possession of, and Hugel's conversion of, this mixed lineage strain is "the only explanation that fits all the evidence in the case." *Id.* at 10; *see also id.* at 10-15.

### d)    Respondents' Arguments

Respondents argue that Medytox has failed to identify a piece of physical property that was stolen, rather than an intangible property. RIB at 32-33. Respondents argue that there is no evidence of a physical sample going missing. *Id.* at 33-34. Respondents also argue that there is no evidence Medytox had a mixed lineage strain, but that the evidence does show that Medytox's strain in 2001 or 2002 were the same as its current strain. *Id.* at 35-36.

Respondents also argue that Medytox has failed to identify the characteristics of any mixed lineage strain with the necessary specificity. *Id.* at 36-37. Further, Respondents argue that Medytox has not shown it ever possessed a strain with the ▮ SNPs shared by Hugel's strain, 69A, and UMass but lacking all of ▮▮▮▮▮ specific to Medytox's strain. *Id.* at 37-39. Respondents argue that Medytox's mixed lineage theory tracing back to Dr. Sugiyama is speculative and unsupported by the record. *Id.* at 39-43.

### e)    Staff's Arguments

Staff argues that the evidence shows Medytox's strain has consistently shared genetic characteristics of its current strain. SIB at 25-26. Staff argues that the evidence shows there was no difference between the original research cell bank, which was transferred by Dr. Yang to Dr.

Jung, and CBAM0301. *Id.* at 26-27. Staff also argues that the evidence shows there have been no significant changes in later cell banks. *Id.* at 27-28. This is critical because Medytox does not argue that Hugel stole a strain that is genetically identical to its current strain. *See* § CIB at 50.

Staff argues that the evidence does not show that Medytox owned a mixed lineage culture at the time of the alleged theft. SIB at 28-29. Staff notes that Medytox has failed to identify the precise genetic characteristics of the mixed lineage strain. *Id.* at 29.

Staff argues that the evidence shows Medytox had already used ████████████ to create its initial research cell bank by 2000, before the alleged theft. *Id.* at 30 (citing evidence). Staff argues that there is "no credible evidence" to support Medytox's theory that it possessed an ancestor mixed lineage culture. *Id.* at 30-31.

As to the scientists who possessed the strains at issue, Staff likewise argues that there is no credible evidence to support that Dr. Sugiyama's lab possessed a mixed lineage culture. *Id.* at 31. Staff also argues that there is no evidence of Dr. Yang's culturing practices and that it is equally likely that he used ████████████ rather than ████████, and therefore there is only conjecture that Dr. Yang possessed a mixed lineage. *Id.* at 31-32. Staff argues that it is also more likely than not that the culture Dr. Yang brought back to Korea had undergone ████████ ██████ to lead to the strain in Medytox's cell banks, and that the evidence shows it is more likely that Dr. Jung himself performed ████████████. *Id.* at 32-33.

Staff argues that Medytox's "historical facts" "are nothing more than wishful thinking and conjecture." *Id.* at 33. Thus, the Staff disagrees with Medytox's position that "that the lineage that gave rise to the two Umass strains and the FDA's 69A strain 'also existed in Dr. Sugiyama's Hall A-Hyper stock culture at the University of Wisconsin at the relevant time.'" *Id*. Staff thus argues

that the evidence does not show Medytox ever possessed a mixed lineage culture, let alone at the time of the theft or conversion. *Id.* at 34.

<b>f)    Medytox Has Failed to Prove by a Preponderance of the Evidence That it Possessed a Mixed Lineage Culture</b>

I find that Medytox has failed to prove by a preponderance of the evidence that it possessed a mixed lineage culture at the time of the alleged conversion. Because Medytox lacks any direct evidence showing the genetic characteristics of the strains it owned at the time of the alleged theft, its experts were left to provide opinions on what might have been; relying on hypotheticals to try and reconstruct what Medytox had. These opinions are too speculative. At best, these hypotheticals show it is ***possible*** that Medytox had such a mixed lineage strain. But speculative evidence showing a possibility falls short of meetings its burden of proof by the preponderance of the evidence. "A mere possibility, or conjecture, or strong suspicion, created by the evidence, is not sufficient basis" to find conversion. *Anderson, Clayton & Co. v. Rayborn*, 192 So. 28, 28 (Miss. 1939) (finding that the plaintiff failed to prove conversion because "[t]he evidence offered tends only to raise a lively suspicion or conjecture" that the cotton found in the defendant's warehouse was the cotton lost by the plaintiff); *see also Intellectual Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1331 (Fed. Cir. 2017) (reversing denial of judgment as a matter of law, explaining that theories which are "mere speculation or attorney argument . . . do not provide substantial evidence supporting the jury's verdict"). The hypothesizing of Medytox and its experts does not establish that it is more likely than not that Medytox owned a mixed lineage culture.

Medytox presented the mixed lineage theory primarily based on the testimony of its expert, Dr. Keim. Dr. Keim testified that the genetic data was "consistent with . . . the likely possibility that the samples of the Hall A-hyper that Dr. Yang brought to Korea from the University of Wisconsin and later transferred to Medytox's founder, Dr. Jung, consisted of mixed lineages." CX-

0002C (Keim WS) at Q/A 133. Dr. Keim testified that mixed lineages are "universal." *Id.* at Q/A 136. He also testified, however, that they may not always be detectable. *Id.* at Q/A 135. Dr. Keim explained minor variants would appear in the DNA testing data if they are "more frequent than about 0.5%" of the raw data. *Id.* at Q/A 47. Dr. Keim testified that in the 1145 Investigation, CB19 contained minor alleles at two SNPs, which is "evidence" of a mixed lineage in CBAM0301. *Id.* at Q/A 136. As Dr. Keim explained, using single colony isolation will eliminate any prior diversity, while direct culturing will retain it. *Id.* at Q/A 137. In Dr. Keim's opinion, the mixed lineage culture could have existed if the research cell bank which Dr. Jung obtained from Dr. Yang was cultured via direct culturing, while later cultures from both Hugel and Medytox were cultured using ███████████. *Id.* at Q/A 139-141; *see also* CDX-0002C.15 (reproduced below):



CX-1046C, Figure 11; CX-1050C

Dr. Keim opines that it is "very likely[]" that Dr. Yang brought a mixed lineage culture with him from Wisconsin to Korea. *Id.* at Q/A 144. This opinion is based on Dr. Keim's opinion that there was no evidence of any other Hall A-hyper strain in Korea other than Medytox. *Id.* at Q/A 145.

Dr. Keim's opinion is not persuasive or credible because it is too speculative and relies on assumptions that are unsupported by the record evidence. Dr. Keim himself admitted that he does not know the number of variants or the distribution of variants that Medytox inherited from Dr. Yang. Tr. (Keim) at 297:15-18. Nor did he know that information about the strain Dr. Yang took from Wisconsin. *Id.* at 198:1-4. The record also shows there is no DNA information relating to samples predating CBAM0301. *See, e.g.*, RX-0059C.0069-71 (Medytox responses to Request for Admission Nos. 220-23); Tr. (Keim) at 300:23-301:2.

Further, Medytox's witness testimony is inconsistent with Dr. Keim's theory that the cell bank from which CBAM0301 was a mixed lineage culture. Dr. Jung testified during his deposition that there were no genetic alterations between Medytox's original research cell bank and CBAM0301. RX-0022C (Jung Dep. Tr.) at 116:3-9, 116:12-21, 116:23-117:11. Dr. Jung also testified that the strain Medytox received from Dr. Yang had the specific set of mutations previously identified as trade secrets. *Id.* at 195:21-196:1. This testimony undermines the mixed lineage theory by showing that Medytox owned a culture that was genetically almost identical to CBAM0301.

Dr. Keim's assumptions about how predecessors of CBAM0301 were generated are also unsupported by the evidence. Dr. Keim's testimony requires a specific series of events: that ███ ████████████████ did not occur in the predecessors to CBAM0301 starting at least from when Dr. Yang took a sample from Wisconsin in 1979 until sometime after the alleged conversion but before CBAM0301 was generated. CX-0002C at Q/As 141-146; *see also id.* at Q/A 140; CDX-0002C.15:



CX-1046C, Figure 11; CX-1050C

This theory is directly contradicted by Dr. Jung's deposition testimony.

Dr. Jung testified that the first cell bank created from what he received from Dr. Yang was created using ███████████. RX-0022C (Jung Dep. Tr.) at 98:2-99:3. This occurred in or around 2000, when Dr. Jung obtained Dr. Yang's strain, before the alleged misappropriation. CX-0001C (Jung WS) at Q/A 26. The evidence thus shows that Medytox's cell bank at the time of the alleged misappropriation had its genetic diversity eliminated and was not a mixed lineage culture as Dr. Keim hypothesized.

Further, as Staff and Respondents persuasively argue, there is no evidence that ███████ ███████████ was not performed earlier on some predecessor strain to the strain Dr. Jung obtained by Dr. Yang, either in Dr. Yang's laboratory or at the University of Wisconsin. SIB at 32-33; RIB at 42-43. Although Medytox argues that "there would be no reason for a research institution to permanently destroy the genetic diversity of the strains in the possession[,]" CRB at 9 (citing Tr. (Keim) at 258:8-13), I do not find Dr. Keim's testimony persuasive because it is

conclusory and because Medytox's attorney argument provides an explanation that is not included in Dr. Keim's testimony. *See* Tr. (Keim) at 258:8-13.

To summarize, Dr. Keim's opinion that Medytox owned a mixed lineage culture is unsupported by contemporaneous evidence. Dr. Keim's opinion is largely speculative and many assumptions he made are either unsupported by or contradicted by other record evidence. I find that his opinion therefore is not persuasive. Because the mixed lineage theory rests on Dr. Keim's testimony, I find that Medytox has failed to prove by a preponderance of the evidence that it owned a mixed lineage culture.[11]

>   **2.      The Evidence Does Not Show it is More Likely Than Not That Hugel Exercised Wrongful Dominion over a Mixed Lineage Culture**

Even if Medytox could establish that it owned a theoretical mixed lineage culture, it has failed to prove by a preponderance of the evidence that Hugel exercised wrongful dominion over that culture.

>   **a)      Undisputed Facts**

I begin with the undisputed facts, which largely relate to the DNA evidence from the whole genome sequencing. I focus on Dr. Keim's phylogenetic analysis because Respondents' experts adopted his analysis for purposes of this Investigation. Tr. (Benson) at 831:3-5; RIB at 28. The parties sampled the following Hugel cell banks: ████████████████████████

---

[11] My finding that Medytox has failed to prove ownership by a preponderance of the evidence is independent of whether Medytox identified the genetic characteristics of the allegedly converted strain with enough specificity. *See* CRB at 17 (arguing that Respondents and Staff are requiring too high a level of precision). "The degree of particularity with which identification must be made in proof of a conversion in a trover action will vary with the circumstances of the case." *Burgess v. Small*, 118 A.2d 344, 345 (Me. 1955). While the parties dispute this issue, I find that it is ultimately not relevant to deciding this case because even assuming that Medytox's identification is sufficient, it has still failed to prove that it owned a mixed lineage culture of *C. botulinum* at the time of the alleged misappropriation.

██████. CX-0002C (Keim WS) at Q/A 56. ██████ is the oldest master cell bank at Hugel, which was created in ████████. CX-0038C.13. The other cell banks were created either directly or indirectly from ████. *Id.* at 22-23. Specifically, ██████████████████████

████████████████████████████████████████. *Id.* In his phylogenetic analysis, Dr. Keim did not rely on ████████████████████████

████████████████████████. CX-0002C (Keim WS) at Q/As 62-63.

As for Medytox's strains, Dr. Keim relied on the 2019 testing of Medytox's CB19[12] cell bank for his phylogenetic analysis.[13] *Id.* at Q/A 67. CB19 is a ████████████████████

██████████████, CBAM0301. *Id.* at Q/A 68.[14] In addition, Dr. Keim relied on the over 700 genomic sequences of *C. botulinum* strains that are available in the GenBank database. *Id.* at Q/A 71. These include a genome called CP000727.1 which was provided by the U.S. Army Medical Research Institute for Infectious Diseases ("USAMRIID") of a strain that derived from Dr. Hall's "Hall A-hyper" strain. *Id.* at Q/As 72-73. Dr. Keim used CP000727.1 (referred to in the phylogenetic tree as "GCA_000017045.1_Clostridium_botulinum_A_hall") and a strain called ATCC19397, which is a close relative of the Hall A-hyper strain that was taken from nature, as his reference strains. *Id.* at Q/A 79.

Using the DNA data, Dr. Keim prepared a phylogenetic tree that includes the 50 closest relatives of Medytox and Hugel's strains. *Id.* at Q/A 90; CX-1155C. A relevant portion of that tree is reproduced below:

---

[12] CB19 is also known as BTAW1901. *Id.* at Q/A 64. It was referred to as BTAW1901 through the 1145 Investigation.

[13] This testing was performed as part of the 1145 Investigation. *Id.* at Q/A 64.

[14] Respondents sought to sample and test Medytox's CBAM0301 cell bank, but I denied their motion to compel. Order No. 21 (June 2, 2023).



CX-1155C. The bottom strains shown in this excerpt are Hugel's ███████████

██████. *Id.* CB19 in this excerpt is Medytox's CB19 strain. *Id.* In this phylogenetic tree, each

branch has a length representing the number of SNPs that differentiate the genomes. CX-0002C

(Keim WS) at Q/A 91.

Dr. Keim explained that what he calls the "███████████ clade" (which includes both

Hugel's and Medytox's strains) has 40 unique SNPs compared to other strains. *Id.* at Q/A 95. The

███████████ clade also includes CP000727.1, a strain named 69A, and two sequences of a strain

sequenced by the University of Massachusetts. *Id.* at Q/A 111. The Umass strains were strains

sequenced in the laboratory of Dr. Bal Ram Singh at the University of Massachusetts, Dartmouth,

who obtained his strain from the University of Wisconsin. *Id.* at Q/As 122-125. Medytox's strain

has ██████ that are not shared by any other Hall A-hyper strain that was sequenced in this

investigation. *Id.* at Q/A 129. The 69A, Umass, and Hugel's strains share █ unique SNPs not shared

by the other strains, and then Hugel's strain has █ unique SNPs not shared by any other member

of this clade. *Id.* The evidence shows that Hugel's strain does not derive from the current Medytox

strain. *Id.* at Q/A 131-32.

Dr. Keim analyzed other genetic similarities and differenced between the strains in this

"███████████ clade." Dr. Keim analyzed the "indels" (insertions or deletions) in common between

the Medytox and Hugel strain. *Id.* at Q/As 156-157. Dr. Keim acknowledged that indels are less useful than SNPs in performing phylogenetic analysis. *Id.* at Q/A 158. Dr. Keim found that all the strains in the ███████ clade share 39 indels. *Id.* at Q/A 162. Dr. Keim did not, however, identify the number of indels that were unique to Hugel's strain. Tr. (Keim) at 184:10-12.

Dr. Keim also examined genomic arrangement within these strains. *Id.* at Q/As 166-67. Dr. Keim found that when compared to ATCC19397, the strains in the ███████ clade contained one rearrangement (referred to as "Fang" after the author of an article reporting this rearrangement) and three large deletions of multiple genes. *Id.* at Q/A 169. These characteristics are shared by CP000727.1, 69A, and Umass strains. *Id.* at Q/A 174. Although the parties do not disagree on the phylogenetic analysis, they disagree on the appropriate inferences to be drawn from the analysis.

**b)    Disputed Facts**

Medytox's theory of conversion revolves around a visit made by Dr. Yeon Soo Seo to Dr. Jung's laboratory at Sun Moon University.[15] CIB at 61-63. Drs. Seo and Jung agree that they met at Sun Moon University but disagree about the details of that meeting. According to Dr. Jung, Dr.

---

[15] In its initial post-hearing brief, Medytox argued for the first time that conversion by Dr. Seo was "not the only possible explanation." CIB at 63. It argues that there were other ways conversion could have occurred, and alleged that "[w]hile it is not 100% clear how Hugel stole from Medytox, what is clear is that Dr. Moon had multiple points of access to Medytox's facilities that he could have illicitly used to his advantage and the totality of the evidence shows that Hugel obtained its strain from Medytox even if there not something as definitive as videotape showing the taking from the laboratory." *Id.* As Staff points out, this theory was not previously raised by Medytox. SIB at 39; *see also* RRB at 9 (referring to a related theory as a "last-ditch alternative argument"). Medytox's prehearing brief only argued in this investigation that Dr. Seo converted its strain during a visit to Sun Moon University. CPB at 30-32; Tr. (Medytox Opening) at 15:16-19:2. Medytox has waived any contention that the alleged conversion occurred in another way or at any other time by failing to raise that argument earlier. *See* Ground Rule 11.2. Medytox's argument in reply that Dr. Kim, a professor at Sun Moon University, could have stolen its strain, *see* CRB at 24-25, has also been waived. I therefore only consider the theory that Medytox timely raised during this Investigation: that Dr. Seo allegedly took a sample of *C. botulinum* during his visit to Sun Moon University.

Seo arrived unannounced in 2001 at Dr. Jung's laboratory at Sun Moon University. CX-0001C (Jung WS) at Q/A 59. Dr. Jung arrived with Dr. Yeon-Wook Kim, another professor at Sun Moon University. *Id.* Dr. Jung and Dr. Kim apparently had disagreements at that time. *Id.* at Q/A 60.

According to Dr. Jung, Dr. Seo asked to see his laboratory, and Dr. Jung allowed Dr. Seo and Dr. Kim to visit his laboratory unaccompanied by Dr. Jung. *Id.* at Q/As 61-62. According to Dr. Seo, the visit to Sun Moon University happened after he had moved from Samsung Biotech Research University ("SBRI") to KAIST, which was in October 2002. JX-0150C (Seo Dep. Tr.) at 35:8-24, 39:17-23, 40:1-21. The timing of this visit is a disputed issue in this Investigation because according to Dr. Seo, Dr. Moon was already culturing *C. botulinum* in Dr. Seo's laboratory at SBRI before Dr. Seo visited Sun Moon University. *Id.* at 43:6-12. Dr. Seo testified that he was invited to Sun Moon University by Dr. Kim. *Id.* at 40:5-21. According to Dr. Seo, he did not visit any laboratories other than Dr. Kim's. *Id.* at 44:17-23. Dr. Seo testified that while Dr. Kim was showing Dr. Seo some common areas, Dr. Seo spoke with Dr. Jung and met him. *Id.* at 48:9-49:12. Dr. Seo testified that he never entered Dr. Jung's laboratory. *Id.* at 49:11-22. Dr. Seo testified that he did not take any samples, and that he has never possessed any samples of *C. botulinum*. *Id.* at 51:1-10.

### c) Medytox's Arguments

Medytox argues that the Medytox and Hugel strains share unique DNA characteristics that are evidence of misappropriation. CIB at 27-34. Medytox argues that misappropriation can be inferred via this circumstantial evidence, especially in view of its contention that Hugel could not have found its strain in a can of beans. *Id.* at 33-34. Medytox argues that neither theory presented by Hugel for how Hugel found its strain is plausible. *Id.* at 34-35. Medytox contends that numerous mutations in the Hall A-hyper clade evolved in the laboratory, not in nature, and thus are evidence

Hugel's strain could not have come from nature. *Id.* at 35-38. Medytox also contends that a laboratory leak could not have occurred. *Id.* at 38-41.

Medytox further argues that there is no direct evidence of Dr. Moon finding a strain of *C. botulinum* in a can of beans. *Id.* at 41-48. Medytox argues that Hugel "either destroyed or never possessed" the kinds of records it expects Hugel to have had. *Id.* at 42-43. Medytox also contends that there is no witness to corroborate Dr. Moon's story. *Id.* at 43. And Medytox contends that Dr. Moon did not report his discovery to health authorities, even though Medytox contends he should have, or publish about the discovery. *Id.* at 43-44. Medytox criticizes the theory as implausible and argues that Hugel's experts do not support the theory. *Id.* at 45-49. Based on the above contentions, Medytox argues that "the only reasonable and likely explanation" for how Hugel obtained a strain is that it converted the mixed lineage culture from Medytox. *Id.* at 50. Medytox argues that Hugel had both a motive and opportunity to obtain Medytox's strain, focusing on Dr. Moon's visit to Sun Moon University. *Id.* at 61-63.

In reply, Medytox argues that the circumstantial evidence weighs heavily in its favor. CRB at 20-23. Medytox also argues that the timeline of Dr. Seo's visit is consistent with Hugel converting Medytox's strain. *Id.* at 23-24. Medytox also argues that Dr. Jung is credible, and that the attacks on his credibility are unsupported. *Id.* at 25-27. Medytox also argues that Hugel's story that it obtained its strain from a can of beans is not credible.[16] *Id.* at 29-37. And Medytox argues that its experts are more credible than Hugel's. *Id.* at 37-44.

---

[16] In its initial post-hearing brief, Medytox argued for the first time that Hugel's allegedly "false exculpatory defense" should be held against Hugel as proof of conversion. CIB at 63-68. But as Respondents point out, RRB at 29, this argument was not raised in Medytox's prehearing brief. I agree with Respondents that Medytox has waived this argument. *See* Ground Rule 11.2. I therefore do not consider this argument.

### d)      Respondents' Arguments

Respondents argue that the evidence does not show Hugel took a strain from Medytox. RIB at 43-82. Respondents argue that the facts around Dr. Seo's visit show that it occurred after Hugel and Dr. Moon had acquired a strain, that Dr. Seo never entered the lab, and that Dr. Seo is more credible than Dr. Jung. *Id.* at 45-49. Respondents also argue that the genetic evidence does not support the claim of conversion. *Id.* at 49. Respondents argue that the genetic evidence shows that Hugel's strain is closer to other ███████ strains than it is to Medytox's. *Id.* at 50-51. Respondents argue that the proof that Hugel's strain is a ██████ clade is insufficient to prove theft because there are many other sources which had ███████ strains. *Id.* at 51-52.

Respondents also argue that even though Medytox contends Hugel's strain came from a lab, that does not support that it came from Medytox. *Id.* at 53-54. Respondents contend that Medytox must show that Hugel could not have obtained its strain from any other source, but that it cannot do so. *Id.* at 54-55. Respondents argue that the history of strain sharing here is relevant because it makes it impossible to identify the origin of the strain. *Id.* at 57-58. Respondents also argue that Medytox's experts never considered any other potential source of Hugel's strain. *Id.* at 58-59. Respondents argue that although it does not bear the burden to prove where its strain came from, the evidence demonstrates that it came from a can. *Id.* at 61-75. Respondents also argue that Medytox's experts are not credible. *Id.* at 75-82.

Respondents also argue that even if Medytox's claims "(i) that it possessed the relevant property and (ii) that Hugel's present strain is derived from a sample that Dr. Seo acquired from Medytox" are true, it does not rise to the level of conversion. Respondents argue there is no proof that Hugel ever possessed Medytox's property. RIB at 82-83. Respondents argue that even if Dr.

Seo or another person took some of Medytox's culture, there is no evidence that Hugel ever possessed that strain. *Id.* at 83-84.

Respondents further argue that there is no evidence that Medytox was deprived of the use of its property. *Id.* at 84-85. Respondents argue that Medytox was not deprived of the use of any property. *Id.* at 85-86. Respondents also argue that because Medytox retained copies of this property, the claim does not rise to the level of conversion. *Id.* at 84-86.

In reply, Respondents argue that the evidence shows that Hugel's strain could not have come from Medytox. RRB at 25-29. Respondents argue that Medytox is improperly demanding that Hugel prove its own lawful ownership. *Id.* at 25. Respondents argue that Medytox "dismisses as a 'rounding error' the key DNA evidence" which it contends shows that Hugel's strain could not have come from Medytox. *Id.* at 26. Respondents argue that █ SNPs was enough to find that misappropriation occurred in the 1145 Investigation, but that Medytox argues ████████ does not exculpate Hugel here. *Id.* at 26-28.

Respondents then rebut individual sections of Medytox's brief. *Id.* at 31-45. Respondents argue that Hugel's strain is genetically closer to other ████████ strains and that Medytox did not consider these alternative sources. *Id.* at 48-50. Respondents further argue that evidence does support its strain being isolated from spoiled food. *Id.* at 50-51. Finally, Respondents reiterate their argument that the legal requirements for conversion have not been satisfied. *Id.* at 51-52.

### e)    Staff's Arguments

Staff argues that there is no evidence Hugel took Medytox's *C. botulinum* strain. SIB at 35. Staff argues that there is no evidence that Hugel accessed Medytox's strain. *Id.* at 35-39. Staff contends that the evidence does not support that Dr. Seo took a strain when he visited Sun Moon

University. *Id.* Staff also argues that there is no evidence that any physical property was taken by Hugel. *Id.* at 39-40.

Staff further contends that the genetic evidence does not support the conversion claim. *Id.* at 40. Staff argues that the genetic evidence does not support a finding of conversion even if Medytox could establish it owned a mixed lineage culture. *Id.* at 43. Staff argues that just because Hugel's strain is related to Medytox's, that does not establish conversion. *Id.* at 43-44. Staff argues that Medytox and its experts cannot exclude non-Medytox strains, and that other Hall A-Hyper strains were in Korea at the relevant time. *Id.* at 44-45. Staff contends that the evidence does not support Medytox's conjecture about when ███████████ occurred or that it in fact occurred in the way Medytox contends. *Id.* at 45-46.

Staff also criticizes Medytox for focusing on the origin of Hugel's strain. SIB at 47. Staff contends that the question is not whether Hugel's strain came from a can of beans, but whether the evidence shows Hugel converted Medytox's strain. *Id.* Staff also argues that Respondents have presented credible evidence to support Hugel's story about the origin of its strain. *Id.* at 47. Staff also argues that even if a strain was stolen or converted, Respondents have raised legitimate questions about whether the taking was so serious as to rise to the level of conversion, as it is not clear that taking one of many copies would have deprived Medytox of their right to the property. *Id.* at 48-49.

> **f)    Medytox Has Failed to Prove by a Preponderance of the Evidence that Hugel Exercised Wrongful Dominion Over a Sample from Medytox**

After considering the evidence, I find that Medytox has failed to prove by a preponderance of the evidence that Hugel exercised wrongful dominion over a strain from Medytox. I find that the evidence does not support Medytox's claim that Dr. Seo took a sample of bacteria at Sun Moon

University. I also find that the DNA evidence does not support that Hugel took a sample from Medytox.

I am not persuaded that Dr. Seo converted a sample of *C. botulinum* when he visited Sun Moon University. Medytox's own witness testimony undermines this theory, showing no physical evidence of conversion. As Staff points out, the evidence shows that in 2001, vials containing strain samples were labeled and stored on wire racks by type of strain in a lab freezer. RX-0019C (Kim Dep. Tr.) at 141:10-24. In 2001, Medytox kept logs of vials that were used and the number remaining. *Id.* at 142:9-143:5. Medytox employee Hack Woo Kim does not remember any vials went missing at this time. *Id.* at 143:23-144:1. Nor did Dr. Jung have any evidence showing something was missing. Tr. (Jung) at 109:20-23. While Medytox argues that a sample could have been taken from a laboratory bench upon which samples containing the strain would have been handled, CRB at 25-26, this is only a theory unsupported by any witness testimony. The lack of physical evidence undermines Medytox's theory.

I also find that Dr. Seo's testimony about his visit to Sun Moon University occurred is more credible than Dr. Jung's. One disputed issue is the timing of that visit. Medytox's theory is that the conversion occurred when Dr. Moon was using Dr. Seo's lab at SBRI to purify botulinum toxin, so Dr. Seo must have given the *C. botulinum* to Dr. Moon. If this visit occurred after Dr. Seo had left for KAIST, this was after Dr. Moon had stopped working in Dr. Seo's lab at SBRI.

I find that Dr. Jung's testimony about when this meeting occurred is not credible because his testimony changed between his deposition and his testimony, and he was impeached about this. Tr. (Jung) at 101:1-102:6 (acknowledging that at his deposition, he testified that Dr. Seo was at KAIST when this visit occurred); *see also* CX-0002C (Jung WS) at Q/A 59 (testifying that Dr. Seo was at SBRI when this visit occurred). Nor do I find the attempted rehabilitation of Dr. Jung,

*see* CRB at 23 (citing evidence), persuasive. Medytox tries to argue that the process of Dr. Seo moving took months, and thus Dr. Jung's testimony is consistent with Dr. Seo. Nevertheless,  Dr. Jung himself could not recall when Dr. Seo announced his move or completed his move, so there is no basis to find that Dr. Seo had announced his move, but not completed it. *See* Tr. (Jung) at 112:17-113:4, 113:15-20. The attempted rehabilitation is thus unsupported by Dr. Jung's own testimony.

Further, Dr. Seo's recollection was not equivocal. JX-0150C (Seo Dep. Tr.) at 35:8-24, 39:17-23, 40:1-21. I therefore find that Dr. Seo's recollection of when he visited Sun Moon University is more credible than Dr. Jung's recollection. The evidence therefore shows that Dr. Seo's visit came after he had moved to KAIST. This also undermines Medytox's theory of the case. Dr. Seo testified that while Dr. Moon was working in Dr. Seo's laboratory at KAIST, Dr. Moon was not performing any research on *C. botulinum* at KAIST. JX-0150C (Seo Dep. Tr.) at 39:4-7. I note that even if I found Dr. Jung credible on the timing of the date, this would not be dispositive: Medytox has not undermined the credibility of Dr. Seo's testimony that Dr. Moon had a strain of *C. botulinum* when Dr. Moon started working in Dr. Seo's lab at SBRI is not credible. *Id.* at 29:8-12.

The weight of the evidence shows that Dr. Seo visited Sun Moon University after Dr. Moon had already obtained a strain of *C. botulinum* and began isolating botulinum toxin. This evidence does not support Medytox's claim. I also find that Dr. Seo's testimony that he did not enter Dr. Jung's laboratory or take a sample of *C. botulinum* is credible. JX-0150C (Seo Dep. Tr.) at 44:20-23, 49:11-18, 49:21-22, 50:23-25, 51:1-10. I am unpersuaded by Medytox's attacks on Dr. Seo's credibility. *See* CIB at 27. The same reasons identified as reasons why Dr. Seo is not credible could

apply equally to Dr. Jung: both have both personal interests in the outcome of this investigation and financial interests in the parties.

I am also unpersuaded that the testimony of Dr. Junho Lee supports the claim of conversion. Dr. Lee testifies that he encountered Dr. Moon at SBRI in Fall 2001, when Dr. Moon was working in Dr. Seo's laboratory. CX-1134C (Lee WS) at Q/As 16-21. Dr. Lee's suspicion of Dr. Moon came from an evasive answer that Dr. Moon gave in which Dr. Moon allegedly said, "there are ways of getting" *C. botulinum*. *Id.* at Q/A 28-32. Dr. Lee's suspicion is not evidence. Nor is his timeline inconsistent with the timeline presented by Hugel or Dr. Seo. According to Dr. Seo, Dr. Moon already had *C. botulinum* when he started working at SBRI. JX-0150C (Seo Dep. Tr.) at 29:8-12. Nor is this testimony necessarily inconsistent with Dr. Moon beginning harvesting in the summer of 2001. *See* CRB at 23-24. All that Medytox has done is cast suspicion on Dr. Moon. This suspicion is not evidence that Dr. Seo converted a strain of *C. botulinum* from Medytox.

Nor am I persuaded that the phylogenetic analysis supports the claim of conversion. While the evidence shows a relationship between Medytox and Hugel's strains, it does not necessarily follow that the evidence shows it is more likely than not that Hugel took its strain from Medytox. That is because Medytox's theory rests on a critical assumption which I do not find credible: that Medytox is the only place Dr. Moon could have obtained his *C. botulinum* strain. *See* CIB at 57-58. Dr. Keim repeatedly stated that his opinion was based on his belief that the only source in Korea was Medytox. CX-0002C (Keim WS) at Q/A 145; Tr. (Keim) at 262:18-263:4, 265:12-23. I find this focus on Korea to be overly narrow given the worldwide distribution of Hall A-hyper strains as I discuss below. Even assuming that the potential sources could be limited to Korea, this assumption is not supported by the evidence. Dr. Yang testified during his deposition that five or

six students worked in his laboratory studying *C. botulinum*. RX-0029C (Yang Dep. Tr.) at 46:1-22. Each student working on *C. botulinum* had their own stock. *Id.* at 69:16-21. And when asked during cross-examination, Dr. Keim could not even eliminate other sources in Korea, such as from Dr. Yang. Tr. (Keim) at 195:23-196:1. It is thus unknown whether any other sources existed in Korea that came from Dr. Yang, let alone from other potential sources.

The evidence shows that there were many sources of Hall A-hyper strains outside of Korea. *See* RIB at 11-14, 51-53. The evidence here shows, as it did in the 1145 Investigation, that "the Hall A-hyper strain held by the University of Wisconsin was freely circulated to other entities[.]" *Botulinum Toxin Prods.*, Comm'n Op. at 30. Dr. Theresa Smith, Medytox's expert in the 1145 Investigation, explained that "[d]uring the first part of the 20th century, researchers regularly traded BoNT-producing bacterial strains for collaborative studies or research into specific organisms and it is known that Dr. Hall sent Hall strains to various researchers during that time." CX-0129C.3. This strain made its way to the U.S. Army at Fort Detrick, Maryland (at what is now known as USAMRIID). *Id.* at 3-4. This strain was then taken by Dr. Edward Schantz from Fort Detrick to the Food Research Institute at the University of Wisconsin in 1972. *Id.* at 4. This strain was forwarded to multiple commercial laboratories, which include Metabiologics, Inc. (in Madison, Wisconsin), List Biological Laboratories, Inc. (in Campbell, California), Wako Laboratories (in Kyoto, Japan), and Allergan. *Id.* Other companies which have possessed Hall A-hyper strains are Lanzhou, Daewoong, and Revance. Tr. (Pickett) at 370:5-15, 372:9-13.

There are other entities who have also possessed these strains. *Id.* Universities and public agencies have also had samples, including the University of Chicago, California Polytechnic State University, Harvard University, the Michigan State Department of Health, KAIST, University of Massachusetts at Dartmouth, and the Botulinum Research Center. *Id.* at 372:24-373:4, 373:15-

374:9. Laboratories in Europe also have Hall A-hyper samples. *Id.* at 374:18-21. Dr. Pickett agreed that "it's impossible to know everyone who has a sample of the Hall A-hyper strain[.]" *Id.* at 374:22-24. As Dr. Pickett admitted, through the 1970s, 1980s, and 1990s, laboratories would share samples of Hall A-hyper strains and only disclose the source if they published an article. *Id.* at 374:25-376:10. This evidence thus undermines Medytox's assumption that Medytox was the only source of a Hall A-hyper strain for Hugel in the early 2000s.

In view of the widespread distribution of the Hall A-hyper strain, I find that the DNA evidence does not show that it is more likely than not that Hugel converted its strain from Medytox. The DNA evidence shows that both Hugel and Medytox both possess a ▮▮▮▮ strain. But that does not prove conversion. The genetic evidence does not show *any* SNPs that Hugel and Medytox's strains share that are not in any other ▮▮▮▮ strain. Tr. (Keim) at 189:11-16. Instead, the evidence shows Hugel's strain shares ▮ SNPs with at least 2 other ▮▮▮▮ strains that are not shared with Medytox's strain: Umass and 69A. CX-1155C; CX-0002C (Keim WS) at Q/A 129.

As Dr. Keim admitted, these strains and Hugel's strain share a more recent common ancestor than Medytox's current strain. Tr. (Keim) at 187:6-11. This DNA evidence undermines Medytox's theory that Hugel's strain is derived from a strain Medytox previously owned. RIB at 52-53. As Dr. Keim admitted, based on the genetic information, he could not exclude the possibility of Hugel's strain coming from another source of ▮▮▮▮ strain other than Medytox, including another source in Korea such as Dr. Yang. Tr. (Keim) at 195:17-196:1. Neither Medytox nor their experts persuasively explain how Hugel's strain could have been taken from Medytox while not sharing any unique SNPs that are not shared by other strains; they instead assume that Medytox is the only source and therefore it must have been stolen.

I am also not persuaded by Medytox's argument, presented in reply, that its experts considered other sources. *See* CRB at 10. Dr. Keim testified that he was asked only to evaluate the two alternative theories: conversion or a can of spoiled food. Tr. (Keim) at 179:17-21. Dr. Lenski's testimony that he considered other sources was repeatedly impeached. Tr. (Lenski) at 323:10-327:12. Their testimony otherwise, Tr. (Keim) at 243:2-244:16; Tr. (Lenski) at 353:24-354:16, is contradicted by their cross-examination testimony and therefore is not credible.

The differences between the evidence here and the evidence in the 1145 Investigation exemplify the failure of proof here. In the initial determination in the 1145 Investigation, the ALJ found that Medytox and Daewoong's strains shared six SNPs which did not exist in any other sequenced strain. *Botulinum Toxin Prods.*, Initial Determination at 99-100. As the ALJ explained, Daewoong's strain shared unique SNPs with a minor variant strain in Medytox's CB19 but not the major variant of CB19. *Id.* at 109. The ALJ explained that the "most logical conclusion" was that Daewoong's strain came from a cell bank created from CBAM0301 which had one of these minor variants, and then that this variant became fixed. *Id.* at 109-10. The Commission agreed with this analysis, finding that the genetic evidence established "by more than a preponderance of the evidence (indeed by near certainty) that Daewoong derived its strain from Medytox." *Botulinum Toxin Prods.*, Comm'n Op. at 37. The Commission found that there was a "solid *prima facie* case that [Daewoong] acquired Medytox's strain by improper means." *Id.* at 38-39.

The evidence in the 1145 Investigation showed a closer relationship than exists here. In the 1145 Investigation, Daewoong's strain shared SNPs with Medytox that no other *C. botulinum* strain shared; here, Hugel's strain does not share any SNPs with Medytox's that are not also shared by other sequenced *C. botulinum* strains. CX-1155C. In the 1145 Investigation, Medytox had a minor variant which had additional shared SNPs with Daewoong; here, there is no evidence that

any Medytox strain had a minor variant which shares SNPs with Hugel's strain that are not shared with every other sequenced ██████████ strain. In the 1145 Investigation, there were only 6 SNPs that were different; by contrast, here, Hugel's strain has ██ SNPs not shared by any Medytox strain: the █ shared with the Umass and 69A strains and ██ others that are not shared by any other strain. CX-1155C. And while there are 40 SNPs shared by Medytox and Hugel that are not shared by strains other than the ██████████ clade, those SNPs are also shared by every other ██████████ strain analyzed by the parties. CX-1155C. The evidence here does not show a "near certainty" that Hugel's strain is derived from Medytox. Instead, it shows the opposite: that Hugel's strain is not derived from Medytox's.

I am also unpersuaded by Medytox and its experts' theory that these genetic differences can be explained by a mutation in the *mutS* gene. CIB at 31. Dr. Keim explained that the Hall A-hyper clade contains a nonsense mutation in the *mutS* gene, a gene which fixes mutations, which could result in an increased mutation rate. CX-0002C (Keim WS) at Q/A 105; *see also* CX-0003C (Lenski WS) at Q/A 54. Medytox argues that this genetic defect could result in the differences between the strains. CIB at 60 (citing evidence). Nevertheless, Medytox's experts did not explain that *mutS* resulted in the █ SNPs, and the cited evidence relates either to whether a mixed lineage existed or when the SNPs in Hugel's strain arose. CX-0002C (Keim WS) at Q/As 136, 145 (opining that a mixed lineage existed); CX-0003C (Lenski WS) at Q/As 64 (opining about high mutation rate), 107 (opining, in a conclusory manner, that the SNPs found in Hugel's strain occurred after the alleged theft). Like much of Medytox's case, this theory is based on conjecture: there is no evidence of when any mutations arose in Hugel's strain or that these differences are due to a mutation in *mutS*. I am not persuaded that this mutation rate accounts for the genetic differences.

I disagree with Medytox that the genetic similarities, along with the allegation of access, are enough to meet Medytox's burden or to establish a *prima facie* case of conversion. *See* CIB at 33-34. For this proposition, Medytox cites four cases in which access and substantial similarity were sufficient to prove a claim of trade secret misappropriation. *Id.* (citing cases). But as Respondents and Staff persuasively argue, Medytox identifies no case in which these elements are enough to establish conversion. RRB at 9-11; SIB at 44.

A claim of conversion requires a showing that the defendant unlawfully exercised dominion over the plaintiff's rights. Medytox cites no case in which a court has found conversion based on access and substantial similarity, nor am I aware of any. But even if conversion could be shown by access and substantial similarity, Medytox has not proven those two elements. As I explained above, I am unpersuaded that Hugel or Dr. Seo ever had access to or did, in fact, access Medytox's strain. And given that numerous sources for a ███████ strain existed, I do not find the genomes of Medytox and Hugel's strains to be substantially similar given the significant genetic differences. Although there are similarities, the differences between Medytox and Hugel are also significant within the context of the ███████ clade.

Because Medytox has failed to present a *prima facie* case of conversion, I find that it is irrelevant whether Hugel has proven that its strain was found in a can of beans. Medytox devotes a significant portion of its briefing to this issue. CIB at 34-49; CRB at 29-37.[17] But because I find that Medytox has not presented a *prima faci*e case of conversion, Hugel's exculpatory defense need not be resolved. In other words, even if I found that Hugel's stain was definitively not found in a can of beans, it would not serve to overcome any of the many weaknesses in Medytox's *prima*

---

[17] In its reply brief, Medytox faults Dr. Moon for failing to "show up to defend his story." CRB at 22. I find this argument unpersuasive. Dr. Moon left Hugel in July 2017. RX-0009C (Lee WS) at Q/A 16. Medytox has presented no evidence that it attempted to secure Dr. Moon's testimony.

*facie* case. For the same reasons, I have determined that I do not need to consider whether it is plausible that Hugel's strain could have been the result of a lab leak. CIB at 38-41. Similarly, I do not find it necessary to address a disputed factual issue between the parties about the origin of the 69A strain of *C. botulinum* that was used in the phylogenetic analysis. *See id.* at 39-40.

I finally note that in finding that Medytox has failed to meet its burden of proof, I am not requiring Medytox to affirmatively disprove every other possible source of Hugel's strain. *See* CIB at 22. Instead, I am weighing the evidence presented by Medytox and finding that it does not establish Medytox's claim of conversion is more likely than not. As I explained, the evidence does not support that Medytox's alleged act of conversion occurred: Dr. Seo allegedly taking *C. botulinum* from Dr. Yang's laboratory at Sun Moon University. This is due both to the lack of credibility of Dr. Yang and the lack of physical evidence. Nor do I find that the genetic evidence shows that claim is more likely than not.

The genetic evidence shows that Hugel has a ▮▮▮▮▮ strain. However, because Medytox admittedly is not the only entity with such a strain, the fact that Hugel has a ▮▮▮▮▮ strain cannot create a presumption that Hugel took its strain from Medytox. Ultimately, the record shows that ▮▮▮▮ strains, were held by numerous scientists and companies across the world. Considering that, the evidence does not affirmatively prove conversion. Medytox focuses on its assertion that there was no other "known source" of ▮▮▮▮ strains in Korea. CRB at 28. But that is conjecture from Medytox, and its focus on Korea is too narrow given the evidence of worldwide sharing of the ▮▮▮▮ strain. Medytox has not established that it is more likely than not that Hugel's strain came from Medytox. It has therefore failed to prove conversion.

## V.     RESPONDENTS' DEFENSES TO THEFT AND CONVERSION

In its Initial Post-Hearing Brief, Respondents raise two defenses to the claim of theft and conversion: that Medytox's claim is preempted by trade secret law, and that these claims are not an "[u]nfair method[] of competition [or] unfair act[] in the importation of articles" under 19 U.S.C. § 1337(a). RIB at 127-32.[18] I address each of these defenses in turn.

### A.     Preemption

Respondents argue that the claim of theft and conversion is preempted "[t]o the extent that Medytox continues to allege that its claims of theft and conversion are related broadly to its 'strain' as a whole, and not to a physical sample[.]" RIB at 127. But in reply, Respondents "agree[] . . . that to the extent Medytox's claims for theft and conversion are directed to a specific physical sample of its strain, they are not preempted." RRB at 65. As Medytox and Staff point out, the premise of this preemption defense is incorrect because Medytox is claiming that a physical sample of *C. botulinum* was converted. CIB at 119; SIB at 85-86. And as I explained above, one key piece of evidence (or lack thereof) for Medytox's claim is a lack of any physical evidence of conversion. Accordingly, I find that Medytox's claim is not preempted.

### B.     Not an "Unfair Act[] in the Importation of Articles" under Section 337

Respondents argue that even if there was conversion, the alleged conversion here does not have a nexus between the unfair acts and importation such that it is within the Commission's statutory authority. RIB at 130-31. Respondents argue that there is no nexus because the allegedly converted property is not being used in the importation of its products. *Id.* at 131. Respondents

---

[18] Respondents raised several other defenses in their prehearing brief: statute of limitations; laches; estoppel, waiver, and/or acquiescence; and unclean hands. RPB at 210-228. Respondents did not raise these defenses in their Initial Post-Hearing Brief, and I therefore deem them waived. *See* Ground Rule 14.2.

argue that conversion is not a continuing tort, and that use of a copy is not an act of conversion. *Id.* at 131-132. Respondents argue that even if its original sample was acquired from Medytox via an act of theft or conversion, the imported products were not manufactured using the converted property, so there is not a sufficient nexus.

Medytox argues that the alleged conversion can be a predicate for a violation of section 337. CIB at 120-21. Medytox argues that there is a necessary nexus between the conversion and importation because without the alleged conversion, Respondents would not have been able to manufacture a product for importation or sale in the United States. *Id.* at 121-22. Staff agrees with Medytox that the alleged conversion is an unfair act in the importation of articles. SIB at 87.

Because I found that Medytox has not proven conversion by a preponderance of the evidence, *see* § IV.B, it may be unnecessary to address this issue. But I find that if the claimed conversion had occurred, it would have a sufficient nexus to importation. The alleged unfair act at issue here is conversion of a sample of *C. botulinum* which allegedly was the predecessor to Hugel's current strain. As Respondents admit, under Medytox's own theory, Hugel is using *C. botulinum* that is derived from the allegedly stolen strain to manufacture its Accused Products. RRB at 66-67. This is not significantly different from use of a trade secret to manufacture a product, which is within the scope of the Commission's authority. *Raised Garden Beds*, Comm'n Op. at 11-19. I find that in this case, a sufficient nexus exists between the alleged unfair act and the importation of Accused Products to fall within the scope of the Commission's authority if a violation had been proven.

## VI. DOMESTIC INDUSTRY

Although I find no unfair act, I find that Medytox has established that a domestic industry exists under section 337(a)(1)(A) based on Medytox and its licensees, Evolus and AEON. I further

find that Medytox has established a threat of substantial injury to the domestic industry of Evolus, but that Medytox has not established a threat of substantial injury to the domestic industry of Medytox or AEON. However, I decline to find a domestic industry in the unrelated botulinum toxin product suppliers.

### A.     Existence of a Domestic Industry

#### 1.     Medytox

Medytox contends that a domestic industry exists based on its research and development ("R&D") in MT10909L. CIB at 73-79. Although Respondents contend that the investments are not significant, they do not generally contest the dollar amounts presented by Medytox. RIB at 90-93. Staff argues that the evidence demonstrates that a domestic industry exists. SIB at 56-65.

The calculations performed by Medytox and its expert, Mr. Herrington, were not disputed by Respondents. Tr. (Sheridan) at 929:10-23. Medytox presented evidence that its domestic research and development investments fall into three categories: clinical (costs relating to clinical trials), regulatory (consulting and development expenses associated with seeking regulatory approval), and CMC[19] (costs paid for packaging). CX-0007C (Lee WS) at Q/As 19-29; *see also* CX-0601C (spreadsheet of investments). Clinical investments specifically include expenditures for executing phase 1, phase 2, and phase 3 clinical trials. CX-0007C (Lee WS) at Q/A 19. Regulatory investments "mainly includes the cost for preparing and asking for and carrying out meetings with the regulatory authorities[.]" *Id.* CMC costs "includes the development of production processes and basic research into the characteristics of the toxin and various testing methods of toxins[.]" *Id.* Mr. Herrington testified that between January 1, 2021, and March 30,

---

[19] In the context of FDA-approved drugs and biologics, "CMC" refers to "Chemistry, Manufacturing & Controls."

2022 (the filing date of the complaint), Medytox made the following investments in each of these three categories:

|  | Investments (Jan. 1, 2021, to May 31, 2023) |
|---|---|
| Clinical | ██████ |
| Regulatory | ██████ |
| CMC | ██████ |

CX-0005C (Herrington WS) at Q/A 60 (relying on CX-0242C and CX-0602C); CDX-0005C.3; *see also id.* at Q/As 61-67 (explaining what investments fell in each category). Mr. Herrington also presented evidence of total investments made in each of these three categories from January 1, 2021, through May 31, 2023. CX-0005C (Herrington WS) at Q/As 51-53:

|  | Investments (Jan. 1, 2021, to May 31, 2023) |
|---|---|
| Clinical | ██████ |
| Regulatory | ██████ |
| CMC | ██████ |

Mr. Herrington calculated that the domestic R&D activity on MT10109L represented ████████████ of Medytox's total worldwide R&D investments in MT10109L from January 1, 2021, through March 30, 2022, and █████ of Medytox's total worldwide R&D investments in MT10109L from January 1, 2021, through May 31, 2023. *Id.* at Q/A 57.

Medytox argues that its investments are quantitatively significant. CIB at 75-76. Medytox argues that the Commission has approved of comparisons of domestic R&D and worldwide R&D as an apples to apples comparison. CIB at 75 (citing *Certain Playards & Strollers*, Inv. No. 337-TA-1288, Initial Determination, 2023 WL 2967392, at *79 (Mar. 31, 2023)). Medytox argues it is not required to compare its domestic R&D to total worldwide investments to show quantitative significance. *Id.* at 76.

Medytox also argues that its investments are qualitatively significant. CIB at 76. Medytox argues that the R&D is necessary to develop a safe and effective product that will obtain regulatory approval. *Id.* Medytox further argues that it is seeking to expand its indications. *Id.* Medytox also argues that it is continuing to grow its investments, including after the complaint was filed. *Id.* at 76-77.[20]

Respondents argue that none of the facts identified by Medytox are sufficient to establish qualitative significance. RIB at 90-91. Respondents further argue that the evidence does not show quantitative significance, because it does not consider significant non-US investments, including investments in plant construction, or the fact that only two of over 800 employees are based in the United States. RIB at 92-93.

Staff contends that the evidence shows the qualifying activities are qualitatively and quantitatively significant. SIB at 63. Staff contends that the investments identified are quantitatively significant, even when excluding CMC expenses which Staff contends should be excluded from the calculation. *Id.* at 63-64. Staff argues that the comparison of domestic R&D to foreign R&D is the proper comparison, not comparison to foreign manufacturing. *Id.* at 64.

I find that Medytox has proven by a preponderance of the evidence that a domestic industry exists based on its investments made prior to the filing of the complaint on March 30, 2022. There are no factual disputes about the amount of the investments, only disputes about the significance of the investments. I find that Medytox has shown that the industry is quantitatively significant. The Commission has previously rejected arguments like Respondents' that foreign manufacturing

---

[20] Medytox also argues that investments made by Allergan should be considered as part of the "entire investment picture" of MT10109L for determining domestic industry. CIB at 78-79. The parties introduced no evidence of Allergan's investments, only statements made in a vacated portion of an initial determination in the 1145 Investigation. I decline to consider these investments.

expenditures must be considered in determining significance, albeit in a patent-based investigation. *Certain Movable Barrier Operator Sys. & Components Thereof*, Inv. No. 337-TA-1118, Comm'n Op. at 24-26 (Public Version Jan. 12, 2021). But that holding in *Movable Barrier Operator Systems* is equally applicable here in an (a)(1)(A) investigation: there is no requirement for Medytox to compare its domestic R&D expenses to foreign manufacturing expenses. The comparison of domestic R&D to foreign R&D is an appropriate comparison. The evidence shows that Medytox's R&D is quantitatively significant because Medytox's domestic R&D investments are ██████████████████ its total worldwide R&D investments. CX-0005C (Herrington WS) at Q/As 52, 60. This conclusion is the same even if CMC investments were excluded, as CMC investments account for ██████████████████ of claimed investments. *Id.* I find that Respondents' comparison of employees is not appropriate here because Respondents do not know how many of Medytox's worldwide employees work on MT10109L R&D.

I also find that the activities and investments are qualitatively significant, and that the nature of the activities are those of a domestic industry that can be protected under section 337. Most of the expenses identified are clinical expenses or regulatory expenses being used to obtain FDA approval. CX-0007C (Lee WS) at Q/As 19. Clinical investments are being used to execute phase 1, 2, and 3 clinical trials, including contract research organization activities relating to FDA submissions and clinical trials. *Id.* at Q/As 19, 21-26. Regulatory expenses include expenses for preparing for and carrying out meetings with regulatory authorities, as well as consulting on regulatory matters. *Id.* at Q/As 19, 27-28. These investments are directly related to Medytox's attempts to obtain FDA approval for MT10109L. I find that these investments are qualitatively significant under the circumstances because they are necessary and required for Medytox to obtain FDA approval and therefore to market MT10109L. The Commission has also previously found

activities relating to clinical trials and FDA regulatory activities to qualify as a domestic industry under section 337. *Certain Strontium-Rubidium Radioisotope Infusion Sys., & Components Thereof Including Generators*, Inv. No. 337-TA-1110, Comm'n Op. at 40-42 (Public Version Dec. 11, 2019); *see also Bone Cements*, Comm'n Op. at 34 (explaining that clinical trials have been credited in past investigations).[21]

For all of these reasons, Medytox has proven that a domestic industry exists based on its own investments and activities relating to MT10109L.

### 2.     Evolus

Medytox argues that a domestic industry exists based on Evolus's activities relating to Jeuveau®. CIB at 79-85. Respondents argue that Medytox has failed to establish a domestic industry based on Evolus's activities. RIB at 93-96. Staff argues that the evidence shows a domestic industry exists based on Evolus's activities. SIB at 65-69.

Evolus is a licensee of Medytox's strain of *C. botulinum*. JX-0078C. Medytox presented evidence of Evolus's investments through Mr. Herrington, whose calculations were not disputed. Tr. (Sheridan) at 929:10-23. Sandra Beaver, Evolus's Chief Financial Officer, testified about Evolus's activities and investments. CX-0009C (Beaver WS); JX-0086C. Jeuveau®, which is Evolus's only commercial product, launched in May 2019. JX-0086C ¶¶ 5, 9. To launch Jeuveau®, Evolus invested in and performed R&D, including designing and performing clinical trials and filing a Biologic License Application (BLA) to obtain FDA approval. *Id.* ¶ 10. In 2022, costs associated with medical affairs accounted for ███████████ of Evolus's total U.S. R&D expenditures, costs associated with clinical activities accounted for ███████████ of

---

[21] Commissioner Kearns, however, has expressed his view that these expenditures do not qualify. *See Strontium-Rubidium Radioisotope Infusion Sys.*, Comm'n Op. at 42 n.17; *Bone Cements*, Comm'n Op. at 34 n.30.

Evolus's total U.S. R&D expenditures, and regulatory activities accounted for ███████

of Evolus's total U.S. R&D expenditures. CX-0009C (Beaver WS) at Q/A 7. ████ of Evolus's total

R&D investments relate to costs incurred in the United States. *Id.* at Q/A 8. Evolus's employees

involved in clinical activities are involved in executing clinical trials. *Id.* at Q/A 9. Evolus's

employees involved in medical affairs provide on-site training for existing U.S. customers. *Id.*

Evolus's employees involved in regulatory activities are responsible for seeking and maintaining

FDA approval and assisting contract manufacturers with regulatory compliance. *Id.*

Based on Ms. Beaver's testimony, Mr. Herrington calculated that Evolus spent ███████

on research and development between February 18, 2021, when Evolus and Medytox entered a

license, and March 30, 2022. CX-0005C (Herrington WS) at Q/As 25-26 (relying on JX-0086C,

CX-1008, CX-0603C, CX-0635C, CX-0189, CX-0190, CX-0191, and CX-0192); CDX-0005C.4.

Mr. Herrington also calculated Evolus's R&D expenses between January 1, 2017, and March 30,

2022, and between January 1, 2017, and June 30, 2023. *Id.* Mr. Herrington determined that between

February 18, 2021, and March 30, 2022, Evolus's R&D expenses were ████ of the combined

R&D costs and cost of sales for Jeuveau®. *Id.* The evidence also shows that Evolus has ██████

████████████████████████ activities. CX-0005C (Herrington WS) at Q/A 33 (citing CX-

0187C). Respondents' expert, Mr. Sheridan, calculated that the R&D activities between January

18, 2021, and March 30, 2022, accounted for ████ of Evolus's total operating expenses and ████

of Evolus's net revenue. RX-0007C (Sheridan WS) at Q/A 81.

Medytox argues that these investments are quantitatively significant when compared to

Evolus's worldwide R&D investments. CIB at 81. Medytox argues that the ███████ figure

provided by Ms. Beaver can support this even without the underlying evidence. CIB at 81-82.

Medytox argues that there was no need to compare Evolus's R&D investments with its total

operating expenses or net sales. *Id.* at 82. Medytox also argues that it did analyze Evolus's R&D

investments as a percentage of cost of sales, and that these calculations establish the quantitative

significance of the investments. *Id.* at 82-83. Medytox further argues that it did not need to include

Daewoong's costs of manufacturing. *Id.* at 83-84.

Medytox argues that these investments are qualitatively significant for several reasons. CIB

at 84. Medytox argues that these investments were necessary to develop Jeuveau® and obtain FDA

approval, that Evolus is continuing to perform ongoing R&D for new indications, that the █████

███████████████ is used to support Jeuveau®, that ████ of its employees support Jeuveau®, and

that Evolus's investments have led to success for Jeuveau®. *Id.* Medytox argues that Evolus's net

operating losses and deficit do not undermine the significance because Evolus is a growing

company and is continuing to grow its revenue year-over-year. *Id.* at 84-85.

Respondents argue that these investments are not quantitatively significant because the

investments only account for ████ of Evolus's total operating expenses and ████ of Evolus's total

net sales. RIB at 94. Respondents also argue that Ms. Beaver's ██████ figure is unreliable

because it lacks support in the record. *Id.* Respondents contend that Evolus has also incurred net

operating losses and has a significant deficit, which shows Jeuveau® is not successful. *Id.*

Respondents further argue that the ████ figure does not account for the foreign manufacturing

investments relating to Jeuveau®, such as Daewoong's expenses. *Id.* at 94-95. Respondents argue

that Daewoong may have R&D expenses which are not being accounted for by Mr. Herrington's

analysis. *Id.* at 95.

Staff argues that these activities are significant. SIB at 67. Staff argues that qualitatively,

the investments are significant because they were necessary to the commercialization of Jeuveau®,

Evolus's only commercial product. *Id.* Staff also argues that the investments are quantitatively

significant because the ▆ represents activities that allow Evolus to commercialize Jeuveau®. SIB at 68-69.

I find that Evolus's investments are quantitatively significant. Medytox has shown that Evolus's R&D expenses represent ▆ of Evolus's purchasing cost of Jeuveau®; this is quantitatively significant. I find that this is an appropriate comparison to show the significance of Evolus's investments under the circumstances. I also find that Ms. Beaver's testimony allocating the R&D expenses to the United States is reliable. Ms. Beaver testified that she came up with the ▆ number by referencing internal Evolus documents. JX-0151C (Beaver Dep. Tr.) at 15:8-15. That is sufficient to substantiate that figure. As Medytox and Staff point out, "there is no Commission requirement that sworn witness testimony directed to the domestic industry requirement cannot be credited without further corroboration by underlying documentation." *Certain Solid State Storage Drives, Stacked Elecs. Components, & Prods. Containing Same*, Inv. No. 337-TA-1097, Comm'n Op. at 21 (Public Version June 29, 2018). Respondents' attacks on Ms. Beaver's credibility are unsupported by any evidence, and therefore I find her testimony reliable.

I further find that these investments are qualitatively significant and the nature of the activities are those of a domestic industry that can be protected under section 337. Jeuveau® is Evolus's only commercial product. JX-0086C ¶ 5. The investments which have been claimed here are necessary expenses to bring the product to market, including obtaining FDA approval. These are significant expenses in the context of this industry, as Evolus would be unable to sell Jeuveau® without its R&D investments. The investments are also directed towards obtaining new clinical indications which will expand Jeuveau®'s uses, which is significant in the context of this industry.

For all these reasons, Medytox has proven by a preponderance of the evidence that a domestic industry exists based on Evolus's investments and activities relating to Jeuveau®.

### 3.    AEON

Medytox also contends that a domestic industry exists based on AEON's investments in its ABP-450 product. CIB at 85-89. Respondents argue that the investments are overstated because they include costs that cannot be properly included and that Medytox failed to demonstrate the investments are significant. RIB at 96-97. Staff argues that Medytox has established that a domestic industry exists based on Aeon's investments. SIB at 69-72.

AEON is a licensee of Medytox's strain of *C. botulinum*. JX-0144C. Medytox presented evidence of Aeon's investments through a declaration from Aeon's CEO, Marc Forth, and its expert Mr. Herrington. Mr. Forth explained that ABP-450 is currently in clinical trials. JX-0138C ¶ 9. Mr. Forth set forth investments made from 2019 through June 30, 2023. *Id.* ¶ 12. The R&D expenses set forth in Mr. Forth's declaration include Labor, Clinical, and Operations categories. *Id.* Mr. Forth explained that these costs include costs associated with clinical trials, external costs associated with regulatory compliance, overhead, employee compensation, and other expenses. *Id.* ¶ 13. "Labor" category includes all employees, including contractors and consultants. JX-0148C (Forth Dep. Tr.) at 34:4-10. The "Clinical" category includes clinical trial expenses. *Id.* at 35:23-36:3. The "Operations" category includes quality assurance employees and consultants. *Id.* at 36:4-20. Mr. Forth testified that "well ███████████" of these expenditures were made in the United States. *Id.* at 78:1-10 AEON occupies an ████████ office space in Irvine, California, which supports ABP-450. JX-0138C ¶ 15. In 2020, AEON employed ████████, and in 2023, it employs ███. *Id.* ¶ 16. Of these, ███ are involved in R&D. JX-0148C (Forth Dep. Tr.) at 16:3-17:24.

Mr. Herrington calculated that AEON has invested a total of ███████ in R&D from June 21, 2021, when AEON's license with Medytox became effective, through March 30, 2022. CX-0005C at Q/A 73; CDX-0005C.5 (citing CX-0180C, CX-1083C, CX-1089C). Of this, ███ or ███████, was allocated to domestic investments based on Mr. Forth's testimony. *Id.* ███████ of the domestic investments were in the Labor category, ███████ of the domestic investments were in the Clinical category, and ███████ of the domestic investments were in the Operations category. *Id.*

Medytox argues that these activities are qualitatively significant because the domestic R&D expenditures are ███████ of AEON's worldwide R&D expenditures. CIB at 87. Medytox also argues that Mr. Forth's declaration is reliable evidence to substantiate the investments. *Id.* at 87. Medytox also argues that there is no need to compare AEON's investments to investments by AEON's supplier, Daewoong's. *Id.* at 87-88. Medytox argues that these activities are qualitatively significant because they are necessary to develop the product and obtain regulatory approval, and all the activities are used to support ABP-450. *Id.* at 88. Medytox argues that the investments are not overstated because travel and overhead expenses were properly considered as research and development costs. *Id.* at 89.

Respondents argue that the claimed investments include costs which should not be included as research and development, including travel costs and overhead costs. RIB at 96. Respondents also argue that the investments are unsupported because AEON did not provide any documentation to support a summary spreadsheet prepared for litigation. *Id.* at 97. Respondents further argue that Medytox failed to consider Daewoong's R&D investments, as it did with Evolus. *Id.*

Staff argues that the evidence supports the reliability of AEON's investments. SIB at 69-71. Staff also argues that the evidence shows that the investments are qualitatively significant

because they are necessary to bring ABP-450 to market in the United States. *Id.* at 72. Staff further argues that these investments are quantitatively significant because the domestic investments represent ▮ of AEON's total worldwide R&D expenses. *Id.*

I find that Mr. Forth's declaration and the evidence relied upon by Medytox are credible and reliable. Mr. Forth's declaration is sufficient because "there is no Commission requirement that sworn witness testimony directed to the domestic industry requirement cannot be credited without further corroboration by underlying documentation." *Solid State Storage* Drives, Comm'n Op., at 21. Mr. Forth explained that his declaration was based on his review of AEON's records and discussions with AEON employees. JX-0138C ¶ 3.

There is no indication that Mr. Forth's testimony is inaccurate or otherwise false; Respondents' attacks on his credibility are based solely on speculation. Likewise, the summary spreadsheet provided by AEON, CX-0180C, is sufficient. The Commission does not require extensive documentation of investments for domestic industry if that evidence is reliable. *See Certain Wet Dry Surface Cleaning Devices*, Inv. No. 337-TA-1304, Comm'n Op. at 83-84 (Jan. 8, 2024) (finding that the economic prong could be supported by a single spreadsheet with data that was created using reliable methodology). Mr. Forth has explained how this information was collected and there is no indication it is unreliable. I therefore find his testimony reliable. I also find that inclusion of travel and overhead costs is reasonable because they relate to qualifying research and development activities.

I also find that Medytox has shown that AEON's investments are significant qualitatively and quantitively and the nature of the activities are those of a domestic industry that can be protected under section 337. Qualitatively, AEON's investments are directed towards clinical and regulatory work to obtain FDA approval.  JX-0138C ¶¶ 8-11. These activities are necessary to

bring ABP-450 to market in the United States and are therefore significant. Quantitatively, █

of AEON's investments are directed towards activities in the United States. As I explained with

respect to Evolus, there is no need for Medytox to compare AEON's investments to its supplier,

Daewoong's.

For all these reasons, Medytox has shown that a domestic industry exists based on AEON's

investments in research and development activities relating to ABP-450.

### 4.    Allergan, Ipsen, and Supernus

Medytox also argues that a domestic industry exists through the activities of other domestic

BTX suppliers: Allergan, Dysport, and Supernus. CIB at 90-94. Medytox argues that for a non-

statutory case under section 337(a)(1)(A), a domestic industry does not need to relate to the

intellectual property at issue. *Id.* at 93.

Respondents argue that there is no support for the proposition that these unrelated

companies can be relied upon for the domestic industry requirement. RIB at 98-99. Staff also

argues that these companies cannot be relied upon for the domestic industry requirement. SIB at

72-73. Staff argues that even in (a)(1)(A) investigations, Commission precedent requires a

complainant to rely on its own activities, activities of its affiliates, or activities of others authorized

to sell or practice the intellectual property at issue. *Id.* at 73-74.

I am not persuaded by Medytox's argument that a domestic industry may exist based on

investments in products wholly unrelated to the complainant. No decision cited by Medytox

supports its position. Instead, Medytox takes quotes out of context in cases or investigations that

never considered this issue. *See* CIB at 71-72 (citing cases). The Federal Circuit's decision in

*TianRui* considered only injury to the complainant and held that the complainant did not have to

practice the trade secrets to have a domestic industry. *TianRui Grp. Co. v. Int'l Trade Comm'n*,

661 F.3d 1233, 1335-37 (Fed. Cir. 2011). In *Botulinum Toxin Products*, the domestic industry at issue was that of Allergan, Medytox's then-licensee. *Botulinum Toxin Prods.*, Comm'n Op. at 22-23. In *Bone Cements*, the domestic industry was based on the complainant's own products. *Bone Cements*, Comm'n Op. at 7. Medytox's quotation from *Airtight Cast-Iron Stoves* removes key context. The entire relevant portion reads: "[i]n the present case the ALJ found that the domestic industry consists of that segment of the entire coal and wood-burning stove industry which was the target of the unfair acts and practices, i.e., Jotul U.S.A., its distributors and dealers. We agree with the ALJ's conclusion." *Certain Airtight Cast-Iron Stoves*, Inv. No. 337-TA-69, Comm'n Op., 1980 WL 41970, at *4 (Fec. 31, 1980). Jotul was the complainant, and thus the domestic industry extended to its entire dealer and distribution network. *Id.* at *1, *6. In *Foodservice Equipment*, where the domestic industry included companies who do not appear to have been licensed, but who utilized the complainants' products. *Certain Foodservice Equipment & Components Thereof*, Inv. No. 337-TA-1166, Comm'n Op. at 3-4 (Public Version Dec. 16, 2020). But even in *Foodservice Equipment* and *Airtight Cast-Iron Stoves*, the Commission did not find a domestic industry in companies that were unrelated to the complainant.

The circumstances here are different: Allergan, Ipsen, and Supernus have no current relationship with Medytox or Medytox's MT10109L. They are not licensed to the allegedly proprietary strain that was converted. Medytox has identified no investigation in which the Commission has found a domestic industry under subsection (a)(1)(A) based on parties with no relationship to the complainant or its products. Medytox seeks to extend the scope of domestic industry far beyond what the Commission has recognized, and I agree with Staff and Respondents that this is improper. SIB at 75; RIB at 117-120. I decline to do so in the first instance absent a

Commission decision doing so. I therefore do not find a domestic industry exists based on Allergan, Ipsen, or Supernus's activities.

### B.     Threat of Injury to Domestic Industry

Medytox only argues that there is a threat of substantial injury. For the reasons set forth below, I find that Medytox has proven by a preponderance of the evidence that there is a threat of substantial injury to Evolus, but that Medytox has failed to show by a preponderance of the evidence that there is a threat of substantial injury to itself or to AEON.

There is no dispute that Hugel has substantial foreign manufacturing capacity and intent to penetrate the United States market. Tr. (Sheridan) at 910:25-911:15; *see also* SIB at 76; RIB at 99-117 (not disputing these factors). At the time of the hearing, Hugel hoped to obtain FDA approval for its Biologics License Application in the first quarter of 2024. RX-0008C (Hartman WS) at Q/A 23. It obtained that approval on February 29, 2024. CX-1172. Hugel anticipates being able to import approximately 90,000 vials of Letybo® into the United States in the first two months after obtaining FDA approval. CX-1139C (Hartman Dep. Tr.) at 221:17-222:5. Mr. Hartman previously stated that Hugel "aims to make Letybo® one of the top ▮▮ brands in the U.S. market within three years of the launch ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ [.]" CX-0048.0002 (internal quotation marks omitted).

Hugel's documents show an intent to aggressively market and price Letybo® in the United States. *See, e.g.*, JX-0022C; *see also* CX-0005C (Herrington WS) at Q/As 110-123 (discussing several Hugel presentations). Although Mr. Hartman testified at the hearing that Hugel has not yet set a price for Letybo® and that it plans to set its price ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *see* RX-0008C (Hartman WS) at Q/As 27-29, 33-34, this testimony is contradicted by the documents showing Hugel's future marketing plans. The May 31, 2023, GTM ("Go to Market") strategy

document shows Hugel's goals. JX-0022C. Hugel intends to enter the market priced at a ███ ███ to Allergan and "███████ than other Tier 2 players[.]" JX-0022C.5. Hugel intends to perform a ██████████████████████████████. *Id.* at 5, 18. ███████████ is a key value consideration in Hugel's plans. *Id.* at 21.

Hugel's documents also identify ████ as a competitor who Hugel intends to differentiate itself from. *Id.* at 27. Hugel has indicated an intent to ███████████ prices as well, on average by ███. JX-0020C.9 (July 12, 2021, presentation). Mr. Hartman attempted to explain away or minimize the pricing and marketing plans set forth in these presentations. RX-0008C (Hartman WS) at Q/As 60-94. I do not find this testimony to be persuasive. As Mr. Hartman testified at his deposition, these presentations are ██████████████ with Hugel's goals and there has been ███████████ in them since 2021. CX-1139C (Hartman Dep. Tr.) at 249:3-19. I therefore find the documents to be credible, and that Mr. Hartman's testimony does not persuade me that credibility of the documents has been undermined. Accordingly, the evidence thus shows that although Hugel has not yet set a price, it intends to aggressively market Letybo® and undercut others on price, including Evolus.

Medytox argues that the evidence shows that Respondents threaten harm to Medytox and its licensees, Evolus and AEON. CIB at 103. This includes indirect injury to Medytox due to lower royalties. *Id.* Medytox argues that Evolus, as a key competitor, will also be harmed by Hugel's entry because Hugel's undercutting of Evolus's price would harm Evolus's profits. *Id.* at 103-05. Medytox argues that it and AEON would also be harmed. *Id.* at 105. Medytox argues that Hugel's market entry could hurt its ability to achieve its target market share for MT10109L. *Id.* Medytox further argues that Hugel's entry into a therapeutic market could harm AEON by reducing prices

and resulting in lower profitability. *Id.* at 105-06. Medytox also argues that there would be harm by creation of delays in clinical trials. *Id.* at 113.

Respondents argue that any harm is speculative because Medytox assumes that Medytox and AEON will receive FDA approval. RIB at 99-100. Respondents argue that this uncertainty reduces the likelihood of harm. *Id.* at 100-102. Respondents also argue that AEON and Hugel will not compete because AEON's therapeutic product is not interchangeable with Hugel's aesthetic product. *Id.* at 102, 105-08. Respondents further argue that the market share forecasts relied upon only show uncertainty in the market and the high degree of risk of not obtaining approval. *Id.* at 103-04. Respondents argue that the allegations regarding harms to clinical trials are purely speculative and rely on no evidence. RIB at 104-05.

Respondents argue that the allegations regarding Hugel's pricing are unsupported and speculative. *Id.* at 108-11. Respondents cite the evidence of their witnesses indicating that Hugel has not yet determined its pricing and argue that Medytox's claims are unsupported by the evidence and testimony. *Id.* at 108-10. Medytox argues there is no evidence that Hugel will undercut the U.S. market, and that Hugel's pricing outside of the United States is not relevant. *Id.* at 111-12. Respondents further argue that all projections of future commercial performance are speculative, including for Evolus's Jeuveau®. *Id.* at 112-13. Respondents argue that Hugel has not finalized its plans for launching Letybo®. *Id.* at 114. Respondents further argue that Hugel's marketing strategy is different than other aesthetic providers, which is evidence that there will not be harm to Evolus or other aesthetic BTX products. *Id.* at 115-17.

Staff argues that there is no threat of substantial injury to Medytox, Evolus, or Aeon. SIB at 76. Staff argues that the evidence shows it is more likely than not that Hugel will receive FDA approval. *Id.* at 77. But Staff argues that the entry of another supplier is insufficient to show

probable future injury. *Id.* at 77-78. Staff argues that that Medytox's threatened injury is too speculative and not based on reliable evidence. *Id.* at 79. Staff argues that "Medytox's reliance on select hyperbolic and aspirational statements from Hugel's internal marketing documents is misplaced." *Id.* Staff argues that Mr. Hartman's testimony is credible and supported by the documents. *Id.* at 79-80. Staff argues that evidence from foreign markets are not credible to show harm in the U.S. market. *Id.* at 80-81. Staff argues that the weight of the evidence does not support an inference that Hugel's entry will cause a reduction in market share, lost sales, or lost profits, particularly given the other market participants and potential new entrants such as Galderma. *Id.* at 81-82. Staff argues that the speculative nature of this future injury is "further emphasized" by the fact that neither AEON nor Medytox have obtained FDA approval. *Id.* at 82-83. Staff also argues that there is no evidence regarding harm to clinical trials. *Id.* at 83-84.

In its supplemental briefing, Medytox argues that the evidence of Letybo®'s FDA approval "constitute[s] further evidence that Hugel's arguments lack merit." CSB at 1. Medytox argues that this evidence shows that "Hugel will have a product on the market that directly competes with Evolus and other BTX suppliers." *Id.* at 2. Medytox argues that "CX-1171 in particular makes clear that Hugel is planning for an aggressive launch that will cause substantial harm to Evolus and other BTX suppliers." *Id.* at 3.

In their supplemental brief, Respondents argue that FDA approval "in itself does not support Medytox's argument that these documents demonstrate a threat of substantial injury[.]" RSB at 2. Respondents argue that entry into the market alone is not sufficient to show a threat of injury. *Id.* Respondents also argue that these documents are not relevant to Hugel's go-to-market strategy or pricing strategy. *Id.* at 2. Respondents contend that these documents are "not relevant to Hugel's launch strategy, which has not been finalized[.]" *Id.* at 3. Respondents also argue that

these exhibits "are not probative to the timing and likelihood of whether Medytox and Aeon are able to successfully enter the market." *Id.*

In its supplemental brief, Staff argues that "Medytox appears to assign greater importance to these exhibits than is appropriate considering other, more persuasive, evidence of record." SSB at 3. Staff argues that "mere entry into an existing, competitive market is insufficient to demonstrate probable future substantial injury to the domestic industry of Medytox and its licensees." *Id.* Staff also argues that neither document contains evidence of marketing or pricing. *Id.*

I find that the evidence shows that a threat of injury exists with respect to Evolus. There is no dispute that Hugel has substantial foreign manufacturing capacity and an explicit intent to enter the U.S. market. *See Rubber Resins*, Comm'n Op. at 64. The evidence shows that Hugel did obtain FDA approval, as Hugel expected. CX-1171; CX-1172; RX-0008C (Hartman WS) at Q/A 23. Hugel has intended an intent to begin marketing Letybo® in the United States in "the back half of 2024." CX-1171.1. This further shows a clear intent to enter the market. The evidence, as shown in Hugel's marketing plans, also clearly indicate an intent to undersell the domestic products, including Evolus's Jeuveau®. *See* discussion *supra*. When the evidence is taken as a whole, Hugel has shown both an intent to enter the market and an intent to directly compete with Evolus. There is a substantial threat of harm to Evolus because Hugel and Evolus will compete and because Hugel has identified ███ as a key competitor which it intends to differentiate itself from. *See, e.g.*, JX-0022C.27. There is also a nexus between the importation and this harm because the importation will allow Hugel to sell its product in the United States.

By contrast, the evidence of a threat of harm to Medytox is speculative. Medytox has not yet obtained FDA approval, and even in the most optimistic case, approval is more than a year

away. CX-1162C. (Albright WS) at Q/As 147-153. Mr. Albright's expectation of a launch for MT10109L within a year came before Medytox obtained a "refuse to file" letter shortly before the evidentiary hearing. Tr. (Albright) at 459:25-460:6. Medytox presented testimony of the success rate of approvals for BLAs, estimating it to be ██████████ once a drug application is accepted. CX-0006C (Schwartz WS) at Q/A 40. But this high-level statistical overview does not consider the specific likelihood of approval for MT10109L. There is no evidence clearly indicating what the likelihood is of MT10109L obtaining approval. This renders the alleged threat of harm too speculative as to Medytox.

Any claim of a threat of injury to AEON is also speculative. AEON is still in phase 2 clinical trials and has not yet begun phase 3 clinical trials. JX-0148C (Forth Dep. Tr.) at 27:7-28:10. AEON does not anticipate filing its BLA until the ████████. *Id.* at 28:11-16. It is thus speculative as to whether AEON's ABP-450 will ever reach the market. But even if ABP-450 does reach the market, it will only be approved for therapeutic indications. JX-0148C at 15:16-16:2; CX-0005C (Herrington WS) at Q/A 71. I am not persuaded by Medytox's arguments or Mr. Herrington's testimony, CX-0005C (Herrington WS) at Q/A 129, that Hugel's entry into the market and lower prices in the aesthetic market will cause harm to the therapeutic market. And I find Respondents' expert persuasive that a BTX product approved for aesthetic uses will not compete with one used for therapeutic uses. RX-0006C (Seevers WS) at Q/A 19. Although there is evidence that off-label use is common for pharmaceutical drugs, there is no specific evidence that off-label use is common for the biologics at issue here, which are botulinum toxin products. Nor is there an indication that the alleged off-label use, *i.e.*, use of an aesthetic BTX product for therapeutic uses, would occur, or that it would harm the prices and profitability of a therapeutic BTX product. This theory of harm therefore is too speculative.

Medytox also lacks any evidence to support the claim of harm to clinical trials for Medytox, AEON, and Evolus. Medytox made this argument in a single sentence citing only three pieces of testimony. *See* CIB at 113. The testimony provided by Medytox's expert, Mr. Schwartz, was conclusory and did not suggest any actual competition exists for clinical study populations. CX-0006C (Schwartz WS) at Q/A 30. Likewise, neither Mr. Forth nor Mr. Hartman provided more than high-level testimony about competition for clinical trials, let alone testimony showing any competition from Respondents. JX-0148C (Forth Dep. Tr.) at 105:6-106:1; CX-1139 (Hartman Dep Tr.) at 164:17-165:4. This theory has not been supported by sufficient evidence, and I find that it is too speculative to support a finding of a threat of injury.

In conclusion, I find that Medytox has shown by a preponderance of the evidence that a threat of substantial injury exists to Evolus but that it has not shown by a preponderance of the evidence that a threat of substantial injury exists to Medytox or AEON.

## VII.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.     The Commission has personal and *in rem* jurisdiction.

2.     The importation requirement of section 337 has been satisfied.

3.     Medytox has failed to demonstrate that Respondents committed theft or conversion.

4.     Medytox has demonstrated that a domestic industry exists with respect to it and its licensees', Evolus and AEON's, botulinum toxin products.

5.     Medytox has demonstrated a threat of substantial injury to Evolus's domestic industry.

6.     Medytox has failed to demonstrate a threat of substantial injury to Medytox's or AEON's domestic industry.

7.     No violation of 19 U.S.C. § 1337 has been shown by the importation and sale of botulinum toxin products.

## VIII.   RECOMMENDED DETERMINATION ON REMEDY AND BONDING

The Commission's Rules provide that the administrative law judge shall issue a recommended determination concerning the appropriate remedy in the event the Commission finds a violation of section 337 and the amount of bond to be posted by respondents during Presidential review of any Commission remedies. *See* 19 C.F.R. § 210.42(a)(l)(ii).

### A.     Limited Exclusion Order

The Commission has never addressed the appropriate length of an exclusion order in a theft or conversion claim. I find that trade secret misappropriation is the closest analog to the claims here. "The duration of an order in a trade secret misappropriation case is set as the time it would have taken to independently develop the trade secrets." *Rubber Resins*, Comm'n Op. at 82. "In addition, [t]he Commission has the discretion to begin that countdown at the effective date of the exclusion order rather than from the date of misappropriation, [and] the Commission ordinarily does so in trade secret misappropriation cases[.]" *Certain Balanced Armature Devices, Prods. Containing Same, & Components Thereof*, Inv No. 337-TA-1186, Comm'n Op. at 37 (Oct. 29, 2021) (internal quotation marks omitted) (alterations in original). "To determine the time it would have taken a respondent to independently develop the misappropriated trade secrets, the Commission may consider the length of time it took the complainant to develop the trade secrets and the resources of the respondent." *Id.*

Medytox argues that any exclusion order should be indefinite. CIB at 122. Medytox argues that this is appropriate because Respondents could not have obtained their strain but for the alleged

theft and conversion, and that at the time of the alleged theft, no other ███████ strain was available. *Id.* at 122-23.

Respondents argue that an exclusion order should be limited to the amount of time it would take Hugel to obtain a ███████ strain legitimately. RIB at 134. Respondents argue that the evidence shows Hugel could have obtained such a sample in less than a year, and thus argues that the exclusion order should be four months or less, but no more than one year. *Id.* at 135.

Staff argues that a limited exclusion order should last no more than one year. SIB at 90-91. Staff argues that ███████ strains were available, and that Respondents were able to obtain such a strain within a ███████. *Id.*

The Commission has granted exclusion orders with no time limit and a certification provision, but generally only false advertising cases where the exclusion order comes with a certification provision. *See, e.g.*, *Raised Garden Beds*, Comm'n Op. at 54-55 (discussing cases). I find Medytox's request for an indefinite exclusion order to therefore be inappropriate here, just as it was in the 1145 Investigation. *Botulinum Toxin Prods.*, Initial Determination at 257-258. Unlike in the 1145 Investigation, there is evidence showing that Respondents can obtain a commercially viable strain through legitimate means. Hugel was able to obtain an ███████ within █ ███████ to purchase a ███████ strain from ███████. RX-0011C (Kwon WS) at Q/A 29-32. That is the best evidence of the time it would take for Hugel to independently develop a strain, and accordingly, I recommend that a limited exclusion order last five months.

In a similar trade secret investigation, "where it is not readily apparent by inspection at the border whether an imported product is manufactured using the misappropriated trade secrets, the Commission has determined to require Respondents to obtain a ruling (via an advisory opinion or a modification proceeding) from the Commission prior to the importation of any accused

products." *Botulinum Toxin Prods.*, Comm'n Op. at 62. The same circumstances are true here: it would not be readily apparent at the border if the imported product is manufactured using the allegedly converted strain. Accordingly, I recommend that the same procedure is required if Respondents seek to import before the end of the exclusion order.

### B.    Cease and Desist Order

Section 337(f)(1) provides that the Commission may issue cease and desist orders to respondents found to be in violation. See 19 U.S.C. § 1337(f)(1). "Cease and desist orders are generally issued when, with respect to the imported infringing products, respondents maintain commercially significant inventories in the United States or have significant domestic operations that could undercut the remedy provided by an exclusion order." *Certain Arrowheads with Deploying Blades & Components Thereof & Packaging Therefor*, Inv. No. 337-TA-977, Comm'n Op. at 16-17 (Public Version Apr. 28, 2017); *see also Certain Electric Skin Care Devices, Brushes & Chargers Therefor, & Kits Containing Same*, Inv. No. 337-TA-959, Comm'n Op. at 26 (Public Version Feb. 13, 2017) (same). "A complainant seeking a cease and desist order must demonstrate, based on the record, that this remedy is necessary to address the violation found in the investigation so as to not undercut the relief provided by the exclusion order." *Arrowheads with Deploying Blades*, Comm'n Op., at 17; *see also Electric Skin Care Devices*, Inv. No. 337-TA-959, Comm'n Op. at 26 (same).

Medytox argues that a cease and desist order is warranted because Respondents have the ability and intent to stockpile commercially significant inventory of Letybo® in the United States. CIB at 123-24. Respondents, by contrast, argue that there is no inventory, let alone a commercially significant one, and that there is no evidence of significant domestic operations, and therefore a

cease and desist order is not warranted. RIB at 135-36. Staff argues that the evidence does not support issuance of a cease and desist order. SIB at 91-92.

Medytox argues in its supplemental brief that Hugel's FDA approval supports issuance of a cease and desist order. CSB at 4. Medytox argues that CX-1171 indicates Hugel's intent to transition for a launch in the back half of 2024. *Id.* Medytox also argues that CX-1171 indicates that Hugel is importing and stockpiling Letybo® in anticipation of launch. *Id.* Respondents argue that CX-1171 and CX-1172 do not "evidence[] any intent or ability to stockpile Letybo®; they merely provide a tentative timeline of 'the back half of 2024' for a launch." RSB at 4-5. In its supplemental brief, Staff argues that CX-1171 and CX-1172 do not support issuance of a cease and desist order because neither document indicates that Hugel has inventory, plans to stockpile, or significant domestic operations. SSB at 4.

The FDA approval of Letybo® supports issuance of a cease and desist order as to Hugel America, Inc. The evidence shows that Hugel America, Inc. had no inventory of Letybo® in the United States as of the evidentiary hearing. RX-0008C (Hartman WS) at Q/A 95. Mr. Hartman testified that Hugel has no plans to import or stockpile product before FDA approval. RX-0008C (Hartman WS) at Q/As 96-97. But FDA approval was obtained after the hearing, and Hugel America, Inc. is preparing for a launch in 2024. CX-1171; CX-1172. FDA approval is critical because Mr. Hartman admitted that a month or two after approval, Hugel will be able to import 90,000 vials into the country. CX-1139C at 221:17-222:1. And preparing for a launch this year indicates that Hugel America, Inc. will have significant domestic operations. Accordingly, the evidence shows that a cease and desist order is proper as to Hugel America, Inc. By contrast, there is no evidence that Hugel, Inc., which is not a domestic company, has significant domestic

operations, ability to stockpile, or domestic inventory. Accordingly, no cease and desist order is proper against Hugel, Inc.

Croma will not be involved in distribution of Letybo® in the United States. Tr. (Herrington) at 508:11-16. There is no evidence that Croma has any inventory, let alone a commercially significant one. *Id.* at 506:17-22. Nor is there evidence that Croma has any domestic operations. Accordingly, a cease and desist order is not proper as to Croma.

Accordingly, if the Commission finds a violation, I recommend that a cease and desist order issue against Hugel America, Inc., but not against Hugel, Inc. or Croma.

## C.    Bonding

During the 60-day period of Presidential review, imported articles subject to an exclusion order are entitled to conditional entry under bond. 19 U.S.C. § 1337(j)(3). The purpose of the bond is to protect the complainant from any injury. 19 C.F.R. §§ 210.42(a)(l)(ii), 210.50(a)(3). The amount of the bond must be an amount sufficient to protect the complainant from any injury. 19 U.S.C. § 1337(j)(3); 19 C.F.R. § 210.50(a)(3). "The Commission has set bond amounts based on the price difference between the infringing imports and the domestic industry products or on a reasonable royalty applicable to the infringing products." *Certain Non-Volatile Memory Devices and Products Containing the Same*, Inv. No. 337-TA-1046, Comm'n Op., at 67 (Public Version Oct. 26, 2018). A 100 percent bond is appropriate in cases where the calculation of a price differential is impractical and there is insufficient evidence in the record to determine a reasonable royalty. *Id.* The complainant "bear[s] the burden of establishing the need for a bond amount in the first place." *Id.*

Medytox argues that a 100 percent bond is appropriate. CIB at 124. It argues that a price comparison is not feasible because the Accused Products have not entered the U.S. market and no

price has been set. *Id.* at 124-25. It also argues that the royalty rates in the Medytox-Evolus and Medytox-AEON licenses are not appropriate because the rates "do not adequately capture the value paid" for a license to use Medytox's BTX strain. *Id.* at 125. In its supplemental brief, Medytox argues that a bond is necessary based on Hugel's FDA approval because importation will be for a launch in direct competition with domestic suppliers, including Medytox. CSB at 5.

Respondents argue that a 100% bond is not appropriate. RIB at 137. It argues that because it does not have FDA approval to launch, there is no need to protect Medytox or its licensees from injury. *Id.* Respondents argue that Medytox's royalty rates are evidence of a rate, and that a ▮ ▮ rate based on Evolus's license is proper. *Id.* at 137-38. Respondents argue that AEON's license also supports a ▮ rate. *Id.* at 138. In their supplemental brief, Respondents argue that Hugel is in no position to injure Medytox or its licensees, and that CX-1171 and CX-1172 show only an aspirational launch date. RSB at 5.

Staff questions whether a bond is necessary because any injury is speculative since it is unknown when Respondents will receive FDA approval. SIB at 94. Staff agrees with Respondents that if a bond should be set, a ▮ bond is reasonable. *Id.* at 94-95. In its supplemental brief, Staff argues that "there is no evidence that Letybo will be shipped, much less sold, into the U.S. during the Presidential Review Period. Nor is there any evidence of an injury to Medytox or its licensees[.]" SSB at 5.

The Medytox-Evolus license sets a ▮ of net sales during the Initial License Period, which has ended, and ▮ of Net Sales for the Renewal License during the Renewal License Period. *See generally* JX-0078C. The license also contains other consideration, including Evolus issuing stock to Medytox and settlement of litigation. *Id.* The Medytox-AEON license sets a ▮ *See generally* JX-0144C. The license

also contains other consideration, including AEON issuing stock to Medytox and settlement of litigation. *Id.*

If the Commission finds a violation, I recommend that the bond be set at ████. Medytox and AEON have no product on the market. Any injury to Medytox during the bond period would be based on lost royalties owed to Medytox by Evolus based on sales of Letybo®. The FDA approval of Letybo® shows that any importation would be for a launch of Letybo®, which would directly compete with Evolus's Jeuveau®. CX-1171; CX-1172. Evolus is paying a ████ ████ under the license with Medytox. *See* JX-0078C.6, 11-12 (§§ 1.4-1.5, 5-6). I find that imposing a bond at this same rate would protect Medytox from any injury if a violation were found. I am unpersuaded by Medytox's arguments that a 100 percent royalty rate is appropriate. The Commission has previously relied on settlement agreements as evidence of a reasonable royalty for purposes of setting a bond. *See Certain Light-Emitting Diode Prods., Fixtures, & Components Thereof*, Inv. No. 337-TA-1213, Comm'n Op. at 25-26 (Public Version Jan. 14, 2022). There is no dispute that the settlement agreements include a royalty rate. Medytox argues that it "is impractical[]" to determine a reasonable royalty and that it could not discern the proper value of other consideration in the Evolus and Aeon licenses. RIB at 128. But that is irrelevant because the only injury Medytox can suffer is lost royalties. I note that experts also routinely determine the proper value of other consideration in other contexts, and there is no evidence that Mr. Herrington could not have determined an adjusted royalty rate which took that other consideration into account. *See* CX-0005C (Herrington WS) at Q/A 148. Absent any other evidence in the record, the Evolus license is the best evidence of a royalty rate which would protect Medytox from any harm. I therefore recommend that if a violation is found, that the bond be set at ████.

## IX.    INITIAL DETERMINATION ON VIOLATION

For the reasons set forth above, it is my initial determination that no violation of section 337 of the Tariff Act, as amended, has occurred in the importation into the United States of certain botulinum toxin products.

I hereby certify to the Commission this Initial Determination and the Recommended Determination.

The Secretary shall serve the confidential version of this Initial Determination upon counsel who are signatories to the Protective Order (Order No. 1) issued in this investigation. A public version will be served at a later date upon all parties of record.

Pursuant to 19 C.F.R. § 210.42(h), this Initial Determination shall become the determination of the Commission unless the Commission has ordered review of the determination in response to a petition filed under 19 C.F.R. § 210.43(a) or the Commission reviews the determination on its own initiative pursuant to 19 C.F.R. § 210.44.

## X.    ORDER

Within seven days of the date of this document, the parties shall jointly submit a single proposed public version of this document with any proposed redactions indicated in red. If the parties submit excessive redactions, they may be required to provide declarations from individuals with personal knowledge, justifying each proposed redaction and specifically explaining why the information sought to be redacted meets the definition for confidential business information set forth in 19 C.F.R. § 201.6(a). To the extent possible, the proposed redactions should be made electronically, in a single PDF file using the "Redact Tool" within Adobe Acrobat. The proposed redactions should be submitted as "marked" but not yet "applied." The proposed redactions should be submitted via email to Moore1313@usitc.gov and not filed on EDIS.

**SO ORDERED**.

Bryan F. Moore
Administrative Law Judge

Certain Botulinum Toxin Products and Processes for Manufacturing or Relating to Same;
Inv. No. 337-TA-1313 (Violation)

337-1313 Violation

### CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the parties listed have entered an appearance in the above captioned investigation, and a copy of the PUBLIC CERTIFICATE OF SERVICE was served upon the following parties via first class mail and air mail where necessary.

| Document | Security | Document Type | Official Rec'd | Title |
|---|---|---|---|---|
| 825357 | Public | ID/RD - Final on Violation | 07/08/2024 02:41 PM | Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond |

Service Date:     July 08, 2024

/s

Lisa R. Barton

U.S. International Trade Commission

500 E Street, S.W.

Suite 112

Washington, D.C. 20436

PUBLIC VERSION

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

In the Matter of

**CERTAIN BOTULINUM TOXIN
PRODUCTS AND PROCESSES FOR
MANUFACTURING OR RELATING TO
SAME**

Investigation No. 337-TA-1313

## COMMISSION OPINION

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND ................................................................................................. 2

       A.    Procedural History ................................................................................... 2

       B.    The Parties ............................................................................................... 5

III.   COMMISSION REVIEW OF THE FINAL ID ....................................................... 6

IV.    ANALYSIS ......................................................................................................... 7

       A.    The Commission Has Statutory Authority Over this Investigation ............ 7

       B.    Medytox Failed to Show that Hugel Converted Its Property ..................... 8

V.     CONCLUSION .................................................................................................. 17

## I.    INTRODUCTION

On June 10, 2024, the presiding administrative law judge ("ALJ") issued the final initial determination ("Final ID") and recommended determination on remedy and bonding in this investigation.  The Commission has determined to review in part the Final ID issued by the presiding administrative law judge ("ALJ").  On review, the Commission has determined that there has been no violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337.

In summary, the Commission modifies the Final ID's finding that the Commission has jurisdiction over this investigation by clarifying that the Commission has statutory authority. Additionally, the Commission affirms, with modifications, the Final ID's conclusion that Complainant, Medytox Inc. ("Medytox"), did not show by a preponderance of the evidence that Respondents, Hugel, Inc. and Hugel America, Inc. (together, "Hugel"), converted Medytox's property.  Further, the Commission takes no position on whether Medytox satisfied the domestic industry and injury requirements and whether Medytox satisfied the importation requirement. *See* Final ID at 47-69; *Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984).  The Commission also denies Medytox's request for oral argument.[1]

This opinion sets forth the Commission's reasoning in support of that determination.  The Commission affirms and adopts the ID's findings, conclusions, and supporting analysis that are not inconsistent with the Commission's opinion.

---

[1] Medytox's request failed to provide any reasoning why oral argument is necessary or appropriate.

PUBLIC VERSION

## II.    BACKGROUND

### A.    Procedural History

The Commission instituted this investigation on May 5, 2022, based on a complaint[2] filed

on behalf of Medytox of the Republic of Korea.  87 Fed. Reg. 26782, 26873 (May 5, 2022).  The

complaint alleged violations of subsection (a)(1)(A) of section 337 based on the importation into

the United States or in the sale of certain botulinum toxin products and processes for

manufacturing or relating to the same by reason of theft and conversion and misappropriation of

trade secrets, the threat or effect of which is to destroy or substantially injure an industry in the

United States.  *Id.*  The notice of investigation named as respondents Hugel, Inc. of the Republic

of Korea; Hugel America, Inc. of Irvine, California; and Croma Pharma GmbH of Leobendorf,

Austria ("Croma," and together with Hugel, "Respondents").  *Id.*  The Office of Unfair Import

Investigations ("OUII") participated in this investigation.  *Id.*

On February 6, 2024, the investigation terminated as to Medytox's misappropriation of

trade secrets allegations.  Order No. 39 (Jan. 22, 2024), *unreviewed*, Comm'n Notice (Feb. 6,

2024).

The evidentiary hearing was held on February 25-29, 2024.[3]

---

[2] Verified Complaint of Medytox Under Section 337 of the Tariff Act of 1930, as
Amended (Mar. 30, 2022) ("Complaint" or "Compl.").

[3] The hearing transcripts are cited herein as "Hrg. Tr."

On March 15, 2024, Medytox and Respondents filed their initial post-hearing briefs.[4]  On

March 22, 2024, OUII filed its initial post-hearing brief.[5]  On March 29, 2024, Medytox and

Respondents filed their post-hearing reply briefs.[6]  On April 5, 2024, OUII filed its post-hearing

reply brief.[7]

On June 10, 2024, the ALJ issued the Final ID, which found that Medytox did not show

that Respondents violated section 337.  More particularly, the Final ID found, *inter alia*:

1.    The Commission has personal, *in rem*, and subject matter jurisdiction.

2.    The importation requirement of section 337 has been satisfied.

3.    Medytox has failed to demonstrate that Respondents committed theft or conversion.

4.    Medytox has demonstrated that a domestic industry exists with respect to it and its licensees', Evolus and AEON's, botulinum toxin products.

5.    Medytox has demonstrated a threat of substantial injury to Evolus's domestic industry.

6.    Medytox has failed to demonstrate a threat of substantial injury to Medytox's or AEON's domestic industry.

7.    No violation of 19 U.S.C. § 1337 has been shown by the importation and sale of botulinum toxin products.

---

[4] Complainant's Post-Hearing Brief (Mar. 15, 2024) ("CPHBr."); Respondents' Initial Post-Hearing Brief (Mar. 15, 2024) ("RPHBr.").

[5] Commission Investigative Staff's Initial Post-Hearing Brief (Mar. 22, 2024) ("OPHBr.").

[6] Complainant's Responsive Post-Hearing Brief (Mar. 29, 2024) ("CPHBr. (Reply)"); Respondents' Responsive Post-Hearing Brief (Mar. 29, 2024).

[7] Commission Investigative Staff's Responsive Post-Hearing Brief (Apr. 5, 2024) ("OPHBr. (Reply)").

Final ID at 9-10, 68-69.  The Final ID also included the ALJ's RD, should a violation be found.

On June 24, 2024, Medytox filed a petition for Commission review of the Final ID that included a request for oral argument, and Respondents filed a contingent petition for Commission review of the Final ID.[8]  On July 2, 2024, Medytox and Respondents each filed responses to the respective petitions.[9]  On July 8, 2024, OUII filed a combined response to both petitions.[10]  Issues not raised in the petitions for review are deemed to have been abandoned.  *See* 19 C.F.R. § 210.43.

On July 10, 2024, the private parties filed their public interest statements pursuant to 19 C.F.R. § 210.50(a)(4).[11]  OUII did not file a submission.  The Commission did not receive comments on the public interest from non-parties in response to its notice seeking such comments.

The Commission has determined to review:  (1) the Final ID's findings and conclusions regarding jurisdiction; (2) the Final ID's findings and conclusions regarding conversion; and

---

[8] Complainant's Petition for Review of the Initial Determination and Request for Oral Argument (June 24, 2024) ("CPet."); Summary of Complainants' Petition for Review of the Initial Determination and Request for Oral Argument (June 24, 2024); Respondents' Contingent Petition for Review of the Initial Determination (June 24, 2024) ("RPet.").

[9] Complainant's Response to Respondents' Contingent Petition for Review of the Initial Determination (July 2, 2024) ("CResp."); Respondents' Response to Complainant's Petition for Review of the Initial Determination and Request for Oral Argument (July 2, 2024) ("RResp."); Summary of Respondents' Response to Complainant's Petition for Review of the Initial Determination and Request for Oral Argument (July 2, 2024).

[10] Office of Unfair Import Investigation's Response to the Private Parties' Petitions for Review of the Initial Determination (July 2, 2024) ("OResp.").

[11] Complainant's Statement regarding the Public Interest (July 10, 2024); Respondents' Submission Pursuant to 19 C.F.R. § 210.50(a)(4)(i) (July 10, 2024).  OUII did not file a submission.

4

(3) the Final ID's findings and conclusions regarding importation, domestic industry, and injury. As stated above, the Commission takes no position on the Final ID's findings regarding importation, domestic industry, and injury.

### B.    The Parties

#### 1.    Complainant Medytox Inc.

Medytox is a biopharmaceutical company based in the Republic of Korea founded in 2000 by Dr. Hyun Ho Jung.  CX-0001C (Jung WS) at Q/A 2, 9-11; Final ID at 3.  Medytox launched its first product, Meditoxin® in 2006.  CX-0001C (Jung WS) at Q/A 10; Final ID at 3. Medytox is currently seeking approval from the U.S. Food and Drug Administration ("FDA") for a product that Medytox refers to internally as MT10109L, which is a liquid botulinum toxin product.  CX-0001C (Jung WS) at Q/A 18; Final ID at 3.

Medytox's U.S. subsidiary is Luvantus, Inc. ("Luvantus").  CX-1162C (Albright WS) at Q/A 4; Final ID at 3.  Luvantus's purpose is to market and commercialize MT10109L in North America.  CX-1162C (Albright WS) at Q/A 23-24; Final ID at 3.

#### 2.    Respondents Hugel, Inc.; Hugel America, Inc.; and Croma Pharma GmbH

Hugel, Inc. is a biopharmaceutical company based in the Republic of Korea that was founded in November 2001 by Dr. Kyeong Yeop Moon, who served as its CEO until July 2017. RX-0009C (C. Lee WS) at Q/A 3-4, 16-17; Final ID at 3.  Hugel, Inc. manufactures a botulinum toxin product, Letybo®.  RX-0010C (Kwon WS) at Q/A 14; RX-0008C (Hartman WS) at Q/A 21-23; Final ID at 3.

Hugel America, Inc. is a Delaware corporation with a principal place of business in Irvine, California.  Respondents Hugel, Inc.'s and Hugel America, Inc.'s Response to Complaint under Section 337 of the Tariff Act of 1930, Statement of Public Interest and Notice of

Institution of Investigation, at ¶ 16 (June 7, 2022) ("Hugel Resp. to Compl."), at ¶ 16; Final ID at 3. Hugel America, Inc. was created as a joint venture between Hugel Inc. and Croma to bring products to the United States and other countries. Hugel Resp. to Compl. at ¶ 16; CX-0010C at 14; Final ID at 3-4. Croma no longer has any ownership interest in Hugel America, Inc. CX-1139C (Hartman Dep. Tr.) at 280:6-281:22; Final ID at 4. Hugel America, Inc. seeks to launch Letybo® in the "back half of 2024." CX-1171 at 1; Final ID at 4.

Croma is a limited liability company organized under the laws of the Republic of Austria, with a principal place of business in Austria. Response of Respondent Croma Pharma GmbH's to the Complaint under Section 337 of the Tariff Act of 1930 and Commission's Notice of Investigation, at ¶ 21 (June 7, 2022); Final ID at 4.

## III.  COMMISSION REVIEW OF THE FINAL ID

When the Commission reviews an initial determination, in whole or in part, it reviews the determination *de novo*. *Certain Soft-Edged Trampolines & Components Thereof*, Inv. No. 337-TA-908, Comm'n Op. at 4 (May 1, 2015). Upon review, the "Commission has 'all the powers which it would have in making the initial determination,' except where the issues are limited on notice or by rule." *Certain Flash Memory Circuits & Prods. Containing Same*, Inv. No. 337-TA-382, USITC Pub. No. 3046, Comm'n Op. at 9-10 (July 1997) (quoting *Certain Acid-Washed Denim Garments & Accessories*, Inv. No. 337-TA-324, Comm'n Op. at 5 (Nov. 1992)). With respect to the issues under review, "the Commission may affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part, the initial determination of the administrative law judge." 19 C.F.R. § 210.45(c). The Commission also "may take no position on specific issues or portions of the initial determination," and "may make any finding or conclusions that in its judgment are proper based on the record in the proceeding." *Id.*; *see also Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984).

6

PUBLIC VERSION

## IV.    ANALYSIS

The Commission modifies and supplements the Final ID's findings to conclude that no violation of section 337 has occurred. Specifically, the Commission modifies the following findings in the Final ID: (1) the Commission modifies the findings in the Final ID on jurisdiction to find the Commission has statutory authority over this investigation; (2) the Commission affirms the Final ID's finding that CBAM0301 ████████████████████ ████████████████████████████████, was created using ████████ but the Commission does not adopt the characterization of the resolution of that issue as being "critical"; and (3) the Commission supplements the Final ID's findings to determine that even if Hugel's evidence and statements indicating that it discovered its strain in a can of beans are not credible, as Medytox argues,[12] Medytox *still* failed to meet its burden of proof.

### A.    The Commission Has Statutory Authority Over this Investigation

The Commission has determined to review the Final ID's jurisdiction findings (ID at 9-10) and, on review, clarifies the Commission's investigative authority is statutory. Specifically, in the Commission Opinions recently issued in Inv. Nos. 337-TA-1355 and 337-TA-1362, the Commission clarified that the terms "subject matter jurisdiction," "personal jurisdiction," and "*in rem* jurisdiction" are not necessarily applicable to the Commission's investigative authority under section 337. *See Certain Compact Wallets & Components Thereof*, Inv. No. 337-TA-1355, Comm'n Op. (July 29, 2024); *Certain Liquid Transfer Devices with an Integral Vial Adapter*, Inv. No. 337-TA-1362, Comm'n Op. (July 23, 2024). The Commission is "a creature

---

[12] In addition to arguing that Medytox did not meet its burden in showing that Hugel converted its property, Hugel alleged that it obtained its strain from spoiled food. *E.g.*, Final ID at 34. Medytox disputes that Hugel obtained its strain from food and also asserts that the Commission should infer that Hugel instead got its strain from Medytox in view of the alleged falsity of this statement. *E.g.*, *id.*

of statute." *Kyocera v. Int'l Trade Comm'n*, 545 F.3d 1340, 1355 (Fed. Cir.

2008). Accordingly, pursuant to its enabling statute, the Commission has statutory authority to

investigate an alleged violation of section 337 where a complaint alleges that the named

respondents have engaged in unfair methods of competition and unfair acts in the importation of

articles into the United States or in the sale of such articles, "the threat or effect of which is:"

> (i) to destroy or substantially injure an industry in the United States;

> (ii) to prevent the establishment of such an industry; or

> (iii) to restrain or monopolize trade and commerce in the United States.

19 U.S.C. § 1337(a)(1)(A).

### B.    Medytox Failed to Show that Hugel Converted Its Property

Under Commission Rules and the Administrative Procedure Act, Medytox bears the

burden of proof with respect to its conversion claim to show that a violation of section 337

occurred. 19 C.F.R § 210.37(a); 5 U.S.C. § 556(d). "Preponderance of the evidence," *i.e.*,

"more likely than not," "has long been recognized as the traditional burden of proof in civil

administrative proceedings." *Rodriguez v. Dep't of Veterans Affs.*, 8 F.4th 1290, 1299 (Fed. Cir.

2021); *see also Burgess v. Small*, 117 A.2d 344, 346 (Me. 1955) (applying the preponderance of

the evidence standard for conversion claims); Restatement (Second) of Torts § 433B & cmt. a

("As on other issues in civil cases, the plaintiff is required to produce evidence that the conduct

of the defendant has been a substantial factor in bringing about the harm he has suffered, and to

sustain his burden of proof by a preponderance of the evidence.").

"[W]here the question is whether particular conduct constitutes 'unfair methods of

competition' and 'unfair acts' in importation, in violation of section 337[(a)(1)(A)], the issue is

one of federal law and should be decided under a uniform federal standard, rather than by

reference to a particular state's tort law." *See TianRui Grp. Co. v. Int'l Trade Comm'n*, 661 F.3d

8

1322, 1327 (Fed. Cir. 2011).  One source of law that the Commission has relied upon for

determining the single federal standard for claims ordinarily arising out of state law are the

Restatements of Law.  *See Certain Processes for the Mfr. of Skinless Sausage Casings &*

*Resulting Prods.,* Inv. Nos. 337-TA-148, 337-TA-169, ID, 1984 WL 273789, at *94 (July 31,

1984) (relying on the Restatement of Torts for trade secret misappropriation claims).

The Restatement (Second) of Torts explains that "[c]onversion is an intentional exercise

of dominion or control over a chattel which so seriously interferes with the right of another to

control it that the actor may justly be required to pay the other the full value of the chattel."

Restatement (Second) of Torts § 222A.

All parties agree that there are two elements for conversion:  1) a possessory right (*e.g.*,

ownership) in property; and 2) the exercise of wrongful dominion over that property to the

exclusion of those rights.  *E.g.*, Final ID at 12-13; CPHBr. at 20-22; RPHBr. at 9; OPHBr. at 18-

19.

### 1.    The Final ID

At the outset, the Final ID first assessed the "burden of proof in this Investigation,

because it is critical in assessing the evidence and arguments presented by the parties."  Final ID

at 15.  The Final ID recognized, as noted above, that Medytox framed its case around the

"fundamental question" of whether it "[i]s it more likely that Hugel found its strain in a can of

beans in Korea or stole a mixed lineage culture from Medytox?"  CPHBr. at 1; Final ID at 15.

The Final ID rejected Medytox's argument, reasoning that "Medytox's framing does not take

into the account the relevant burden of proof for its claim and seeks to improperly shift the

9

burden to Hugel." Final ID at 16; *see also id.* at 17 (citing cases).[13] The Final ID explained: "[u]nder Commission Rules and the Administrative Procedures Act, Medytox bears the burden of proof with respect to its claim to show that a violation of section 337 occurred." *Id.* (citing 19 C.F.R § 210.37(a); 5 U.S.C. § 556(d)). Accordingly, the Final ID concluded that "[t]he fundamental question under this standard is not whether Medytox's story or Hugel's story is more likely, it is whether Medytox has shown its story is more likely than not," and that to prove conversion, Medytox must establish both that "1) it is more likely than not that Medytox owned a strain of *C. botulinum*" and that "2) it is more likely than not that Hugel converted that strain from Medytox." *Id.* at 16-17.

The Final ID noted that there is no dispute that Hugel did not convert Medytox's current strain or a strain that is genetically identical to that strain. Final ID at 17 n.9. Instead, Medytox has alleged that Hugel stole a mixed lineage culture that contained the ancestor of the Hugel strain. *Id.* The parties contest whether Medytox ever owned any such mixed lineage culture.

Applying the two-prong test for conversion, the Final ID determined that Medytox failed to show that it possessed a mixed lineage culture at the time of the alleged conversion. Final ID at 17-29. The Final ID noted that Medytox lacks any direct evidence showing the genetic characteristics of the strains it owned at the time of the alleged theft in 2001, and found that the expert testimony it offered as to what Medytox might have owned at the time was speculative

---

[13] *TechnoMarine SA v. Jacob Time, Inc.*, 905 F. Supp. 2d 482, 497 (S.D.N.Y. 2012) (applying New York law and explaining that the burden in a conversion case is not shifted to the defendant to prove its goods were lawfully obtained); *Adams v. Wells Fargo Bank, N.A.*, No. 5:17CV73-CWS-CMC, 2018 WL 3301676, at *9 (E.D. Tex. Feb. 5, 2018) (declaring, in the context of a conversion of property finding that "by focusing on the validity of the [underlying] lien, Plaintiff's response attempt[ed] to [improperly] shift the burden of proof as to elements of his conversion claim to Defendant.").

██████████████████████████

and not credible.  *Id.* at 25, 27.  The Final ID also found that Medytox's expert testimony as to

what it might have possessed was contradicted by the deposition testimony of Medytox founder

Dr. Jung.  *Id.* at 28.  Dr. Jung testified that the first cell bank he created was made using ████

███████████ . *Id.* ████████████████████████████

████████████████████████████████████████████████

████  *Id.* at 19.  The Final ID found that this occurred in or around 2000, prior to the alleged

theft, and it showed that "Medytox's cell bank at the time of the alleged misappropriation had its

genetic diversity eliminated and was not a mixed lineage culture."  *Id.* at 28.

As to the second prong of the conversion test, the Final ID also found that even if

Medytox could establish that it owned a theoretical mixed lineage culture at the time of the

alleged conversion, it failed to prove that Hugel exercised wrongful dominion over that culture.

Final ID at 29-46.  The Final ID noted that Medytox's theory of conversion revolves around a

visit made by Dr. Yeon Soo Seo[14] to Dr. Jung's laboratory at Sun Moon University.  *Id.* at 32.

The Final ID considered the competing evidence regarding Dr. Seo's visit with Dr. Jung (when

allegedly the strain was stolen), found that Medytox's evidence was not credible, and concluded

that the evidence does not show that Dr. Seo removed anything from Dr. Jung's lab.  *Id.* at 37-

46.  The Final ID found that there is no evidence showing that any vials from Dr. Jung's lab went

missing even though Medytox kept logs of vials that were used and the number remaining.  *Id.* at

38.  The Final ID also found that the evidence actually showed that Dr. Seo visited Sun Moon

University after Hugel's founder Dr. Moon had already obtained a strain of *C. botulinum*.  *Id.* at

39.  The Final ID also rejected Medytox's argument that the phylogenetic relationship between

---

[14] At the time of this visit, Dr. Moon worked in Dr. Seo's laboratory.  JX-0150 (Seo
Dep.) at 25:10-17.

the Medytox strain and the Hugel strain supported Medytox's conversion claim because the Final ID found that there were other potential sources for Hugel to have obtained its bacteria. *Id*. at 40-42.

The Final ID added that it is "unpersuaded by Medytox's argument that by asserting its strain came from a can of beans, Hugel has disclaimed any other potential source for its strain," pointing out that "Medytox cites no legal authority for the proposition that Hugel's assertions would bar me from considering all evidence, including other potential sources, in assessing whether Medytox has met its burden of proof." *Id.* at 16 n.8. The Final ID found that "even if I found that Hugel's stain was definitively not found in a can of beans, it would not serve to overcome any of the many weaknesses in Medytox's *prima facie* case." *Id*. at 45-46. The Final ID therefore determined "that it is irrelevant whether Hugel has proven that its strain was found in a can of beans." *Id*. at 45.

### 2.    Medytox's Petition

Medytox argues that the Final ID legally erred by "finding that Medytox sought to improperly shift the burden to Hugel." CPet. at 26. Medytox alleges that on the "factual record," "the burden of proof boils down to a question of whether Hugel stole its strain from Medytox or found its strain in a can of beans" because Hugel "inject[ed] the 'can of beans' story into this investigation." *Id.* Medytox also asserts that the Final ID's refusal to consider the alleged falsity of Hugel's defense was erroneous because the alleged falsity "was part of Medytox's *prima facie* case." *Id.* at 28.

Medytox additionally argues that the alleged falsity of Hugel's defense is relevant for two reasons. First, Medytox argues that "the fact that Hugel claimed it found its strain in a can of beans shows that it did not get its strain from any of the academic institutions or entities other than Medytox that it identified as potential sources of its ███████ strain," and that "[b]y

12

eliminating these other sources and then proving that Hugel's strain did not come from beans,

Medytox met its burden of proving Hugel stole from Medytox." CPet. at 28; *see also id.* at 32-

33. Medytox asserts that "Hugel should be legally *precluded* from arguing any other source for

its strain, and this investigation should be limited to a choice between the parties' two competing

theories of the case—beans versus theft from Medytox." *Id.* at 29. Medytox further argues that

testimony from Dr. Changjin Lee, Hugel's Chief Technology Officer and Head of Research and

Development, that he did not receive his strains from non-Medytox sources operated "as a

judicial admission that removed from the dispute the question of whether Hugel could have

acquired its strain from any of these sources." *Id.* at 30; *see also id.* at 31-32. Medytox

alternatively alleges that this testimony was an evidentiary admission. *Id.* at 33. Here, Medytox

argues that Dr. Lee's testimony shows that alternative sources for Hugel's strain are not

supported by the evidence based on, *inter alia*, when those sources allegedly first obtained *C.*

*botulinum* strains and an alleged unlikelihood for institutions to have given strains to Dr. Moon.

*Id.* at 33-35. Medytox thus argues that the Final ID erred by relying on the possibility that

Medytox may have acquired its strains from non-food, non-Medytox sources. *Id.* at 32-33.

Medytox further argues that it presented substantial evidence showing that it is impossible to

discover the ███████ in a can of beans, *id.* at 35, 66-81, and by doing so, Medytox proved

by process of elimination that Hugel had stolen its strain. *Id.* at 35.

### 3.    The Commission's Determination

The Commission affirms the Final ID's assignment and application of the burden of

proof. *See* Final ID at 15-17. Further, the Commission affirms the Final ID's findings that

Medytox failed to satisfy either prong of the two-prong conversion test. Specifically, as to the

first prong of the test, the Commission affirms the Final ID's finding that Medytox failed to

show that it possessed a mixed lineage culture at the time of the alleged conversion. *Id*. at 17-29.

PUBLIC VERSION

And as to the second prong of test, the Commission affirms the Final ID's finding that even if Medytox could establish that it owned a theoretical mixed lineage culture at the time of the alleged conversion, it failed to prove by a preponderance of the evidence that Hugel exercised wrongful dominion over that culture. *Id*. at 29-46.

As to the arguments raised in Medytox's petition for review that the Commission needs to address the merits of Hugel's evidence that it allegedly obtained its bacteria from a can of beans, the Commission disagrees.[15] The Commission (like the ALJ) rejects Medytox's binary framing of the issue—that Hugel must have obtained its strain from Medytox because it was not proven to have been obtained from a can of beans. As the Final ID correctly observed, Medytox's framing does not take into the account the relevant burden of proof for its claim and seeks to improperly shift the burden to Hugel. Final ID at 16. Under Commission Rules and the Administrative Procedure Act, Medytox bears the burden of proof with respect to its conversion claim to show that a violation of section 337 occurred. Thus, the relevant question is whether Medytox has proven by a preponderance of the evidence that Hugel converted Medytox's property.

Accordingly, even if the evidence did not affirmatively establish that Hugel obtained its strain from a can of beans, that would not satisfy Medytox's burden of proof or change the outcome in this investigation. This is because whether Hugel obtained its strain from a can of

---

[15] Hugel presented evidence that its founder Dr. Kyeong Yeop Moon had undertaken an effort to collect numerous spoiled food samples (including cans of beans) around the summer of 2001 and tested those samples for the presence of C. botulinum. RPHBr. at 20-21. We note that Hugel's explanation that it obtained its strain from a can of beans is consistent with representations made to Korean regulatory authorities as early as June 2006. RX-0444C; RX-0009C (CJ Lee WS) at Q/As 42, 47, 48. But as explained herein, the Commission need not affirmatively find that Hugel's strain was obtained from a can of beans to find that Medytox did not meet its burden.

14

beans has no relevance to Medytox's own failure to show possession of a mixed lineage culture

at the time of the alleged conversion. Medytox's failure to prove the first prong, *i.e.*, that it

possessed a mixed lineage culture in 2001 is fatal to it case and Hugel's statements and evidence

that it obtained its strain from a can of beans has no bearing on that shortcoming.[16]  Similarly,

the veracity of Hugel's can of beans explanation has no bearing on the affirmed findings as to the

second prong of the conversion test such as the lack of credibility as to Medytox's evidence

regarding Dr. Seo's visit with Dr. Jung and the lack of evidence showing that any vials were

missing from Dr. Jung's lab. *Id*. at 37-46.

Furthermore, as to Medytox's assertion that the Final ID erred by even considering

evidence of other possible sources for the Hugel, as properly noted by the Final ID, Medytox

cites no legal authority for the proposition that Hugel's can of beans assertions would bar the

Commission from considering all evidence of record as to other potential sources of Hugel's

strains. Final ID at 16 n.8.  Medytox's position also ignores that OUII is an independent party to

the investigation and disregards OUII's argument that the bacteria could have been obtained

from other sources based on the record evidence. OPHBr. at 45 (citing RX-0029C (Yang Dep.)

at 46:1-22, 68:21-24, 69:6-70:14); RX-0018C (J. Lee Dep.) at 96:12-97:4, 103:23-107:4; RX-

---

[16] The Commission also affirms the Final ID's finding that Medytox waived its argument that Hugel's allegedly false assertions regarding sourcing its strain from a can of beans should be held against Hugel as proof of conversion. ID at 34 n.16 (citing CPHBr. at 63-68).  Under the ALJ's Ground Rule 11.2, this argument was required to have been raised in Medytox's *prehearing brief*.  Order No. 35, Ground Rule 11.2 (Dec. 11, 2023); *see also* RPHBr. (Reply) at 29.  In contesting the Final ID's waiver finding, Medytox largely points to material other than its prehearing brief, which are irrelevant under the Ground Rule.  *See* CPet. at 41-44.  Likewise, Medytox's "judicial admission" argument is waived because this was never presented to the ALJ.  *See, e.g.*, *Broadcom Corp. v. Int'l Trade Comm'n*, 28 F.4th 240, 250 (Fed. Cir. 2022); *Ajinomoto Co. v. Int'l Trade Comm'n*, 597 F.3d 1267, 1277 (Fed. Cir. 201); Order No. 35, Ground Rules 11.2 and 14.2.

██████████████████████

1151 (Shin article). Medytox similarly failed to present any legal authority that would prevent Hugel from offering both an alternative explanation of how it obtained its strain (*i.e.*, from a can of beans) and arguing that Medytox failed to meet its burden of proof regardless of that alternative explanation. *See* CPet. at 29 (citing no legal authority supporting its proposition that Hugel should be "legally precluded from arguing any other source for its strain[.]").

The Commission notes that the evidence shows that predecessor strains ████████ were freely circulated by the relevant time, *i.e.*, prior to the alleged conversion in 2001, and thus alternative sources for Hugel's strain remained a possibility (whether it was from a can of food tested by Dr. Moon, or obtained from another laboratory). *E.g.*, Hrg. Tr. (Pickett) at 374:25-376:10; Final ID at 42; OPHBr. at 45-46; RX-0029C (Yang Dep.) at 46:1-22, 68:21-24, 69:6-70:14); RX-0018C (J. Lee Dep.) at 96:12-97:4, 103:23-107:4 (Hall A-Hyper botulinum toxin strains were discovered in Korea in the early 2000s by a researcher named Dr. Nari Shin). Indeed, Medytox's expert, Dr. Keim, testified that, based on the genetic evidence, he was unable to exclude the possibility that Hugel's strain was derived from another source of ████████ other than Medytox, including from one of the sources at the University of Wisconsin or in Korea, such as from Dr. Yang himself. Hrg. Tr. (Keim) at 195:17-196:1.

Finally, the Commission modifies the Final ID on page 19. On page 19, the Final ID states, "[h]ow Medytox's CBAM0301 cell bank was derived from earlier samples is one *critical* issue." Final ID at 19. The Commission affirms the Final ID's finding that CBAM0301, ████████████████████████████████████████████, was created using ████████. Final ID at 19. The Commission, however, modifies this sentence by striking "critical." The Commission affirms all other findings in the Final ID related to this issue.

16

**PUBLIC VERSION**

V.     **CONCLUSION**

The Commission has considered all of the other arguments presented by Medytox and does not find them persuasive.  Therefore, for the reasons set forth herein, the Commission determines that Medytox has not established a violation of section 337 based on conversion. Accordingly, the investigation is terminated with a finding of no violation of section 337.

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued: November 1, 2024

Certain Botulinum Toxin Products and Processes for Manufacturing or Relating to Same;
Inv. No. 337-TA-1313 (Violation)

337-1313 Violation

CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the parties listed have entered an appearance in the above captioned investigation, and a copy of the PUBLIC CERTIFICATE OF SERVICE was served upon the following parties via first class mail and air mail where necessary.

| Document | Security | Document Type | Official Rec'd | Title |
|---|---|---|---|---|
| 836273 | Public | Opinion, Commission | 11/01/2024 04:09 PM | Commission Opinion |

Service Date:        November 01, 2024

/s

Lisa R. Barton

U.S. International Trade Commission

500 E Street, S.W.

Suite 112

Washington, D.C. 20436